**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

AMERICAN CIVIL LIBERTIES UNION; AMERICAN
CIVIL LIBERTIES UNION FOUNDATION;
AMERICAN CIVIL LIBERTIES UNION OF
MICHIGAN; COUNCIL ON AMERICAN-ISLAMIC
RELATIONS; COUNCIL ON AMERICAN-ISLAMIC
RELATIONS MICHIGAN; GREENPEACE, INC.;
NATIONAL ASSOCIATION OF CRIMINAL
DEFENSE LAWYERS; JAMES BAMFORD; LARRY
DIAMOND; CHRISTOPHER HITCHENS; TARA
MCKELVEY; and BARNETT R. RUBIN,

        Plaintiffs,

        v.

NATIONAL SECURITY AGENCY / CENTRAL
SECURITY SERVICE; and LIEUTENANT
GENERAL KEITH B. ALEXANDER, in his official
capacity as Director of the National Security Agency
and Chief of the Central Security Service,

        Defendants.

Case No. 2:06-cv-10204

Hon. Anna Diggs Taylor

---

**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, plaintiffs in the

above-captioned action respectfully move the Court to enter partial summary judgment.

This lawsuit challenges the constitutionality of a secret government program, authorized

by President Bush in 2002, in which the National Security Agency (NSA) intercepts the

international telephone and Internet communications of Americans without court

approval (hereinafter "the Program").  Administration officials have conceded publicly

that the Program authorizes the NSA to conduct electronic surveillance that is subject to

the Foreign Intelligence Surveillance Act (FISA), 50 U.S.C. § 1801, *et. seq.* and Title III

of the Omnibus Crime Control and Safe Streets Act (hereinafter "Title III"), 18 U.S.C. §

2510 *et. seq.,* and that they have not complied with the procedural requirements of those

statutes.   Because there is no genuine issue of material fact as to this aspect of the

Program, plaintiffs are entitled to judgment as a matter of law on their claim that this

aspect of the Program violates the Administrative Procedures Act, separation of powers,

and the First and Fourth Amendments to the United States Constitution.  Thus, for the

reasons stated in the enclosed Memorandum in Support of Plaintiffs' Motion for Partial

Summary Judgment, and supported by the enclosed Statement of Undisputed Facts in

Support of Plaintiffs' Motion for Partial Summary Judgment, and Exhibits in Support of

Plaintiffs' Motion for Partial Summary Judgment, plaintiffs are entitled to judgment as a

matter of law.

 Plaintiffs have consulted with defendants about this motion.  Plaintiffs have

informed defendants of their intent to file this motion, and defendants have indicated their

intent to oppose it.

 Plaintiffs respectfully request oral argument on this motion.

    Respectfully submitted,

    s/Ann Beeson_____
    ANN BEESON
     *Attorney of Record*
    JAMEEL JAFFER
    MELISSA GOODMAN (*admission pending*)
    SCOTT MICHELMAN (*admission pending*)
    CATHERINE CRUMP (*admission pending*)
    National Legal Department
    American Civil Liberties Union Foundation
    125 Broad Street, 18th Floor
    New York, NY 10004-2400
    (212) 549-2500
    annb@aclu.org

s/Michael J. Steinberg_____
MICHAEL J. STEINBERG
KARY L. MOSS
American Civil Liberties Union Fund of Michigan
60 West Hancock Street
Detroit, MI 48201-1343
(313) 578-6814
msteinberg@aclumich.org

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

AMERICAN CIVIL LIBERTIES UNION; AMERICAN
CIVIL LIBERTIES UNION FOUNDATION;
AMERICAN CIVIL LIBERTIES UNION OF
MICHIGAN; COUNCIL ON AMERICAN-ISLAMIC
RELATIONS; COUNCIL ON AMERICAN-ISLAMIC
RELATIONS MICHIGAN; GREENPEACE, INC.;
NATIONAL ASSOCIATION OF CRIMINAL
DEFENSE LAWYERS; JAMES BAMFORD; LARRY
DIAMOND; CHRISTOPHER HITCHENS; TARA
MCKELVEY; and BARNETT R. RUBIN,

       Plaintiffs,

       v.

NATIONAL SECURITY AGENCY / CENTRAL
SECURITY SERVICE; and LIEUTENANT
GENERAL KEITH B. ALEXANDER, in his official
capacity as Director of the National Security Agency
and Chief of the Central Security Service,

       Defendants.

Case No. 2:06cv10204

Hon. Anna Diggs Taylor

**MEMORANDUM IN SUPPORT OF
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

ANN BEESON
   *Attorney of Record*
JAMEEL JAFFER
MELISSA GOODMAN (*admission pending*)
SCOTT MICHELMAN (*admission pending*)
CATHERINE CRUMP (*admission pending*)
National Legal Department
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004-2400
(212) 549-2500
annb@aclu.org

MICHAEL J. STEINBERG
KARY L. MOSS
American Civil Liberties Union Fund of Michigan
60 West Hancock Street
Detroit, MI 48201-1343
(313) 578-6814
msteinberg@aclumich.org

Attorneys for Plaintiffs

March 9, 2006

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................................... i

INTRODUCTION ...................................................................................................... 1

LEGAL AND FACTUAL BACKGROUND ................................................................. 1

    A.    Statutory Provisions ................................................................... 1

    B.    The Program ............................................................................... 2

    C.    The Harm to Plaintiffs ............................................................... 4

ARGUMENT ............................................................................................................. 8

    I.    THE PROGRAM VIOLATES THE ADMINISTRATIVE PROCEDURES
        ACT BECAUSE IT AUTHORIZES SURVEILLANCE THAT IS
        PROHIBITED BY STATUTE ............................................................... 9

        A.    FISA and Title III were enacted in response to a history of unchecked
            and abusive surveillance by the Executive ..................................... 9

        B.    FISA and Title III provide the exclusive means by which the
            Executive can engage in electronic surveillance within the United
            States. ....................................................................................... 11

        C.    The Program fails to comply with the requirements of FISA and
            Title III ..................................................................................... 16

    II.    THE PROGRAM VIOLATES THE PRINCIPLE OF SEPARATION
        OF POWERS BECAUSE IT INVOLVES SURVEILLANCE THAT
        CONGRESS HAS SPECIFICALLY PROHIBITED ........................................... 17

        A.    The President's power is at its lowest ebb because Congress has
            expressly prohibited his actions.. ................................................. 17

        B.    The President's power as Commander-in-Chief does not authorize
            him to disregard acts of Congress ................................................ 23

    III.    THE PROGRAM VIOLATES THE FOURTH AMENDMENT BECAUSE
        IT AUTHORIZES THE INTERCEPTION OF PRIVATE
        COMMUNICATIONS WITHOUT A WARRANT AND IS

MANIFESTLY UNREASONABLE ................................................................... 25

    A.    The Program violates the Fourth Amendment because it
           authorizes the interception of phone calls and emails without a
           warrant ..................................................................................................... 25

    B.    The warrant requirement applies with full force to foreign
           intelligence surveillance within the United States. ...................................... 28

    C.    The Program violates the Fourth Amendment because it does not
           require executive officials to satisfy the probable cause standard
           before surveillance begins............................................................................ 33

    D.    The Program violates the Fourth Amendment because neither the
           President nor the Attorney General authorizes each electronic
           surveillance ................................................................................................. 34

IV.    THE PROGRAM VIOLATES THE FIRST AMENDMENT BY
       PERMITTING THE NSA TO INTERCEPT PROTECTED
       COMMUNICATIONS WITHOUT COMPLYING WITH
       CONSTITUTIONALLY MANDATED SAFEGUARDS .................................. 36

    A.    The Program authorizes the interception of private communications
           that are protected by the First Amendment.................................................. 36

    B.    The Program violates the First Amendment because it authorizes
           the NSA to intercept private conversations without first
           demonstrating a compelling interest and narrowly tailoring its
           interceptions to that interest ........................................................................ 39

    C.    The Program violates the First Amendment because it authorizes the
           NSA to intercept private conversations without judicial oversight ............. 40

CONCLUSION.................................................................................................................... 42

## TABLE OF AUTHORITIES

<u>Cases</u>

*A Quantity of Copies of Books v. Kansas*, 378 U.S. 205 (1964)........................................ 41

*Afroyim v. Rusk,* 387 U.S. 253 (1967) ............................................................................. 18

*Alliance To End Repression v. City of Chicago*, 627 F. Supp. 1044 (N.D. Ill. 1985) ...... 40

*Almeida-Sanchez v. United States*, 413 U.S. 266 (1973)................................................. 33

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...................................................... 9

*Bates v. City of Little Rock*, 361 U.S. 516 (1960) ............................................................ 39

*Berger v. New York*, 388 U.S. 41 (1967) .................................................................... 26, 28

*Blake v. Wright*, 179 F.3d 1003 (6th Cir. 1999). ............................................................. 25

*Brown v. Socialist Workers '74 Campaign Comm.*, 459 U.S. 87 (1982)........................... 39

*Camara v. Municipal Court*, 387 U.S. 523 (1967) ..................................................... 27, 34

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ................................................................. 8

*Chimel v. California*, 395 U.S. 752 (1969)....................................................................... 26

*City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750 (1988) ................................ 41

*Clark v. Library of Congress,* 750 F.2d 89 (D.C. Cir. 1984)........................................... 40

*Clinton v. Jones,* 520 U.S. 681 (1997) ............................................................................. 18

*Dalia v. United States*, 441 U.S. 238 (1979). .................................................................. 27

*Ex parte Milligan*, 71 U.S. (4 Wall.) 2 (1866)........................................................... 23, 25

*Florida v. J.L.*, 529 U.S. 266 (2000)............................................................................... 34

*Freedman v. Maryland*, 380 U.S. 51 (1965)..................................................................... 41

*FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215 (1990)....................................................... 41

*Gibson v. Fla. Legislative Investigative Comm.*, 372 U.S. 539 (1963) ............................. 39

i

*Gonzales v. Oregon*, 126 S. Ct. 904 (2006) ....................................................................... 14

*Griffin v. Wisconsin,* 483 U.S. 868 (1987) ........................................................................ 34

*Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) ............................................................ 14, 23, 24

*Home Building & Loan Ass'n v. Blaisdell*, 290 U.S. 398 (1934) ...................................... 23

*In re First Nat'l Bank,* 701 F.2d 115 (10th Cir. 1983) ..................................................... 40

*In re Grand Jury Proceedings*, 776 F.2d 1099 (2d Cir. 1985) .......................................... 40

*In re Grand Jury Subpoena to Kramerbooks & Afterwords Inc.*, 26 Med. L. Rptr. 1599 40

*J.E.M. Ag. Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124 (2001) .................. 14

*Katz v. United States*, 389 U.S. 347 (1967) ............................................................. passim

*Kirk v. Louisiana*, 536 U.S. 635 (2002) ........................................................................... 34

*Lee Art Theatre, Inc. v. Virginia*, 392 U.S. 636 (1968) ................................................... 41

*Little v. Barreme*, 6 U.S. (2 Cranch) 170 (1804) ............................................................. 25

*Marcus v. Search Warrant*, 367 U.S. 717 (1961) ....................................................... 36, 41

*Marshall v. Bramer*, 828 F.2d 355 (6th Cir. 1987) .......................................................... 40

*Maryland v. Garrison*, 480 U.S. 79 (1987) ................................................................. 27, 28

*McDonald v. United States*, 335 U.S. 451 (1948). ...................................................... 26, 27

*Miller v. French,* 530 U.S. 327 (2000) ......................................................................... 17, 18

*Mistretta v. United States*, 488 U.S. 361 (1989) .............................................................. 18

*Morales v. TWA, Inc.*, 504 U.S. 374 (1992) ..................................................................... 14

*NAACP v. Alabama*, 357 U.S. 449 (1958) ........................................................................ 38

*New Jersey v. T.L.O.*, 469 U.S. 325 (1985) ...................................................................... 33

*O'Connor v. Ortega*, 480 U.S. 709 (1987) ....................................................................... 34

*Olmstead v. United States*, 277 U.S. 438 (1928) .............................................................. 37

*Osborn v. United States*, 385 U.S. 323 (1966)..................................................... 26

*Paton v. La Prade*, 469 F. Supp. 773 (D.N.J. 1978).......................................... 40

*Payton v. New York*, 445 U.S. 573 (1980) ......................................................... 26

*Roaden v. Kentucky*, 413 U.S. 496 (1973) ......................................................... 41

*Shelton v. Tucker*, 364 U.S. 479 (1960) ............................................................. 39

*Shelton v. United States*, 404 F.2d 1292 (D.C. Cir. 1968)................................. 18

*Sigley v. City of Parma Heights,* __ F.3d __, 2006 WL 305524 (6th Cir. Feb. 10, 2006).. 9

*Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602 (1989)….…………….………33, 34

*Stanford v. Texas*, 379 U.S. 476 (1965) ............................................................. 36

*Stanley v. Georgia*, 394 U.S. 557 (1969) ........................................................... 36

*Tattered Cover, Inc. v. City of Thornton*, 44 P.3d 1044 (Colo. 2002) ............................. 39

*Terry v. Ohio*, 392 U.S. 1 (1968) ......................................................................... 34

*United States v. Belfield*, 692 F.2d 141 (D.C. Cir. 1982) ................................. 11

*United States v. Brown*, 484 F.2d 418 (5th Cir. 1973)................................. 33, 35

*United States v. Buck*, 548 F.2d 871 (9th Cir. 1977) ........................................ 33

*United States v. Butenko*, 494 F.2d 593 (3d Cir. 1974) ................................. 33, 35

*United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304 (1936). ............................. 18

*United States v. Dionisio*, 410 U.S. 1 (1973)...................................................... 39

*United States v. Ehrlichman*, 546 F.2d 910 (D.C. Cir. 1976)............................ 35

*United States v. Hoffman*, 334 F. Supp. 504 (D.D.C. 1971)............................. 31

*United States v. Karo*, 468 U.S. 705 (1984) ...................................................... 26

*United States v. Nixon*, 418 U.S. 683 (1974) ..................................................... 17

*United States v. Robel,* 389 U.S. 258 (1967) ..................................................... 24

*United States v. Smith*, 27 F. Cas. 1192 (C.C.D.N.Y. 1806) (No. 16,342)...................... 17

*United States v. Truong*, 629 F.2d 908 (4th Cir. 1980) .............................................. 33, 34

*United States v. U.S. Dist. Ct.*, 407 U.S. 297 (1972) .................................................. passim

*Watkins v. United States*, 354 U.S. 178 (1957)................................................................ 38

*Whitney v. California,* 274 U.S. 357 (1927) .................................................................... 36

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) .............................. passim

*Zurcher v. Stanford Daily*, 436 U.S. 547 (1978) ........................................................ 37, 41

*Zweibon v. Mitchell*, 516 F.2d 594 (D.C. Cir. 1975) ........................................... 31, 32, 37

Statutes

5 U.S.C. § 7069……………………………………………………………………...9
18 U.S.C. § 2510.......................................................................................................... 1, 9
18 U.S.C. § 2511 .............................................................................. 1, 12, 14, 21
18 U.S.C. § 2516 ......................................................................................................... 2
18 U.S.C. § 2518................................................................................................. 2, 10
18 U.S.C. § 2520 ....................................................................................................... 12
50 U.S.C. § 1801 ........................................................................ 1, 2, 11, 12
50 U.S.C. § 1803.......................................................................................................... 2
50 U.S.C. § 1805 ....................................................................................................... 16
50 U.S.C. § 1809 ....................................................................................................... 12
50 U.S.C. § 1810 ....................................................................................................... 12
50 U.S.C. § 1811 ....................................................................................................... 13
Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (2001) ....... 13
Detainee Treatment Act of 2005, Pub. L. No. 109-148, Div. A, tit. X, § 1003, 119 Stat.
    2739-2740 (2005).................................................................................................... 22
National Security Act of 1947, Pub. L. No. 80-253 (1947)............................................ 22
USA PATRIOT Act, Pub. L. No. 107-56, 115 Stat. 272 (2001) ...................................... 22

Other Authorities

James Madison, *The Federalist No. 47*........................................................................... 18

Legislative Materials

FISA Annual Reports to Congress 1979-2004 ....................................................... 15, 16
Foreign Intelligence Surveillance Act of 1976: Hearings Before the Subcomm. On
    Criminal Laws and Procedures of the Senate Comm. On the Judiciary, 94th Cong. 2d
    Sess. 16 (1976).......................................................................................................... 20

*The National Security Agency and Fourth Amendment Rights*: Hearings Before the Select Committee To Study Governmental Operations with Respect to Intelligence Activities, 94th Cong. 2 (1975)…………………………………………………………………...10

*Intelligence Activities and the Rights of Americans*, Book II, Final Report of the Select Committee to Study Governmental Operations with Respect to Intelligence Activities, United States Senate, S. REP. NO. 94-755 (1976)………………………………………10

H. CONF. REP. NO. 95-1720 (1978), *reprinted in* 1978 U.S.C.C.A.N. 4048........... 20, 22

H. REP. NO. 95-1283 (1978)............................................................................................ 12

S. REP. NO. 95-604(I) (1977), *reprinted in* 1978 U.S.C.C.C.A.N. 3904 ...... 10, 11, 20, 21

S. REP. NO. 95-701 (1978), *reprinted in* 1978 U.S.C.C.A.N. 3973 ......................... 20, 21

## INTRODUCTION

This lawsuit challenges the constitutionality of a secret government program, authorized by President Bush in 2002, in which the National Security Agency (NSA) intercepts the international telephone and Internet communications of Americans without court approval (hereinafter "the Program").  The Program violates the Administrative Procedures Act because it authorizes warrantless electronic surveillance that is expressly prohibited by two federal statutes.  The Program also violates separation of powers because it was authorized by the President in excess of his executive authority and is contrary to limits imposed by Congress.  Finally, by seriously compromising the free speech and privacy rights of the plaintiffs and others, the Program violates the First and Fourth Amendments of the United States Constitution.  In this Motion for Partial Summary Judgment, plaintiffs seek a declaration that a central aspect of the Program is unlawful, and a permanent injunction against its use.

## LEGAL AND FACTUAL BACKGROUND

### A.      Statutory Provisions

Congress has enacted two statutes that together supply "the *exclusive means* by which electronic surveillance . . . and the interception of domestic wire, oral, and electronic communications may be conducted."  18 U.S.C. § 2511(2)(f) (emphasis added).  The first is Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III"), 18 U.S.C. § 2510 *et seq*., and the second is the Foreign Intelligence Surveillance Act, 50 U.S.C. § 1801 *et seq.* ("FISA").

Title III authorizes the government to intercept wire, oral, or electronic communications in investigations of certain enumerated criminal offenses, *see* 18 U.S.C. § 2516, with prior judicial approval, *see id.* § 2518.  FISA governs the use of electronic surveillance against foreign powers and their agents inside the United States, and defines "foreign agent" to include individuals engaged in terrorism.[1]  The statute created the Foreign Intelligence Surveillance Court, a court composed of seven (now eleven) federal district court judges, and empowered this court to grant or deny government applications for electronic surveillance orders in foreign intelligence investigations.  *See* 50 U.S.C. § 1803(a).

## B.   The Program

In the fall of 2001, the NSA launched a secret program to engage in electronic surveillance, without prior judicial authorization, of the communications of people inside the United States.[2]  President Bush authorized the Program in 2001 and has reauthorized it more than thirty times.[3]

The NSA intercepts communications under the Program without obtaining a warrant or any other type of judicial authorization.[4]  Nor does the President or the

---

[1] FISA defines "foreign agent" to include a non-U.S. person – a person who is not a U.S. citizen or permanent resident – who "engages in international terrorism or activities in preparation therefor."  50 U.S.C. § 1801(b)(1)(C).  FISA also defines "foreign agent" to include a U.S. citizen or permanent resident who "knowingly engages in . . . international terrorism, or activities that are in preparation therefore, for or on behalf of a foreign power."  *Id.* § 1801(b)(2)(C).  A "foreign power," includes "a group engaged in international terrorism or activities in preparation therefor."  *Id* § 1801(a)(4).

[2] Plaintiffs' Statement of Undisputed Facts (hereinafter "SUF") 1A (Exh. A at 1881); SUF 1B (Exh. B); SUF 11A (Exh. H); SUF 11B (Exh. B); SUF 11C (Exh. C); SUF 11D (Exh. B); SUF 2A (Exh. C); SUF 2B (Exh. D at 1889); SUF 2C (Exh. F); SUF 3A (Exh E); SUF 3B (Exh. F); SUF 3C (Exh. B).

[3] SUF 1A (Exh. A at 1881); SUF 4 (Exh. D at 1885)

[4] SUF 11A (Exh. H); SUF 11B (Exh. B); SUF 11C (Exh. C); SUF 11D (Exh. B).

Attorney General authorize the interceptions.[5]  Instead, an NSA "shift supervisor" is authorized to approve interceptions of communications.[6]

Under the Program, the NSA intercepts communications without probable cause to believe that the surveillance targets have committed or are about to commit any crime, and without probable cause to believe that the surveillance targets are foreign agents.[7] Rather, the NSA intercepts communications when the agency has, in its own judgment, merely a "*reasonable basis to conclude* that one party to the communication is a member of al Qaeda, affiliated with al Qaeda, or a member of an organization affiliated with al Qaeda, or working in support of al Qaeda."[8]  Attorney General Alberto Gonzales has conceded that the standard used is not criminal "probable cause."[9]  General Michael Hayden, Principal Deputy Director for National Intelligence, has suggested that the standard is merely "[i]nherent foreign intelligence value."[10]

Information collected under the Program is sometimes retained and sometimes disseminated.[11]  The Attorney General has refused to specify the number of Americans whose communications are being intercepted under the Program.[12]

The NSA is intercepting communications that are subject to the requirements of FISA.[13] As the Attorney General has acknowledged, "the Foreign Intelligence Surveillance Act . . . requires a court order before engaging in this kind of

---

[5] SUF 12 (Exh. C).
[6] SUF 13A (Exh. B); *see also* SUF 13B (Exh. H).
[7] SUF 6J (Exh. H).
[8] SUF 6G (Exh. B) (emphasis added); *see also* SUF 6A (Exh. C); SUF 6I (Exh. C); SUF 6B (Exh. D at 1885); SUF 6C (Exh. A at 1881); SUF 6D (Exh. E); SUF 6E (Exh. F); SUF 6F (Exh. G); SUF 6H (Exh. C).
[9] SUF 6J (Exh. H); *see also* SUF 11C (Exh. C).
[10] SUF 6K (Exh. C).
[11] SUF 8 (Exh. H).
[12] SUF 7 (Exh. B).
[13] SUF 9 (Exh. B).

surveillance…unless otherwise authorized by statute or by Congress."[14]  Nonetheless, the

Program has been used "in lieu of" the procedures specified under the FISA.[15]  In the

words of General Michael Hayden, the Principal Deputy Director for National

Intelligence, "this is a more…'aggressive' program than would be traditionally available

under FISA," in part because "[t]he trigger is quicker and a bit softer than it is for a FISA

warrant."[16]

     **C.**    **The Harm to Plaintiffs**

     Plaintiffs are a group of prominent journalists, scholars, attorneys, and national

nonprofit organizations who frequently communicate by telephone and email with people

outside the United States, including in the Middle East and Asia.[17]  Some of the plaintiffs,

in connection with scholarship, journalism, or legal representation, communicate with

people whom the United States government believes or believed to be terrorist suspects

or to be associated with terrorist organizations.[18]  Because of the nature of their calls and

emails, and the identities and locations of those with whom they communicate, plaintiffs

have a well-founded belief that their communications are being intercepted under the

Program.[19]

     The Program is causing concrete and specific injury to plaintiffs and others.  The

Program is disrupting the ability of the plaintiffs to talk with sources, locate witnesses,

---

[14] *Id.*
[15] SUF 10A (Exh. B); *see also* SUF 10B (Exh. C); SUF 10E (Exh. B); SUF 10F (Exh. C); SUF
10G (Exh. F).
[16] SUF 10C (Exh. B); SUF 10D (Exh. C).
[17] SUF 15A (Exh. I, Diamond Decl. ¶¶2-8; Exh. J, Hollander Decl. ¶¶2-12, 14-15; Exh. K,
McKelvey Decl. ¶¶2-7; Exh. L, Swor Decl. ¶¶2, 4, 7, 10).
[18] SUF 15B (Exh. I, Diamond Decl. ¶9; Exh. J, Hollander Decl. ¶¶12-14, 17-24; Exh. K,
McKelvey Decl. ¶¶8-10; Exh. L, Swor Decl. ¶¶5-7, 10).
[19] SUF 15C (Exh. I, Diamond Decl. ¶10; Exh. J, Hollander Decl. ¶¶12-13, 16-24; Exh. K,
McKelvey Decl. ¶¶8-10, 12; Exh. L, Swor Decl. ¶¶8-11).

conduct scholarship, engage in advocacy, and engage in other activity protected by the First Amendment.[20]  Because of the Program, plaintiffs have ceased engaging in certain conversations on the phone and by email.[21]  For example, the Program has limited the ability of plaintiff Professor Larry Diamond to obtain sensitive information from his pro-democracy activist contacts and throughout the Middle East, Africa and Asia.[22]  Because the exposure of the "confidential or sensitive information" that these contacts provide "may cause their governments to retaliate against them," Professor Diamond has "stopped discussing such topics in [his] international phone calls and emails with these individuals."[23]  The Program likewise interferes with the journalistic work of plaintiff Tara McKelvey, who must communicate confidentially with sources in the Middle East as an essential part of her work.[24]  Ms. McKelvey's "inability, because of the NSA Program, to assure anonymity or privacy" to her sources, "many of whom are quite frightened of the United States government and military," has "prevented [her] from obtaining information from some of these individuals."[25]

The program is also impairing the ability of attorneys who are members of plaintiff National Association of Criminal Defense Lawyers to serve their clients effectively.[26]  For example, the Program has interfered with Nancy Hollander's communications with clients and other individuals in the Middle East and Europe; these

---

[20] SUF 15E (Exh. I, Diamond Decl. ¶¶11, 13-15; Exh. J, Hollander Decl. ¶¶12, 16, 25; Exh. K, McKelvey Decl. ¶14-15; Exh. L, Swor Decl. ¶¶9, 11-12, 14-16).
[21] SUF 15D (Exh. I, Diamond Decl. ¶12; Exh. J, Hollander Decl. ¶¶16, 20, 23-25; Exh. K, McKelvey Decl. ¶16; Exh. L, Swor Decl. ¶¶9, 11-16).
[22] SUF 15E (Exh. I, Diamond Decl. ¶15).
[23] SUF 15D (Exh. I, Diamond Decl. ¶12).
[24] SUF 15E (Exh. K, McKelvey Decl. ¶14).
[25] SUF 15E (Exh. K, McKelvey Decl. ¶15).
[26] SUF 15E (Exh. J, Hollander Decl. ¶¶12, 16, 25; Exh. K, Swor Decl. ¶¶9, 11-12, 14-16).

communications are necessary to Ms. Hollander's effective representative of her clients.[27]

Likewise, William Swor "cannot discuss factual issues with witnesses over the phone for

fear of interception" and as a result he cannot obtain exculpatory and other helpful

evidence that could be vital to the defense of his clients.[28]  As Mr. Swor explains, he

would violate his ethical obligations by discussing via international telephone call or

email some particularly sensitive information that may assist his clients, because he

"cannot be certain that such communications are confidential."[29]

    The Program has exacted a financial cost from plaintiffs as well.  Because the

Program inhibits their ability to speak by telephone with sources, clients and others

essential to their work, several of the plaintiffs now must travel long distances to meet

personally with these individuals.[30]  The Program is forcing McKelvey, Hollander, and

Swor to take such trips – at substantial cost – to fulfill their professional

responsibilities.[31]

**SUMMARY OF ARGUMENT**

    The Program empowers executive officers to engage in unchecked surveillance

that is profoundly undemocratic: secret electronic eavesdropping on Americans without

court approval.  To guard against abusive surveillance practices by the Executive that

threatened our democracy in the past, Congress passed two statutes – Title III and the

Foreign Intelligence Surveillance Act – which together provide "the exclusive means" by

which the government can engage in electronic surveillance.  These statutes require the

---

[27] SUF 15E (Exh. J, Hollander Decl. ¶25).

[28] SUF 15E (Exh. L., Swor Decl. ¶¶9, 16).

[29] *Id.*

[30] SUF 15F (Exh. K, McKelvey Decl. ¶¶16-17; Exh. J, Hollander Decl. ¶¶20, 23-25; Exh. L, Swor Decl. ¶¶13-14).

[31] *Id.*

government to obtain court approval, establish probable cause, and satisfy other procedural requirements before it can eavesdrop on the private conversations of Americans.  Because the Program authorizes the NSA to conduct warrantless electronic surveillance that is *expressly prohibited* by FISA and Title III, it violates the Administrative Procedures Act.

The Program also violates separation of powers because it authorizes the NSA to engage in activity that Congress has expressly prohibited.  The division of power among the three branches of government was designed to create a system of checks and balances that would prevent any one branch of government from having absolute power. Consistent with this principle, the Supreme Court has held that the President's power is at its lowest ebb when the President acts contrary to the express will of Congress.  Congress clearly intended that FISA and Title III would provide the exclusive means by which the Executive could engage in electronic surveillance even in times of war or emergency. Moreover, nothing in Article II of the Constitution allows the President, even when acting as Commander-in-Chief, to authorize warrantless interceptions of Americans' private conversations unilaterally and contrary to the express will of Congress.  Indeed, one of the core purposes behind our system of checks and balances is to ensure that no one branch of government has too much power in times of war.

Furthermore, regardless of whether the Program is prohibited or authorized by Congress, any government interception of the private phone calls and emails of Americans must comply with the Fourth and First Amendments.  The Supreme Court has cautioned that electronic eavesdropping poses a particularly grave threat to liberty because of its potential for abuse.  Eavesdropping, with its broad, intrusive sweep, is

dangerously similar to the general searches the framers drafted the Fourth Amendment to prevent.  Under the Program, NSA officers execute warrantless searches at their own discretion.  No neutral judge reviews the search, or requires executive officers to satisfy the probable cause requirement or limit the scope and duration of the surveillance.  In *Keith*, the Supreme Court held that the warrant requirement was a constitutionally mandated safeguard even for wiretaps intended to protect domestic national security.  *United States v. U.S. Dist. Ct.*, 407 U.S. 297 (1972) (hereinafter "*Keith*").  The Supreme Court's reasoning in *Keith* applies with equal force to foreign intelligence surveillance conducted inside the United States.  The Program clearly violates the Fourth Amendment's protection against unreasonable searches.

The Fourth Amendment protection against unwarranted searches and the First Amendment right to speak freely without government intrusion are closely linked.  Because of the threat to free speech, a long line of cases holds that the government cannot investigate First Amendment activity unless it first establishes a compelling interest and proves its investigation is substantially related to that interest.  The Program fails to satisfy this heightened scrutiny.  The Program also fails to satisfy the strict procedural requirements of the First Amendment because it permits the NSA to obtain constitutionally protected information with no judicial oversight.

## ARGUMENT

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sigley v. City of Parma Heights,* __ F.3d __, 2006 WL 305524 (6th Cir. Feb. 10, 2006) (slip copy).

Administration officials have conceded publicly that the Program authorizes the NSA to conduct electronic surveillance that is subject to FISA without complying with the requirements of FISA. Because there is no genuine issue of material fact as to this aspect of the Program, plaintiffs are entitled to judgment as a matter of law on their claim that this aspect of the Program violates the Administrative Procedures Act, separation of powers, and the First and Fourth Amendments to the United States Constitution.[32]

## I.  THE PROGRAM VIOLATES THE ADMINISTRATIVE PROCEDURES ACT BECAUSE IT AUTHORIZES SURVEILLANCE THAT IS PROHIBITED BY STATUTE.

Under the Administrative Procedures Act ("APA"), a court shall "hold unlawful and set aside agency action" that is "otherwise not in accordance with law, " that is taken "in excess of statutory . . . limitations," or that is "in excess of statutory . . . authority." 5 U.S.C. § 706(2)(A), § 706(2)(C). The Program violates the APA because it authorizes warrantless electronic surveillance that is expressly prohibited by FISA and Title III.

### A.  FISA and Title III were enacted in response to a history of unchecked and abusive surveillance by the Executive.

In *Katz v. United States*, 389 U.S. 347 (1967), the Supreme Court held that individuals have a constitutionally protected privacy interest in the content of their telephone calls. In response, Congress enacted Title III in 1968. *See* 18 U.S.C. § 2510 *et. seq.* Through Title III, Congress imposed a strict warrant requirement and other

---

[32] Plaintiffs label this motion one for partial summary judgment because plaintiffs' Complaint alleges that the NSA is also engaged in some datamining practices that, while unconstitutional, may not fall within FISA. *See, e.g.,* Complaint, ¶ 53.

procedural standards on electronic surveillance conducted in law enforcement investigations.  *See* 18 U.S.C. § 2518.

Even after passage of Title III, in the 1960s and 1970s the executive branch continued to engage in widespread warrantless electronic surveillance of people in the United States, claiming that such surveillance was justified to protect the nation's security.  After extensive congressional investigation of these practices by the Church and Pike Committees, the public learned that the Executive had engaged in warrantless wiretapping of numerous United States citizens – including journalists, activists, and members of Congress – "who engaged in no criminal activity and who posed no genuine threat to the national security."  S. REP. NO. 95-604(I), at 6 (1977), *reprinted in* 1978 U.S.C.C.A.N. 3904, 3909 (quoting Church Committee Report, Book II, 12).

Among the most troubling practices Congress investigated and eventually sought to safeguard against through FISA were certain domestic spying activities by the NSA that bear a striking resemblance to those conducted under the current Program.  *See Intelligence Activities and the Rights of Americans*, Book II, Final Report of the Select Committee to Study Governmental Operations with Respect to Intelligence Activities, United States Senate, S. REP. NO. 94-755, 96 (1976) (hereinafter "Church Comm. Book. II") ("In the late 1960's . . . NSA, acting in response to presidential pressure, turned their technological capacity and great resources toward spying on certain Americans."); *The National Security Agency and Fourth Amendment Rights*: Hearings Before the Select Committee To Study Governmental Operations with Respect to Intelligence Activities, 94th Cong. 2 (1975) (hereinafter "Church Comm. Rep. Vol. 5"), *at* http://cryptome.org/nsa-4th.htm (Senator Church noting that Congress had "a particular

obligation to examine the NSA, in light of its tremendous potential for abuse").  In its final report, the Church Committee warned that "[u]nless new and tighter controls are established by legislation, domestic intelligence activities threaten to undermine our democratic society and fundamentally alter its nature."  Church Comm. Rep. Book II, at 1.

In response to the abuses documented by the Church Committee, as well as the Supreme Court's decision in *Keith*, 407 U.S. 297 (1972), Congress enacted the Foreign Intelligence Surveillance Act of 1978.  50 U.S.C. § 1801 *et. seq.; see also United States v. Belfield*, 692 F.2d 141, 145 (D.C. Cir. 1982) ("Responding to post-Watergate concerns about the Executive's use of warrantless electronic surveillance, Congress, with the support of the Justice Department, acted in 1978 to establish a regularized procedure for use in the foreign intelligence and counterintelligence field.").  As the Senate Judiciary Committee explained, FISA was meant to "spell out that the executive cannot engage in electronic surveillance within the United States without a prior Judicial warrant."  S. REP. NO. 95-604(I), 1978 U.S.C.C.A.N. at 3908; *see also id.* at 3910 (FISA designed "to curb the practice by which the Executive branch may conduct warrantless electronic surveillance on its own unilateral determination that national security justifies it").  Congress enacted Title III and FISA with the express intention of prohibiting the executive branch from engaging in the activity the President has now authorized the NSA to conduct under the Program:  unchecked electronic surveillance in the name of national security.

**B.  FISA and Title III provide the exclusive means by which the Executive can engage in electronic surveillance within the United States.**

Together, FISA and Title III supply "the *exclusive means* by which electronic surveillance . . . and the interception of domestic wire, oral, and electronic communications may be conducted."  18 U.S.C. § 2511(2)(f) (emphasis added).  FISA provides that no one may engage in electronic surveillance "except as authorized by statute," 50 U.S.C. § 1809(a)(1), and both FISA and Title III impose civil and criminal penalties for electronic surveillance undertaken without statutory authority, *see id*. §§ 1809, 1810; 18 U.S.C. §§ 2511, 2520.

FISA and Title III define "electronic surveillance" to include the interception of any wire or radio communication by intentionally targeting the communications to or from a particular United States person.[33]  "Electronic surveillance" also includes the interception of any wire communication that occurs within the United States without the consent of any party to the communication.[34]  Under this definition, "either a wholly domestic telephone call or an international telephone call can be the subject of electronic surveillance . . . if the acquisition of the content of the call takes place in the United States."  H. REP. NO. 95-1283, at 51 (1978).  Executive branch officials have publicly acknowledged that the Program involves "electronic surveillance" as defined by FISA.[35]

---

[33] 50 U.S.C. § 1801(f)(1) (electronic surveillance includes "the acquisition by an electronic, mechanical, or other surveillance device of the contents of any wire or radio communication sent by or intended to be received by a particular, known United States person who is in the United States, if the contents are acquired by intentionally targeting that United States person, under circumstances in which a person has a reasonable expectation of privacy and a warrant would be required for law enforcement purposes"); *see also* 18 U.S.C. § 2511(2)(f) (Title III adopts the FISA definition of electronic surveillance).

[34] 50 U.S.C. § 1801(f)(2) (electronic surveillance includes "the acquisition by an electronic, mechanical, or other surveillance device of the contents of any wire communication to or from a person in the United States, without the consent of any party thereto, if such acquisition occurs in the United States").

[35] SUF 9 (Exh. B).

FISA governs electronic surveillance of Americans even in times of war.  While FISA generally prohibits surveillance without prior judicial authorization, FISA allows the Executive to engage in warrantless surveillance for fifteen days after a formal declaration of war.[36]  After fifteen days, the Executive must obtain a FISA warrant to continue the electronic surveillance.[37]   Congress specifically rejected a proposal that would have allowed for warrantless surveillance for periods of up to one year after a formal declaration of war.[38]  FISA and Title III also provide the exclusive means, strictly limited to 72 hours, to conduct warrantless surveillance in the event of an emergency.[39]  Title III contains a similar emergency provision.  18 U.S.C. § 2518.

Despite the clear language of FISA and Title III, the Administration has argued publicly that Congress authorized the President to engage in warrantless wiretapping when it passed the Authorization for Use of Military Force ("AUMF") against al Qaeda.[40]  The Administration's reading of the AUMF's general language is in direct conflict with FISA's specific and unequivocal prohibition on electronic surveillance conducted outside of the bounds of FISA and Title III.  Well-accepted rules of statutory interpretation favor specific provisions over general ones in cases of conflict.  *See, e.g.*, *Morales v. TWA, Inc.*,

---

[36] 50 U.S.C. § 1811 ("Notwithstanding any other law, the President, through the Attorney General, may authorize electronic surveillance without a court order under this subchapter to acquire foreign intelligence information for a period not to exceed fifteen calendar days following a declaration of war by the Congress.").

[37] *Id*.

[38] *See* H.R. CONF. REP. NO. 95-1720, at 16 (1978), *reprinted in* 1978 U.S.C.C.A.N. 4048, 4063. The 15-day period was intended to "allow time for consideration of any amendment to [FISA] that may be appropriate during a wartime emergency."  *Id*. at 4063.

[39] 50 U.S.C. § 1805(f) (Attorney General may authorize warrantless surveillance where an emergency situation exists, but must inform a FISA judge "not more than 72 hours" later, and must obtain a FISA warrant to continue the surveillance).

[40] Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (2001) (authorizing the President "to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons").

504 U.S. 374, 384-85 (1992).  The AUMF language of authorization – "all necessary and appropriate force" – is of the most general nature.  Electronic surveillance inside the United States is not mentioned at all.[41]  By contrast, the unmistakable congressional command in FISA – that FISA and the criminal wiretap laws are to be the "exclusive means by which electronic surveillance . . . may be conducted," 18 U.S.C. § 2511(2)(f) – is aimed precisely and directly at the type of conduct in which the Administration has engaged.  The contention that Congress intended to brush aside such a specific and deliberate scheme of regulation with the most vague and general of authorizations defies common sense.  As the Supreme Court has recently admonished, Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions – it does not, one might say, hide elephants in mouseholes."  *Gonzales v. Oregon*, 126 S. Ct. 904, 921 (2006) (citation and internal quotation marks omitted).[42]

The Administration's position requires a finding that Congress implicitly repealed three key components of FISA and Title III when it passed the AUMF:  the "exclusive means" provision, FISA's limited fifteen-day wartime exemption, and the emergency provisions of FISA and Title III.  Repeals by implication are rarely recognized, and can be established only by "overwhelming evidence" that Congress intended the repeal.  *J.E.M. Ag. Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 137 (2001).  Here there is no such evidence.  Moreover, Congress had ample opportunity to amend FISA

---

[41] In fact, the Administration sought to include the words "in the United States" after the words "appropriate force" so that the authorization would apply to domestic as well as foreign actions. Congress flatly rejected the request.  *See* Tom Daschle, "Power We Didn't Grant," WASH. POST, Dec. 23, 2005, at A21.

[42] The Administration has relied on *Hamdi v. Rumsfeld*, 542 U.S. 507, 508 (2004), to support its expansive interpretation of the AUMF, but that case held only that the "necessary and appropriate force" authorized in the AUMF included authority to detain combatants on a foreign battlefield, not that it included the much broader authority to engage in warrantless wiretapping on American soil.

along the lines the Administration wishes it had: in response to the September 11 attacks,

Congress expanded FISA in both the Patriot Act, Pub. L. No. 107-56, 115 Stat. 272

(2001) (amending FISA through, *inter alia*, Section 218s and 215) and Intelligence

Reform and Terrorism Prevention Act., Pub. L. No. 108-458, 118 Stat. 3638 (2004)

(amending, *inter alia*, the definition of "foreign agent" under FISA).  Notably, neither

legislative enactment repealed the "exclusive means" provision.  In fact, the

Administration has acknowledged that Congress would not have agreed to amend or

repeal provisions of FISA; it decided not to ask Congress to amend FISA to authorize the

Program because Congress had indicated it would likely *reject* such an amendment.[43]

   For over twenty-five years, the Executive branch has successfully used the FISA

process to intercept the communications of alleged terrorists and spies in the United

States.  Statistics released annually by the Justice Department suggest that the Executive

branch has not been hampered in any way in its ability to seek and obtain FISA warrants.

Justice Department statistics indicate that, between 1978 and 2004, the government

submitted almost 19,000 surveillance applications to the FISA Court.  *See* FISA Annual

Reports to Congress 1979-2004, *at* http://www.fas.org/irp/agency/doj/fisa/#rept.  The

FISC denied only four of these applications; granted approximately 180 applications with

modifications; and granted the remaining 18,451 without modifications.  Moreover, the

---

[43] Press Briefing by Attorney General Alberto Gonzales and General Michael Hayden, Principal
   Deputy
Director for National Intelligence (Dec. 19, 2005), *available at*
http://www.whitehouse.gov/news/releases/2005/12/20051219-1.html ("We have had discussions
   with
Congress in the past -- certain members of Congress -- as to whether or not FISA could be
   amended to
allow us to adequately deal with this kind of threat, and we were advised that that would be
   difficult, if not
impossible.").

number of applications made by the Justice Department and approved by the FISA Court

has dramatically increased since 2001.  *See id.*

> ### C.      The Program fails to comply with the requirements of FISA and Title III.

Both FISA and Title III require the Executive Branch to satisfy strict procedural

requirements before it may engage in electronic surveillance of Americans.  To obtain a

court order for electronic surveillance under Title III, the Executive must demonstrate

"probable cause for belief that an individual is committing, has committed, or is about to

commit" one of the enumerated criminal offenses.  18 U.S.C. § 2518(3)(a).  The

Executive must also demonstrate, among other things, "probable cause for belief that

particular communications concerning [the enumerated] offense will be obtained through

[the] interception," *id*. § 2518(3)(b), and that "normal investigative procedures have been

tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too

dangerous," *id*. § 2518(3)(c).

To obtain an order from the FISA Court authorizing electronic surveillance of

foreign agents inside the United States, the Executive must demonstrate, among other

things, probable cause to believe that "the target of the electronic surveillance is a foreign

power or an agent of a foreign power" and that "each of the facilities or places at which

the electronic surveillance is directed is being used, or is about to be used, by a foreign

power or an agent of a foreign power."  50 U.S.C. § 1805(a)(3).

Although FISA and Title III require prior judicial approval of electronic

surveillance, under the Program the NSA is intercepting communications inside the

United States without prior judicial approval.[44]  Although Title III and FISA require a

---

[44] SUF 11A (Exh. H); SUF 11B (Exh. B); SUF 11C (Exh. C); SUF 11D (Exh. B).

showing of probable cause before a court will authorize electronic surveillance, under the Program the NSA is intercepting communications inside the United States without first demonstrating probable cause.[45]  The Program wholly fails to meet the requirements of FISA and Title III, and thus violates the Administrative Procedures Act.

## II.  THE PROGRAM VIOLATES THE PRINCIPLE OF SEPARATION OF POWERS BECAUSE IT INVOLVES SURVEILLANCE THAT CONGRESS HAS SPECIFICALLY PROHIBITED.

### A.    The President's power is at its lowest ebb because Congress has expressly prohibited his actions.

"The Constitution enumerates and separates the powers of the three branches of Government . . . and it is this very structure of the Constitution that exemplifies the concept of separation of powers."  *Miller v. French,* 530 U.S. 327, 341 (2000) (internal quotation marks omitted).   At the same time, the Constitution "enjoins upon its branches separateness but interdependence, autonomy but reciprocity."  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring).  The President is not free to disregard the laws enacted by Congress.  *See United States v. Nixon*, 418 U.S. 683, 715 (1974) (noting that the President is not "above the law"); *United States v. Smith*, 27 F. Cas. 1192, 1230 (C.C.D.N.Y. 1806) (No. 16,342) ("The president of the United States cannot control the statute, nor dispense with its execution, and still less can he authorize a person to do what the law forbids. If he could, it would render the execution of the laws dependent on his will and pleasure; which is a doctrine that has not been set up, and will not meet with any supporters in our government.").

The separation of powers doctrine also prohibits one branch from assuming all power for itself at the expense of the others, especially where authority is meant to be

---

[45] SUF 6J (Exh. H).

shared.  *See* James Madison, *The Federalist No. 47* ("The accumulation of all powers . . .

in the same hands . . . may justly be pronounced the very definition of tyranny."); *Clinton*

*v. Jones,* 520 U.S. 681, 699 (1997) ("The Framers 'built into the tripartite Federal

Government…a self-executing safeguard against the encroachment or aggrandizement of

one branch at the expense of the other.'") (quoting *Buckley v. Valeo*, 424 U.S.1, 122

(1976)); *Miller,* 530 U.S. at 342 ("While the boundaries between the three branches are

not hermetically sealed, the Constitution prohibits one branch from encroaching on the

central prerogatives of another.") (internal quotation marks and citations omitted);

*Mistretta v. United States*, 488 U.S. 361, 382 (1989) ("Concern of encroachment and

aggrandizement…has animated our separation-of-powers jurisprudence.").

Under the Constitution, Congress and the President share authority over foreign

intelligence gathering, as well as war powers.[46]  Because of these shared powers, any

evaluation of the President's authority to authorize the Program and disregard the express

will of Congress must begin with *Youngstown*, 343 U.S. 579.  In *Youngstown,* the Court

held that that President lacked inherent authority to seize the nation's steel mills even

_____

[46] The Constitution grants Congress substantial authority to legislate in the areas of foreign
intelligence gathering, war powers, and foreign affairs.  *See* U.S. Const. art. I, § 8, cl. 18
(necessary and proper clause); *id.* § 8, cl. 1 (granting Congress power to "provide for the common
Defence and general Welfare of the United States"); *id.* § 8, cl. 11 (granting power "[t]o declare
War, grant Letters of Marque and Reprisal, and make Rules concerning Captures on Land and
Water"); *id.* § 8, cl. 12 (granting power "[t]o raise and support Armies"); *id.* § 8, cl. 13 (granting
power "[t]o provide and maintain a Navy"); *id.* § 8, cl. 14 (granting power "[t]o make Rules for
the Government and Regulation of the land and naval Forces"); *see also Afroyim v. Rusk,* 387
U.S. 253, 256 (1967) (noting "Congress has an implied power to deal with foreign affairs").
Congress also enjoys substantial authority to legislate in order to protect individual rights and
liberties, as it has done through FISA.  *See, e.g., Shelton v. United States*, 404 F.2d 1292, 1298 n.
17 (D.C. Cir. 1968) (recognizing "the broad power in Congress to legislate to protect civil and
individual liberties").  The President has the authority to engage in foreign intelligence gathering
pursuant to his foreign affairs powers and his authority as Commander-in-Chief.  *See* U.S. Const.
Art. II, § 2 ("The President shall be Commander in Chief of the Army and Navy of the United
States."); *see also United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936).

though he believed that a strike would cripple the war effort in Korea.  Congress had previously "refused to adopt that method of settling labor disputes" when it enacted the comprehensive Labor Management Relations Act (LMRA).  *Id.* at 586.  The Court held that the President lacked the authority for the seizure because the LMRA implied that Congress intended to prohibit such actions.

In a concurring opinion, Justice Jackson noted that "Presidential powers are not fixed but fluctuate, depending upon their disjunction or conjunction with those of Congress."  *Id.* at 635.  He then set forth an oft-cited paradigm for evaluating the proper constitutional balance between congressional and executive authority.  He distinguished between 1) presidential action pursuant to "an express or implied authorization of Congress," in which case presidential authority "is at its maximum"; 2) presidential action "in the absence of either a congressional grant or denial of authority," which Justice Jackson characterized as "a zone of twilight"; and 3) presidential action "incompatible with the expressed or implied will of Congress," in which case presidential power "*is at its lowest ebb*."  *Id.* at 635-37 (emphasis added).  Justice Jackson considered the seizure of the steel mills to fall under the third category because "Congress ha[d] not left seizure of private property an open field but ha[d] covered it by three statutory policies inconsistent with this seizure."  *Id.* at 639.

Any evaluation of the legality of the Program must start from the recognition that the President's power is "at its lowest ebb" because Congress has expressly prohibited the conduct the President has authorized.[47]  By enacting FISA, Congress placed the President's authority to intercept the calls and emails of people in the United States

---

[47] For the reasons stated *supra* in Section I.B, the Authorization to Use Military Force did not amend or repeal the relevant provisions of FISA or Title III.

squarely into Justice Jackson's third category.   As the Senate Judiciary Committee

explained, the basis for FISA was

> the understanding – concurred in by the Attorney General – that even if the President [h]as an 'inherent' Constitutional power to authorize warrantless surveillance for foreign intelligence purposes, Congress has the power to regulate the exercise of this authority by legislating a reasonable warrant procedure governing foreign intelligence surveillance.

S. REP NO. 95-604(I), 1978 U.S.C.C.A.N. at 3917.[48]  Indeed, Congress even explicitly

stated its intention to place the President's authority at its lowest ebb.  *See, e.g.,* H.

CONF. REP. NO. 95-1720, 1978 U.S.C.C.A.N. at 4064 (noting that the conferees' intent

in adopting a broad exclusive means provision was "to apply the standard set forth in

Justice Jackson's concurring opinion in the steel seizure case: 'When a President takes

measures incompatible with the express or implied will of Congress, his power is at the

lowest ebb'"); S. REP. NO. 95-701 at 64-65 (1978), *reprinted in* 1978 U.S.C.C.A.N.

3973, 4040-41.[49]  As Justice Jackson noted, the President does not have the authority

simply to ignore the law.

Notably, when Congress passed FISA, it also repealed a provision of Title III that

had been used by successive administrations to claim inherent power to engage in

---

[48] *See also id.* at 3965 (emphasizing that "[a]s to methods of acquisition which come within the definition of 'electronic surveillance' in [FISA], the Congress has declared that [FISA and Title III], not any claimed presidential power, controls").

[49] In addition, when testifying before a Senate Judiciary subcommittee in support of FISA, then-Attorney General Levi stated, in response to the question whether a later President could come along and disregards its terms: "I really cannot imagine a President, if this legislation is in effect, going outside the legislation for matters which are within the scope of this legislation…because I really do not think it is quite appropriate to describe the Presidential authority as being absolute on the one hand, or nonexistent on the other…[T]here is a middle category where, assuming Presidential authority, that authority nevertheless, can be directed by the Congress."  Foreign Intelligence Surveillance Act of 1976: Hearings Before the Subcomm. On Criminal Laws and Procedures of the Senate Comm. On the Judiciary, 94th Cong., 2d Sess. 16 (1976).

warrantless national security surveillance.  Prior to the enactment of FISA, Title III provided that,

> [n]othing contained in this chapter. . . shall limit the constitutional power of the President to take such measures as he deems necessary to protect the Nation against actual or potential attack or other hostile acts of a foreign power, to obtain foreign intelligence information deemed essential to the security of the United States, or to protect national security information against foreign intelligence activities.  Nor shall anything contained in this chapter be deemed to limit the constitutional power of the President to take such measures as he deems necessary to protect the United States against the overthrow of the Government by force or other unlawful means, or against any other clear and present danger to the structure or existence of the Government.

18 U.S.C. § 2511(3) (1977), repealed by FISA 201(c).  FISA repealed that language and replaced it with the "exclusive means" provision. [50]

As the Senate Intelligence Committee emphasized, FISA "establish[ed] the *exclusive* United States law governing electronic surveillance in the United States for foreign intelligence purposes," and prohibited the Executive from engaging in warrantless surveillance outside the scope of the statute.  S. REP. NO. 95-701, 1978 U.S.C.C.A.N. at 4016 (emphasizing that the President lacked any "independent, or 'inherent,' authority to authorize electronic surveillance in any way contrary to the provisions of [FISA]").[51]

---

[50] Prior to the repeal of § 2511(3), the Supreme Court recognized in *Keith* that electronic surveillance is within the scope of congressional authority even when the President's authority over national security is implicated.  The Court found that the provision was neutral and that Congress "left presidential powers (over electronic surveillance) where it found them."  407 U.S. at 303.

[51] *See also* S. REP. NO. 95-604(I), 1978 U.S.C.C.A.N. at 3907 (noting that FISA "does not provide statutory authorization for the use of any technique other than electronic surveillance, and combined [with Title III] it constitutes the exclusive means by which electronic surveillance . . . may be conducted; the bill recognizes no inherent power of the President in this area"); S. REP. NO. 95-701, 1978 U.S.C.C.A.N. at 3977 (Senate Intelligence Committee explaining FISA "is to

The House Conference Report also supports the conclusion that Congress intended FISA and Title III to limit the Executive's ability to engage in warrantless surveillance.  The conferees rejected language that would have made Title III and FISA the "exclusive *statutory* means" by which electronic surveillance could be conducted, and instead adopted language that makes the statutes "the exclusive means."  H.R. CONF. REP. NO. 95-1720, 1978 U.S.C.C.A.N. at 4064 (emphasis added).  Congress's decision to omit the word "statutory" is further evidence that Congress intended to preclude claims of inherent authority to engage in warrantless wiretapping.

Upholding the President's authority to authorize the Program would require the Court to declare that the President's power over electronic surveillance in the United States is "exclusive."  *See Youngstown,* 343 U.S. at 640 (Jackson, J., concurring) (noting that President's seizure could be upheld "only by holding that seizure of such strike-bound industries is within his domain and beyond control by Congress").  Such a holding would render FISA unconstitutional or merely hortatory and would call into question the constitutionality of a wide range of congressional enactments that regulate matters involving intelligence, national security, and war.  *See*, *e.g.*, National Security Act of 1947, Pub. L. No. 80-253 (1947) (establishing the statutory framework for the U.S. intelligence community); USA PATRIOT Act, Pub. L. No. 107-56, 115 Stat. 272 (2001) (expanding the Executive's surveillance powers, including its powers under FISA); Detainee Treatment Act of 2005, Pub. L. No. 109-148, Div. A, tit. X, § 1003, 119 Stat. 2739-40 (2005) (prohibiting the use of cruel, inhuman, and degrading treatment in

---

provide legislative authorization and regulation for all electronic surveillance conducted within the United States for foreign intelligence purposes"); *id.* at 4040 (Title III and FISA to be the "sole and exclusive statutory authority" for electronic surveillance).

detention and interrogation).  The separation of powers doctrine exists to ensure that such an immense concentration of power never lies in one branch of government.[52]

### B.     The President's power as Commander-in-Chief does not authorize him to disregard acts of Congress.

The President may not disregard acts of Congress even when exercising his powers as Commander-in-Chief or during times of war or emergency.  War and emergency do not create or enhance constitutional powers.  As the Supreme Court emphasized in *Home Building & Loan Ass'n v. Blaisdell*:

> Emergency does not create power. Emergency does not increase granted power or remove or diminish the restrictions imposed upon power granted or reserved. The Constitution was adopted in a period of grave emergency. Its grants of power to the federal government and its limitations of the power of the States were determined in the light of emergency, and they are not altered by emergency. . . . [E]ven the war power does not remove constitutional limitations safeguarding essential liberties.

290 U.S. 398, 425-26 (1934).  Rather, one of the core purposes behind a system of separation of powers is to ensure that even in times of war or emergency, one branch of government cannot appropriate too much power.  *See, e.g., Ex parte Milligan*, 71 U.S. (4 Wall.) 2, 120-21 (1866) ("The Constitution of the United States is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times, and under all circumstances. No doctrine, involving more pernicious consequences, was ever invented by the wit of man than that any of its provisions can be suspended during any of the great exigencies of government.").

---

[52] The Executive's consolidation of power through the Program raises additional separation of powers problems *vis a vis* the judiciary because it allows the Executive to infringe upon individual constitutional rights without any judicial safeguard.  *See, e.g.*, *Hamdi*, 542 U.S. at 536 (plurality opinion) ("Whatever power the United States Constitution envisions for the Executive in its exchanges with other nations or with enemy organizations in times of conflict, it most assuredly envisions a role for all three branches when individual liberties are at stake.").

As the Supreme Court recently warned, "a state of war is not a blank check for the President when it comes to the rights of the Nation's citizens." *Hamdi,* 542 U.S. at 536 (plurality opinion).  Indeed, the courts must be especially vigilant where the Executive justifies its actions in the name of national security.  The Court has recognized that "the national security underpinnings of the 'war on terror,' although crucially important, are broad and malleable" and particularly susceptible to abuse, *id. at* 520.

> Striking the proper constitutional balance here is of great importance to the Nation during this period of ongoing combat. But it is equally vital that our calculus not give short shrift to the values that this country holds dear …It is during our most challenging and uncertain moments that our [foundational constitutional principles are] most severely tested; and it is in those times that we must preserve our commitment at home to the principles for which we fight abroad.

*Id.* at 532; *see also United States v. Robel,* 389 U.S. 258, 264 (1967) ("It would indeed be ironic if, in the name of national defense, we would sanction the subversion of one of those liberties … which makes the defense of the Nation worthwhile"); *Youngstown,* 343 U.S. at 642 (Jackson, J., concurring) ("[N]o doctrine that the Court could promulgate would seem to me more sinister and alarming than that a President whose conduct of foreign affairs is so largely uncontrolled, and often even is unknown, can vastly enlarge his mastery over the internal affairs of the country by his own commitment of the Nation's armed forces to some foreign venture.").  Justice Jackson noted that separation of powers concerns are heightened when the Commander in Chief's powers are exercised in the domestic sphere, 343 U.S. at 645, and emphasized that "the Constitution did not contemplate that the title Commander-in-Chief of the Army and Navy will constitute him also Commander-in-Chief of the country, its industries and its inhabitants," *id.* at 643.

In the very few cases in which the Supreme Court has considered the

constitutionality of presidential actions taken under the war power that were either

unauthorized or prohibited by Congress, it has rejected the President's power to act.

*Youngstown*, 343 U.S. 579 (1952) (war in Korea did not authorize President to seize the

country's steel mills, where Congress had impliedly prohibited such action); *Little v.*

*Barreme*, 6 U.S. (2 Cranch) 170 (1804) (where Congress had authorized the seizure of

vessels bound to French ports, the President could not authorize the capture of vessels

coming from French ports); *see also Ex parte Milligan*, 71 U.S. (4 Wall.) 2 (1866)

(rejecting claim of authority to try by military commission civilian accused of violating

the law of war in non-hostile territory).

Because the President had no authority to ignore FISA and Title III, the Program

violates separation of powers.

### III.   THE PROGRAM VIOLATES THE FOURTH AMENDMENT BECAUSE IT AUTHORIZES THE INTERCEPTION OF PRIVATE COMMUNICATIONS WITHOUT A WARRANT AND IS MANIFESTLY UNREASONABLE.

Because the Program violates FISA and Title III, it is unlawful and should be

enjoined.  Regardless of whether or not the Program violates these statutes, however, the

Program must be enjoined because it violates the most basic requirements of the Fourth

Amendment.

#### A.   The Program violates the Fourth Amendment because it authorizes the interception of phone calls and emails without a warrant.

It has been settled law for almost forty years that the Fourth Amendment prohibits

the government from indiscriminately listening to the telephone conversations of private

citizens.  *See Katz*, 389 U.S. at 352; *Blake v. Wright*, 179 F.3d 1003, 1008 (6th Cir.

1999).  The framers drafted the Fourth Amendment in large part to prevent the executive

Branch from engaging in the kind of general searches – the fishing expeditions – used by King George to harass and invade the privacy of the colonists.  *Berger v. New York*, 388 U.S. 41, 58 (1967).  Electronic eavesdropping "[b]y its very nature . . . involves an intrusion on privacy that is broad in scope," *Berger*, 388 U.S. at 56, and thus bears a dangerous "similarity to the general warrants out of which our Revolution sprang." *id.* at 64 (Douglas, J., concurring).

Indeed, "[f]ew threats to liberty exist which are greater than that posed by the use of eavesdropping devices." *Berger*, 388 U.S. at 63.  Electronic surveillance "constitutes a dragnet, sweeping in all conversations within its scope – without regard to the participants or the nature of the conversations.  It intrudes upon the privacy of those not even suspected of crime and intercepts the most intimate of conversations." *Id.* at 65 (Douglas, J., concurring).  Because of the "grave constitutional questions" posed by electronic surveillance, courts bear "a heavier responsibility" in supervising the procedures that limit such surveillance.  *Osborn v. United States*, 385 U.S. 323, 329 n.7 (1966).

The warrant requirement is no mere "formalit[y]" – it is a crucial safeguard against abuses by executive officers.  *McDonald v. United States*, 335 U.S. 451, 455 (1948).  As the Supreme Court has emphasized repeatedly, any search conducted without a warrant is presumptively unreasonable.  *See United States v. Karo*, 468 U.S. 705, 717 (1984); *Payton v. New York*, 445 U.S. 573, 586 (1980); *Chimel v. California*, 395 U.S. 752, 762-63 (1969).  "Over and again this Court has emphasized that the mandate of the Fourth Amendment requires adherence to judicial processes, and that searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se

unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." *Katz*, 389 U.S. at 357 (citation, internal punctuation, and footnotes omitted).

The Constitution requires that a warrant be issued by a neutral, disinterested magistrate; that it be based on a demonstration of probable cause to believe that the evidence sought will aid in a particular apprehension for a particular offense; and that it particularly describe the things to be seized as well as the place to be searched. *See Dalia v. United States*, 441 U.S. 238, 255 (1979). Each of these requirements serves a vital interest in protecting an individual's privacy from government intrusion.

The requirement of a neutral, disinterested magistrate reflects the fundamental constitutional premise that executive officers cannot be trusted to police themselves. "The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals. Power is a heady thing; and history shows that the police acting on their own cannot be trusted." *McDonald*, 335 U.S. at 455-56. Thus, "the Constitution requires that the deliberate, impartial judgment of a judicial officer be interposed between the citizen and the police." *Katz*, 389 U.S. at 357 (quoting *Wong Sun v. United States*, 371 U.S. 471, 481-82 (1963)) (internal punctuation omitted). Probable cause, of course, "is the standard by which a particular decision to search is tested against the constitutional mandate of reasonableness." *Camara v. Municipal Court*, 387 U.S. 523, 534 (1967). Its basic function is to ensure that "baseless searches shall not proceed." *Keith*, 407 U.S. at 316. Finally, the particularity requirement "limit[s] the authorization to search to the specific areas and things for which there is probable cause to search" in order to "ensure[] that the search

will be carefully tailored." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987).  The importance of the particularity requirement "is especially great in the case of eavesdropping" because eavesdropping inevitably leads to the interception of intimate conversations that are unrelated to the investigation.  *Berger*, 388 U.S. at 56.  Thus, with respect to eavesdropping devices and wiretaps, the particularity requirement demands not simply that the government describe in detail the communications it intends to intercept, but also that it strictly limit the duration of the intercept.  *Id.* at 58-60.

The Program is presumptively invalid under the Fourth Amendment because it complies with none of the vital safeguards encompassed by the warrant requirement.  Under the Program, executive officers initiate warrantless searches at their own discretion.  No neutral, disinterested magistrate reviews surveillance conducted under the Program and consequently there is no check against unlawful invasions of privacy.  Nor do executive officers satisfy any other aspect of the warrant requirement by limiting their searches to instances in which they have probable cause or by delineating beforehand the scope and duration of the search.[53]  The net effect of the Program is thus to render "individuals secure from Fourth Amendment violations only in the discretion of the police."  *Katz*, 389 U.S. at 358-59 (citation and internal quotation marks omitted).

> **B.    The warrant requirement applies with full force to foreign intelligence surveillance within the United States.**

In *Keith*, the Supreme Court specifically held that the Fourth Amendment reaches even electronic surveillance carried out in the name of national security.  The *Keith* case

---

[53] Although the Supreme Court suggested in *Keith* that Congress could tailor the predicate of the probable cause requirement to the context of national security, *Keith*, 407 U.S. at 322-23 – as indeed Congress has done in FISA – the Supreme Court made no suggestion that the quantum of justification required by the Fourth Amendment is diminished when the national security is at stake.

involved surveillance of a domestic organization and the Court had no occasion to express an opinion as to "the issues which may be involved with respect to activities of foreign powers or their agents." *Id.* at 322.  Nevertheless, the Court's rationale for rejecting a "national security exception" to the Fourth Amendment's warrant requirement is the logical starting point for any analysis into whether the Fourth Amendment applies to domestic surveillance for foreign intelligence purposes.

In *Keith*, the Court concluded that the Fourth Amendment's promise of privacy "cannot properly be guaranteed if security surveillances may be conducted solely within the discretion of the Executive Branch," because, in light of their responsibilities as law-enforcers, investigators, and prosecutors, executive branch officials simply cannot function as "neutral and disinterested magistrates." *Id.* at 316-17.  "The historical judgment, which the Fourth Amendment accepts, is that unreviewed executive discretion may yield too readily to pressures to obtain incriminating evidence and overlook invasions of privacy and protected speech." *Id.* at 317.

The Court rejected the government's arguments that a warrant would unduly frustrate the government's objective in collecting domestic security intelligence.  Indeed, it noted that "security surveillances are especially sensitive because of the inherent vagueness of the domestic security concept, the necessarily broad and continuing nature of intelligence gathering, and the temptation to utilize such surveillances to oversee political dissent." *Id.* at 320.  The Court was likewise unpersuaded by the government's claim that the judiciary lacked competence to handle security matters, which the government posited would be "too subtle and complex for judicial evaluation." *Id.*  In response, the Court noted that "[c]ourts regularly deal with the most difficult issues of

our society," and the Court found "no reason to believe that federal judges will be insensitive to or uncomprehending of the issues involved in domestic security cases."  *Id.* The Court suggested instead that "[i]f the threat is too subtle or complex for our senior law enforcement officers to convey its significance to a court, one may question whether there is probable cause for surveillance."  *Id.*  Nor would the process of obtaining a warrant "fracture the secrecy essential to official intelligence gathering," the Court explained, as the judiciary has substantial experience handling sensitive and confidential issues in other contexts.  *Id.* at 320-321.  Additionally, the non-public, non-adversary nature of warrant application proceedings would help maintain confidentiality.  *Id.* at 321.

All of the Court's reasons for refusing to exempt national security surveillance from the warrant requirement apply with equal force in the context of investigations of suspected foreign agents inside the United States.  The "indiscriminate wiretapping and bugging of law-abiding citizens" that the *Keith* Court rightly feared, *see id.* at 321, are no less likely simply because executive agents may suspect that targets are foreign agents. In the absence of judicial oversight, no one can be sure that surveillance targets are in fact foreign agents.  The executive branch simply asks the judiciary to trust it.  But such an abdication of oversight responsibility by the judiciary would be inconsistent with the very nature of our constitutional system of checks and balances.  *Id.* at 317 ("The Fourth Amendment contemplates a prior judicial judgment, not the risk that executive discretion may be reasonably exercised. This judicial role accords with our basic constitutional doctrine that individual freedoms will best be preserved through a separation of powers

30

and division of functions among the different branches and levels of Government."
(footnote omitted)).

The foundational premise of the *Keith* decision – that a neutral and detached
magistrate is a necessary intermediary between Americans and executive officers – is
equally strong where the targets of the investigation are suspected of being foreign
agents.  If anything, executive officers can be expected to err more frequently when
investigating threats they believe to be foreign, because the officers may not believe
Americans' rights are at stake.  In addition, the concept of "foreign security" threats
contains at least as much "inherent vagueness" as the "domestic security" concept.  *Id.* at
320.  Nor is there any reason to believe the investigation of foreign agents inside the
United States is any less susceptible to "the necessarily broad and continuing nature of
intelligence gathering, and the temptation to utilize such surveillances to oversee political
dissent."  *Id.*  Moreover, in light of the "inherent vagueness" of *both* concepts, judicial
efforts to distinguish between "domestic" and "foreign" threats would serve only to
introduce confusion and vagueness into the law.  As the Supreme Court observed in *Keith*
itself, "[n]o doubt there are cases where it will be difficult to distinguish between
'domestic' and 'foreign' unlawful activities directed against the Government of the
United States where there is collaboration in varying degrees between domestic groups or
organizations and agents or agencies of foreign powers."  *Id.* at 309 n.8.[54]

---

[54] In fact, prior to the *Keith* decision, the government itself contended – both in its briefing before
the Supreme Court in *Keith*, and elsewhere – that an analytical distinction between "domestic"
and "foreign" threats was ill-advised because such threats were often intertwined.  *See Zweibon v.
Mitchell*, 516 F.2d 594, 652 (D.C. Cir. 1975) (en banc) (plurality opinion) (discussing the
Solicitor General's brief in *Keith*); *United States v. Hoffman*, 334 F. Supp. 504, 506 (D.D.C.
1971) ("The government contends that foreign and domestic affairs are inextricably intertwined
and that any attempt to legally distinguish the impact of foreign affairs from the matters of
internal subversive activities is an exercise in futility.").

The judiciary is just as competent to handle sensitive information regarding foreign national security threats as domestic.  Warrant proceedings are just as secret in the context of foreign intelligence gathering, so leaks are no more likely.  In fact, more than twenty-five years' worth of experience with the FISA Court demonstrates that members of the nation's judiciary are fully capable of understanding the need to issue warrants for national security purposes and of keeping secret the information they learn in doing so.

It is worth noting, finally, that were the courts to recognize a foreign intelligence exception to the warrant requirement, there would be no principled basis upon which to confine such an exception to electronic surveillance alone.  As one circuit court explained, if the Executive can eavesdrop on the conversations of Americans without a warrant in the name of foreign intelligence gathering, "it is difficult to see why" the Executive lacks the  "prerogative to rummage through the books, papers, and other effects of dissidents in the United States based on an Executive determination that they posed a threat to national security."  *Zweibon*, 516 F.2d at 618 n.67 (en banc) (plurality opinion) (holding that warrant requirement applied to surveillance of Jewish Defense League even where authorized by the Attorney General "in the name of foreign intelligence gathering for protection of the national security").[55]

---

[55] Indeed, Attorney General Alberto Gonzales, when pressed on the point before the Senate Judiciary Committee, refused to rule out the possibility that the present administration has engaged in warrantless physical searches of homes or offices in pursuit of its national security policies.

> SENATOR SCHUMER:  "Has the government searched someone's home, an American citizen, or office, without a warrant since 9/11, let's say?"
> ALBERTO GONZALES:  "To my knowledge, that has not happened under the terrorist surveillance program, and I'm not going to go beyond that."
> SENATOR SCHUMER: "I don't know what that – what does that mean, under the terrorist surveillance program? The terrorist surveillance program is about wiretaps. This

In the wake of *Keith*, but before the passage of FISA, some cases held that there was a foreign intelligence exception to the warrant requirement.[56]  These cases do not apply in this Circuit.  More importantly, they are inconsistent with the Supreme Court's rationale in *Keith*, and their rationale has now been undermined by over twenty-five years of experience under FISA.  Indeed, FISA judges have had no difficulty understanding the "delicate and complex decisions that lie behind foreign intelligence surveillance," *United States v. Truong*, 629 F.2d 908, 913 (4th Cir. 1980), well enough to grant the executive nearly all the warrants it claimed to need.

>C.   **The Program violates the Fourth Amendment because it does not require executive officials to satisfy the probable cause standard before surveillance begins.**

The Supreme Court's Fourth Amendment cases clearly "indicate that even a search that may be performed without a warrant must be based, as a general matter, on probable cause."  *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 604 (1989); *see also New Jersey v. T.L.O.*, 469 U.S. 325, 340 (1985).  For example, the Court has cautioned that the constitutional allowance for warrantless searches of automobiles "does not declare a field day for the police in searching automobiles," because "[a]utomobile or no automobile, there must be probable cause for the search."  *Almeida-Sanchez v. United States*, 413 U.S. 266, 269 (1973).  Likewise, "[a]s *Payton* [*v. New York*, 445 U.S. 573 (1980)] makes plain, police officers need either a warrant or *probable cause plus* exigent

---

is about searching someone's home. It's different.   So it wouldn't be done under the surveillance program. I'm asking you if it has been done, period."
ALBERTO GONZALES:  "But now you're asking me questions about operations or possible operations, and I'm not going to get into that, Senator."
*Wartime Executive Power and the NSA's Surveillance Authority Before the Senate Judiciary Committee*, 109th Congress (Feb. 6, 2006).
[56] *See., e.g., Truong*, 629 F.2d at 912-15; *United States v. Butenko*, 494 F.2d 593, 604-05 (3d Cir. 1974) (en banc); *United States v. Buck*, 548 F.2d 871, 875 (9th Cir. 1977); *United States v. Brown*, 484 F.2d 418, 426 (5th Cir. 1973).

circumstances in order to make a lawful entry into a home." *Kirk v. Louisiana*, 536 U.S.

635, 638 (2002) (per curiam) (emphasis added).  Certain warrantless searches, to be sure,

are permitted upon a lesser quantum of suspicion, but those cases generally involve "stop

and frisk" searches, *see, e.g.*, *Terry v. Ohio*, 392 U.S. 1 (1968), administrative searches,

*see, e.g.*, *Camara*, 387 U.S. 523, or searches for "special needs," *see, e.g.*, *Skinner*, *supra*.

Listening in on private phone conversations is far more intrusive than a "stop and frisk,"

*see, e.g., Terry*, 392 U.S. at 26, does not satisfy the criteria for administrative searches,

*see, e.g., Griffin v. Wisconsin,* 483 U.S. 868, 873 (1987), and does not fall within the

narrow exception articulated in the "special needs" cases, *see, e.g., O'Connor v. Ortega*,

480 U.S. 709, 720, 725 (1987) (plurality opinion) (citation and internal quotation marks

and alterations omitted) (noting that "special needs" doctrine is available only where "the

warrant and probable cause requirement [are] impracticable.").

By the government's own admissions, under the Program an NSA shift supervisor

need not have probable cause of any kind before approving warrantless electronic

surveillance.  Probable cause means probable cause and not merely "reasonable grounds"

or "reasonable suspicion."  *See, e.g.*, *Florida v. J.L.*, 529 U.S. 266, 272-73 (2000) (noting

distinction between "reasonable suspicion" and "the higher standard of probable cause").

> **D.** **The Program violates the Fourth Amendment because neither the President nor the Attorney General authorizes each electronic surveillance.**

Even courts that – contrary to the rationale of *Keith*, and before the enactment of

FISA – have recognized a foreign intelligence exception to the warrant requirement have

narrowly circumscribed its scope.  *See, e.g.*, *Truong*, 629 F.2d at 915 (exception limited

to surveillance "conducted 'primarily' for foreign intelligence reasons"); *Butenko*, 494

F.2d at 606 (same). Some circuits have held that any foreign intelligence exception to the warrant requirement is available only "if there has been a specific authorization by the President, or by the Attorney General as his chief legal advisor, for the particular case." *United States v. Ehrlichman*, 546 F.2d 910, 925 (D.C. Cir. 1976); *accord*, *Katz*, 389 U.S. at 364 (White, J., concurring) (arguing for a national security exception to the warrant requirement where "the President of the United States or his chief legal officer, the Attorney General, has considered the requirements of national security and authorized electronic surveillance as reasonable"); *Brown*, 484 F.2d at 426 ("[W]e reaffirm . . . that *the President* may constitutionally authorize warrantless wiretaps for the purpose of gathering foreign intelligence." (emphasis added)).

As the D.C. Circuit recognized, "the power surreptitiously to intrude on the privacy of citizens without the necessity of first justifying [the] action before an independent and detached member of the judiciary" is one "easily subject to abuse." *Ehrlichman*, 546 F.2d at 926. Therefore, "if Presidential approval is to replace judicial approval for foreign intelligence gathering, the personal authorization of the President or his alter ego for these matters, the Attorney General is necessary to fix accountability and centralize responsibility for insuring the least intrusive surveillance necessary and preventing zealous officials from misusing the President's prerogative." *Id.*

Dispensing with even this minimal measure of accountability and oversight *within* the executive branch would strip away all meaningful Fourth Amendment protection and turn "national security" into a talisman that the executive could invoke to ward off any judicial oversight of any kind. Relying on NSA shift supervisors to safeguard the privacy rights of Americans would resurrect the precise evil against which the Fourth

35

Amendment was directed, by "plac[ing] the liberty of every man in the hands of every petty officer." *Stanford v. Texas*, 379 U.S. 476, 481 (1965) (quoting *Boyd v. United States*, 116 U.S. 616, 625 (1886)) (internal quotation marks omitted). In summary, because the electronic surveillance conducted under the Program does not comply with the Fourth Amendment's standards, plaintiffs are entitled to judgment as a matter of law.

**IV.   THE PROGRAM VIOLATES THE FIRST AMENDMENT BY PERMITTING THE NSA TO INTERCEPT PROTECTED COMMUNICATIONS WITHOUT COMPLYING WITH CONSTITUTIONALLY MANDATED SAFEGUARDS.**

   **A.   The Program authorizes the interception of private communications that are protected by the First Amendment.**

The Supreme Court has long recognized that the Fourth Amendment protection against unrestricted searches and the First Amendment guarantee of freedom of speech are closely linked. The right to speak freely without government intrusion lies at the core of First Amendment protection. Indeed, "[our founders] believed that freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth." *Whitney v. California,* 274 U.S. 357, 375 (1927) (Brandeis, J., concurring). The Bill of Rights "was fashioned against the background of knowledge that unrestricted power of search and seizure could also be an instrument for stifling liberty of expression." *Marcus v. Search Warrant*, 367 U.S. 717, 729 (1961); *see also Stanford*, 379 U.S. at 485 (observing that the First, Fourth and Fifth Amendments are "closely related, safeguarding not only privacy and protection against self-incrimination but conscience and human dignity and freedom of expression as well" (citation and internal quotation marks omitted)); *Stanley v. Georgia*, 394 U.S. 557, 594 (1969) ("The makers of our Constitution . . . conferred, as against the government, the right to be let

alone – the most comprehensive of rights and the right most valued by civilized man."

(quoting *Olmstead v. United States*, 277 U.S. 438, 478 (1928) (Brandeis, J., dissenting)

(internal quotation marks omitted)).  Because of the convergence of First and Fourth

Amendment values, courts have considered the First Amendment implications of

government power to investigate expressive activity when determining whether the

exercise of such power complies with the Fourth Amendment.  *See, e.g.*, *Zurcher v.

Stanford Daily*, 436 U.S. 547, 564 (1978) (requirements of the Fourth Amendment must

be applied with "scrupulous exactitude" where First Amendment rights implicated).  As

the Court cautioned in *Keith*, "The price of lawful public dissent must not be a dread of

subjection to an unchecked surveillance power."  407 U.S. at 314.

The Supreme Court has noted that the danger to free speech is particularly acute

when the government investigates expressive activity because of a potential threat to

national security.  "Though the investigative duty of the executive may be stronger in

such cases, so also is there greater jeopardy to constitutionally protected speech."  *Keith*,

407 U.S. at 313.  The protections of the Fourth Amendment are particularly necessary

where "the targets of official surveillance may be those suspected of unorthodoxy in their

political beliefs."  *Id.* at 314.  The "danger to political dissent is acute where the

Government attempts to act under so vague a concept as the power to protect 'domestic

security.'  Given the difficulty of defining the domestic security interest, the danger of

abuse in acting to protect that interest becomes apparent."  *Id.*; *see also Zweibon*, 516

F.2d at 635-36 (en banc) (plurality opinion) ("To allow Executive Branch to make its

own determinations as to such matters invites abuse, and public knowledge that such

abuse is possible can exert a deathly pall over vigorous First Amendment debate on issues of foreign policy.").

When the government investigates protected speech without first complying with constitutional safeguards, it violates not only the Fourth Amendment but the First Amendment.  As the Supreme Court has explained, "[a]buses of the investigative process may imperceptibly lead to abridgment of protected freedoms" because "forced revelations" about a person's "beliefs, expressions, or associations . . . concern[ing] matters that are unorthodox, unpopular, or even hateful to the general public" can have a "disastrous" effect on the person whose private communications are thus disclosed. *Watkins v. United States*, 354 U.S. 178, 197 (1957).  Noting that "compelled disclosure of affiliation with groups engaged in advocacy may constitute [an] effective . . . restraint on freedom of association," the Supreme Court "has recognized the vital relationship between freedom to associate and privacy in one's associations. . . . Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs."  *NAACP v. Alabama*, 357 U.S. 449, 462 (1958).  Public knowledge that the government is listening in on individuals' most private expressions of their thoughts creates a "subtle and immeasurable effect" on others, who begin to "adhere to the most orthodox and uncontroversial views and associations in order to avoid a similar fate at some future time."  *Watkins,* 354 U.S. at 197-98; *see also NAACP v. Alabama*, 357 U.S. at 462-63 (the chilling effect of government investigation on associational freedom "may induce members to withdraw from the Association and dissuade others from joining it because of fear of exposure of their beliefs shown through their associations and of the

consequences of this exposure"); *Tattered Cover, Inc. v. City of Thornton*, 44 P.3d 1044,

1053 (Colo. 2002) ("[G]overnmental inquiry and intrusion into the reading choices of

bookstore customers will almost certainly chill their constitutionally protected rights.").

> **B.**    **The Program violates the First Amendment because it authorizes the NSA to intercept private conversations without first demonstrating a compelling interest and narrowly tailoring its interceptions to that interest.**

Because of the threat to free speech, a long line of cases holds that the

government must be held to a higher standard when it seeks to use its powers to

investigate expressive activity.  Courts have made clear that the government cannot

investigate First Amendment activity unless it first establishes a compelling interest and

proves its investigation is substantially related to that interest.

> It is an essential prerequisite to the validity of an investigation which intrudes into the area of constitutionally protected rights of speech, press, association and petition that the State convincingly show a substantial relation between the information sought and a subject of overriding and compelling state interest.

*Gibson v. Fla. Legislative Investigative Comm.*, 372 U.S. 539, 546 (1963); *see also*

*Brown v. Socialist Workers '74 Campaign Comm.*, 459 U.S. 87, 91-92 (1982); *Shelton v.*

*Tucker*, 364 U.S. 479, 488 (1960); *Bates v. City of Little Rock*, 361 U.S. 516, 524 (1960);

*cf. United States v. Dionisio*, 410 U.S. 1, 12 (1973) ("[G]rand juries must operate within

the limits of the First Amendment." (quoting *Branzburg v. Hayes*, 408 U.S. 665, 708

(1972)).  Following this line of authority, courts have applied heightened scrutiny to

assess First Amendment challenges to government investigations that trench on

expressive and associational interests.  *See, e.g.*, *Marshall v. Bramer*, 828 F.2d 355, 359 (6th Cir. 1987).[57]

By authorizing the NSA to intercept private conversations with no judicial oversight and no clear standard, the Program utterly fails to satisfy heightened scrutiny. Though the protection of national security is certainly a compelling interest in the abstract, the Program comes nowhere close to meeting the narrow tailoring requirement that the Constitution demands.  Under the Program, an NSA shift supervisor can initiate eavesdrops of unspecified scope and duration on anyone in America whom the shift supervisor believes may be affiliated with terrorist organizations.  The breadth of the Program has already had a substantial chilling effect on protected speech.  *See supra* Legal and Factual Background, Section C.

> **C.     The Program violates the First Amendment because it authorizes the NSA to intercept private conversations without judicial oversight.**

The Program is inconsistent with the First Amendment for the additional reason that it permits the FBI to obtain constitutionally protected information without judicial oversight.  In a long line of cases, the Supreme Court has held that executive officials cannot, consistent with the Constitution, be invested with the unilateral authority to censor communications or seize records protected by the First Amendment.  These cases

---

[57] *See also In re Grand Jury Proceedings*, 776 F.2d 1099, 1102 (2d Cir. 1985) ("[J]ustifiable government goals may not be achieved by unduly broad means having an unnecessary impact on protected rights of speech, press, or association." (quoting *Branzburg*, 408 U.S. at 680-81); *Clark v. Library of Congress*, 750 F.2d 89 (D.C. Cir. 1984) (recognizing First Amendment claim where the FBI conducted investigation into a library worker's political activities and beliefs); *In re First Nat'l Bank*, 701 F.2d 115, 117 (10th Cir. 1983) ("[T]he government must demonstrate a compelling interest, and a substantial relationship between the material sought and legitimate governmental goals."); *Alliance To End Repression v. City of Chicago*, 627 F. Supp. 1044 (N.D. Ill. 1985) (holding that local law enforcement had violated the First Amendment by infiltrating a political organization and giving false congressional testimony about it); *Paton v. La Prade*, 469 F. Supp. 773 (D.N.J. 1978) (holding that FBI violated student's First Amendment rights when it investigated her for sending a letter to the Socialist Worker's Party as part of a class project); *In re Grand Jury Subpoena to Kramerbooks & Afterwords Inc.*, 26 Med. L. Rptr. 1599.

have emphasized that First Amendment activity is protected not only by substantive standards but also by *procedural* safeguards.  "[A] State is not free to adopt whatever procedures it pleases . . . without regard to the possible consequences for constitutionally protected speech."  *Marcus*, 367 U.S. at 73; *see also, e.g., City of Lakewood v. Plain Dealer Publ'g Co*., 486 U.S. 750 (1988); *Zurcher*, 436 U.S. 547; *Roaden v. Kentucky*, 413 U.S. 496, 501 (1973); *Freedman v. Maryland*, 380 U.S. 51, 57-58 (1965); *A Quantity of Copies of Books v. Kansas*, 378 U.S. 205, 211-12 (1964) (plurality opinion).

Because "only a judicial determination in an adversary proceeding ensures the necessary sensitivity to freedom of expression," the First Amendment demands that a judge, *not* an executive official, decide whether the executive branch may compel the disclosure of protected speech.  *Freedman*, 380 U.S. at 58; *see also FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 223-24 (1990) (plurality opinion).  In *Marcus*, the Supreme Court held that a warrant for seizing allegedly obscene material could not issue on the mere conclusory allegations of an executive officer.  *See Marcus*, 367 U.S. at 724; *see also Roaden,* 413 U.S. at 506.  In *Lee Art Theatre, Inc. v. Virginia*, 392 U.S. 636 (1968) (per curiam), the Court rejected a warrant for the seizure of a film issued on the basis of a police officer's summary affidavit.  If the First Amendment prevents executive officers from unilaterally seizing allegedly obscene books and films, then it certainly prevents executive officers from intercepting Americans' most private conversations.

The Program does not require the kind of judicial review that the First Amendment demands; indeed, it does not require judicial review at all.  The decision to intercept electronic communications is vested solely in the hands of an NSA shift supervisor rather than an Article III judge.  The only check against NSA overreaching is

41

the NSA itself.  The Program's utter lack of procedural safeguards is an additional basis

on which this Court should declare that the Program violates the First Amendment.

## CONCLUSION

For the foregoing reasons, plaintiffs are entitled to judgment as a matter of law

and plaintiffs' motion for partial summary judgment should be granted.


Respectfully submitted,


s/Ann Beeson_____
ANN BEESON
   *Attorney of Record*
JAMEEL JAFFER
MELISSA GOODMAN (*admission pending*)
SCOTT MICHELMAN (*admission pending*)
CATHERINE CRUMP (*admission pending*)
National Legal Department
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004-2400
(212) 549-2500
annb@aclu.org


s/Michael J. Steinberg_____
MICHAEL J. STEINBERG
KARY L. MOSS
American Civil Liberties Union Fund of Michigan
60 West Hancock Street
Detroit, MI 48201-1343
(313) 578-6814
msteinberg@aclumich.org


Attorneys for Plaintiffs

March 9, 2006

## CERTIFICATE OF SERVICE

I hereby certify that on March 9, 2006, I electronically filed the foregoing documents with the Clerk of the Court using the ECF system.  Counsel for Defendants have not yet filed appearances.  However, undersigned counsel has spoken with L. Michael Wicks of the U.S. Attorney's office in Detroit and believes that Mr. Wicks will serve as local counsel in this case.  Undersigned counsel also understands that Anthony Coppolino of the U.S. Department of Justice in Washington, DC will be representing Defendants.  Accordingly, undersigned counsel certifies that on March 9, 2006, he served Mr. Wicks and Mr. Coppolino by sending via first class mail.

1)  Plaintiffs' Motion for Partial Summary Judgment
2)  Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment
3)  Statement of Undisputed Facts in Support of Plaintiffs' Motion for Partial Summary Judgment
4)  Index of Exhibits in Support of Plaintiffs' Motion for Partial Summary Judgment
5)  Exhibits in Support of Plaintiffs' Motion for Partial Summary Judgment

to the following addresses:

L. Michael Wicks, Esq.
Assistant U.S. Attorney
U.S. Department of Justice
211 West Fort Street, Rm. 2001
Detroit, MI 48226

and

Anthony J. Coppolino, Esq.
Department of Justice, Civil Division, Federal Programs
Room 6102
20 Massachusetts Ave., NW
Washington, DC 20530

    s/ Michael J. Steinberg
Michael J. Steinberg (P43085)
American Civil Liberties Union
  Fund of Michigan
60 West Hancock Street
Detroit, Michigan 48201
(313) 578-6814
msteinberg@aclumich.org

Counsel for Plaintiffs

43