# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

AMERICAN CIVIL LIBERTIES UNION; AMERICAN
CIVIL LIBERTIES UNION FOUNDATION;
AMERICAN CIVIL LIBERTIES UNION OF
MICHIGAN; COUNCIL ON AMERICAN-ISLAMIC
RELATIONS; COUNCIL ON AMERICAN-ISLAMIC
RELATIONS MICHIGAN; GREENPEACE, INC.;
NATIONAL ASSOCIATION OF CRIMINAL
DEFENSE LAWYERS; JAMES BAMFORD; LARRY
DIAMOND; CHRISTOPHER HITCHENS; TARA
MCKELVEY; and BARNETT R. RUBIN,          Case No. 2:06-cv-10204

        Plaintiffs,                 Hon. Anna Diggs Taylor

        v.

NATIONAL SECURITY AGENCY / CENTRAL
SECURITY SERVICE; and LIEUTENANT
GENERAL KEITH B. ALEXANDER, in his official
Capacity as Director of the National Security Agency
and Chief of the Central Security Service,

        Defendants.
_____/

**MEMORANDUM OF LAW OF *AMICI CURIAE* NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, AMERICAN-ARAB ANTI-DISCRIMINATION COMMITTEE, ASIAN AMERICAN LEGAL DEFENSE AND EDUCATION FUND, JAPANESE AMERICAN CITIZENS LEAGUE, THE LEAGUE OF UNITED LATIN AMERICAN CITIZENS, AND UNITED FOR PEACE AND JUSTICE IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Jonathan Hafetz             Saul A. Green – P14317
Aziz Z. Huq                MILLER, CANFIELD, PADDOCK &
BRENNAN CENTER FOR JUSTICE    STONE, P.L.C.
 AT NYU SCHOOL OF LAW        150 West Jefferson
161 Avenue of the Americas        Suite 2500
12th Floor                   Detroit, Michigan  48226-4415
New York, New York 10013      (313)  963-6420
(212) 998-6730

# TABLE OF CONTENTS

TABLE OF AUTHORITIES…………………………………………………………...ii

INTEREST OF *AMICI CURIAE*....……………………………………………......1

INTRODUCTION AND SUMMARY OF ARGUMENT………………………….…..3

ARGUMENT………………………………………………………………………...5

I.      THE CHURCH COMMITTEE REVEALED HOW DECADES OF WARRANTLESS ELECTRONIC SURVEILLANCE ERODED THE CONSTITUTIONAL FREEDOMS OF CIVIL RIGHTS ADVOCATES AND OTHER AMERICANS, DEMONSTRATING THE NEED FOR NEW LEGISLATION TO PREVENT FURTHER ABUSES.....................................................................................................5

      A.    For Decades, Intelligence Agencies Spied On Law-Abiding Americans In The Name Of National Security……………………..5

      B.    The NSA's History Highlights The Dangers Of Warrantless Surveillance……………………...…………………………………12

      C.    The Church Committee Demonstrated The Need For New Legislation To Prevent More Abusive Surveillance………………16

II.     FISA WAS ENACTED TO ELIMINATE WARRANTLESS SURVEILLANCE BY THE NSA AND OTHER INTELLIGENCE AGENCIES TO PREVENT FURTHER ABUSES……………………...17

III.    THE SECRET NSA PROGRAM CIRCUMVENTS FISA AND THE INTER-BRANCH CHECKS AND BALANCES DESIGNED TO PREVENT ABUSIVE SURVEILLANCE……………………………21

CONCLUSION……………………………………………………………………..23

# TABLE OF AUTHORITIES

## Cases

*Berger v. New York*, 388 U.S. 41 (1967)………………………..…………………..6

*Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) …………………..…………………..........20

*International Paper Co. v. Ouellette*, 479 U.S. 494 (1987)……………………………...20

*Morales v. TWA, Inc.*, 504 U.S. 374 (1992)……………………………………………...20

*NAACP v. Alabama ex. rel Patterson*, 357 U.S. 449 (1958)……………………………22

*NAACP v. Button*, 371 U.S. 415 (1963)……………………………………………………22

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964)…………………………………..17

*United States v. Belfield*, 692 F.2d 141 (D.C. Cir. 1982)…………………………………17

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952)………………………...20

## Statutes

18 U.S.C. § 2511…………………………………………………………………………18
18 U.S.C. § 2511(2)(f)……………………………………………………………………18
18 U.S.C. § 2516…………………………………………………………………………...18
18 U.S.C. § 2518…………………………………………………………………………...18
18 U.S.C. § 2520…………………………………………………………………………18
47 U.S.C. § 605(a)………………………………………………………………………5
50 U.S.C. § 1805(a)(3)………..…………………………………………..……………18
50 U.S.C. § 1809…………………………………………………………………………18
50 U.S.C. § 1809(a)(1)……………………………………………………………………18
50 U.S.C. § 1810…………………………………………………………………………18
50 U.S.C. § 1811…………………………………………………………………………19

Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (2001)……19

Emergency Detention Act of 1950,  Pub. L. No. 83-831, Title II, §§ 101-16, 64 Stat. 987, 1019 (Sept. 23, 1950)……………………………………………………………………….8

Exec. Order No. 12,333, § 1.12(b), *reprinted in* 50 U.S.C. § 401 ………………………....12

Foreign Surveillance Act of 1978 ("FISA"), Pub. L. 95-511, Title I, 92 Stat. 1796 (1978)…………………………………………………………………………………..passim

Intelligence Authorization Act for FY1993, Pub. L. No. 102-496, § 705………………12

Omnibus Crime Control and Safe Streets Act of 1968 Pub. L. No. 90-351, Title III, 82 Stat
211…………………………………………………………………………………..18

USA PATRIOT Act, Pub. L. No. 107-56, § 218, 115 Stat. 272 (2001)…………………20

## **Legislative Materials**

H.R. Conf. Rep. No. 95-1720 (1978), *reprinted in* 1978 U.S.C.C.A.N. 4048…………..19

Senate Select Comm. to Study Governmental Operations with Respect to Intelligence
    Activities, Intelligence Activities and the Rights of Americans (Book II), S. Rep. No.
    94-755 (1976) …………………...……………………………………..….passim

Senate Select Comm. To Study Governmental Operations with Respect to Intelligence
    Activities, Supplementary Detailed Staff Reports on Intelligence Activities and the
    Rights of Americans (Book III), S. Rep. No. 94-755 (1976)…………………..passim

S. Rep. No. 95-604 (I), *reprinted in* 1978 U.S.C.C.A.N 3904..…………..……..17, 18, 20

## **Other Authorities**

James Bamford, *Body of Secrets: Anatomy of the Ultra-Secret National Security Agency*
    (2002)…………………………………………………………………………...14

Lowell Bergman et al., *Spy Agency Data After Sept. 11 Led F.B.I. to Dead Ends*, N.Y.
    Times, at A1. (Jan. 17, 2006)………………………………………………………13

David Cunningham, *There's Something Happening Here: The New Left, The Klan, and FBI
    Counterintelligence* (2004)……………………………………………………...15

Loch K. Johnson,
    *America's Secret Power: The CIA in a Democratic Society* (1989)……………12, 13

Mark M. Lowenthal, *Intelligence: From Secrets to Policy* (2000)………………………12

National Security Council Directive No. 9, December 29, 1952, *at*
    <http://www.gwu.edu/~nsarchiv/NSAEBB/NSAEBB23/02-16.htm>…………………….12

Press Briefing by Attorney General Alberto Gonzales and General Michael Hayden,
    Principal Deputy Director for National Intelligence (Dec. 19, 2005), *at*
    <http://www.whitehouse.gov/news/releases/2005/12/20051219-1.html>…………….14

James Risen, *State of War: The Secret history of the CIA and the Bush Administration*
    (2006)…………………………………………………………………………...15

Ellen Schrecker, "Immigration and Internal Security: Political Deportations During the McCarthy Era," 60 *Science and Society* 393 (1996-1997)……………………………9

Lawrence D. Sloan, "Echelon and the Legal Restraints on Signals Intelligence: A Need for Reevaluation," 50 *Duke L.J.* 1467 (2001)………………………………………..12

*See* L. Britt Snider, "Recollections from the Church Committee's Investigation of NSA," *at* <www.gwu.edu/~nsarchiv/NSAEBB/NSAEBB178/surv18.pdf>..........................15

Paul Wolf, COINTELPRO: The Untold American Story, Report Presented to U.N. High Commissioner for Human Rights Mary Robinson at the World Conference Against Racism in Durban, South Africa by members of the Congressional Black Caucus, September 1, 2001,
*at* <http//www.icdc.com/~paulwolf/cointelpro/coinwcar3.htm> ……………..……10

## INTEREST OF *AMICI CURIAE*

The National Association for the Advancement of Colored People ("NAACP") is a non-profit membership corporation chartered by the State of New York in 1909. The Nation's oldest and largest civil rights organization, the NAACP has more than 500,000 members and 2,200 units in the United States and overseas.

The American-Arab Anti-Discrimination Committee ("ADC") is a non-profit, non-partisan civil rights organization committed to defending the rights of people of Arab descent and promoting their rich cultural heritage. ADC, which was founded in 1980, is the largest Arab-American grassroots civil rights organization in the United States, with 38 chapters nationwide and members in all 50 States.

The Asian American Legal Defense and Education Fund ("AALDEF"), founded in 1974, is a non-profit organization based in New York City devoted to defending the civil rights of Asian Americans. AALDEF is concerned that the government's reliance on vague and unchecked war powers is the same purported basis that resulted in the unlawful internment of Japanese Americans during World War II.

The Japanese American Citizens League ("JACL") was founded in 1929. JACL is the nation's oldest and largest Asian American non-profit, non-partisan organization committed to upholding the civil rights of Americans with Japanese ancestry.

The League of United Latin American Citizens ("LULAC"), a non-profit membership organization chartered by the State of Texas in 1929, is the oldest and largest Latino civil rights organization in the United States. LULAC advances the economic condition, educational attainment, political influence, health, and civil rights of Hispanic

- 1 -

Americans through community based programs operating at more than 700 LULAC councils nationwide.

United for Peace and Justice, with more than 1,400 member groups, is the nation's largest antiwar coalition coordinating efforts in opposition to the U.S. war on Iraq. Since October 2002 United for Peace and Justice has supported hundreds of local protests and the three largest against the war: at the UN in New York City on February 15, 2003; on the eve of the Republican Convention on August 29, 2004; and in Washington, DC on September 24, 2005.

*Amici* believe that the secret program of warrantless electronic surveillance by the National Security Agency ("NSA") violates the law and jeopardizes the work of civil rights organizations and advocates throughout the country. For decades, the Executive spied on American citizens, including members of *amicus* NAACP, without any judicial oversight. After a congressional investigation in the mid-1970s exposed this surveillance, Congress enacted the Foreign Intelligence Surveillance Act ("FISA") to require that the Executive obtain a warrant before listening to Americans' private communications. *Amici* submit this brief to provide a fuller account of the historical background surrounding FISA's enactment. This background demonstrates why the current NSA secret program impermissibly chills the First Amendment-protected activity of those engaged in today's civil rights struggles and debate about politically controversial issues.[1]

---

[1] *Amici* submit the within brief by unopposed motion, which is incorporated by reference herein.

- 2 -

## INTRODUCTION AND SUMMARY OF ARGUMENT

In 2001, President Bush authorized a secret government program in which the National Security Agency ("NSA") intercepts the international telephone and Internet communications of Americans citizens and residents without a warrant or any other type of judicial approval.  Memorandum of Law in Support of Plaintiffs' Motion for Partial Summary Judgment ("Pls.' Mem.") at 2 (citing Plaintiffs' Statement of Undisputed Facts). As *amici* explain, this secret government program exhibits the same unchecked executive power that led to abusive surveillance of civil rights advocates and others in the past and circumvents the statute enacted specifically to prevent such surveillance from reoccurring.

For decades, the Executive subjected law-abiding Americans to warrantless electronic surveillance.  This shameful history was first exposed to Congress and the American public in 1976 through the investigation and report of the United States Senate Select Committee to Study Governmental Operations with Respect to Intelligence Activities ("the Church Committee").  The Church Committee documented how the NSA and other intelligence agencies had spied on Americans in violation of basic constitutional freedoms.  It also described the tendency of government officials to view wholly legitimate civil rights activity through the lens of national security, targeting even those individuals now viewed as national heroes.

Congress responded to the Church Committee with the Foreign Intelligence Surveillance Act of 1978 ("FISA"), Pub. L. 95-511, Title I, 92 Stat. 1796 (Oct. 25, 1978), prohibiting electronic surveillance of Americans for national security purposes except pursuant to carefully calibrated statutory protections.  Congress enacted FISA against the

backdrop of decades of unchecked executive spying and intended the statute to prevent abusive surveillance of civil rights advocates and others in the future.

The secret program of NSA surveillance at issue here circumvents FISA and violates the Constitution.  This program has interfered with Plaintiffs' communication, research, and advocacy, chilling the First Amendment-protected activity that is essential to civil and human rights work and meaningful public debate.

## ARGUMENT

I.     **THE CHURCH COMMITTEE REVEALED HOW DECADES OF WARRANTLESS ELECTRONIC SURVEILLANCE ERODED THE CONSTITUTIONAL FREEDOMS OF CIVIL RIGHTS ADVOCATES AND OTHER AMERICANS, DEMONSTRATING THE NEED FOR NEW LEGISLATION TO PREVENT FURTHER ABUSES.**

A.     **For Decades, Intelligence Agencies Spied On Law-Abiding Americans In The Name Of National Security.**

In 1924, then-Attorney General, and future Supreme Court Justice, Harlan Fiske Stone expressed grave concerns about federal agencies overstepping their bounds by investigating political and other opinions, rather than unlawful conduct.

> When a police system passes beyond these limits, it is dangerous to the proper administration of justice and to human liberty, which it should be our first concern to cherish. . . .  There is always a possibility that a secret police may become a menace to free government and free institutions because it carries with it the possibility of abuses of power which are not always quickly apprehended or understood.

Senate Select Comm. to Study Governmental Operations with Respect to Intelligence Activities, Intelligence Activities and the Rights of Americans (Book II), S. Rep. No. 94-755, at 3 (1976) ("Church Committee Book II").  Regrettably, Stone's warning was long ignored, with precisely the consequences he foretold.

From the 1930s to the 1970s, Democratic and Republican administrations wiretapped and bugged American citizens without warrants or judicial authorization. *Id.* at 12.  Although the Federal Communication Act of 1934 had made it unlawful to intercept and divulge communications, 47 U.S.C. § 605(a), the Attorney General (and his successors) interpreted the act to permit wiretapping as long as no information was passed outside the government.  Church Committee Book II, *supra*, at 36.  This interpretation eliminated any external check on the Executive branch's power to eavesdrop on even the

- 5 -

most private conversations, dispensing with the requirement that the government justify its suspicions. *See Berger v. New York*, 388 U.S. 41, 63 (1967) ("Few threats to liberty exist which are greater than that posed by the use of eavesdropping devices.").

Most surveillance focused initially on the influence of foreign totalitarian powers. Church Committee Book II, *supra*, at 21. Yet, over time there was a "steady increase in the government's capability and willingness to pry into, and even disrupt, the political activities and personal lives of the people." *Id.* Before long, intelligence activity targeted domestic groups advocating change in America, including civil rights organizations that sought to improve the plight of racial minorities and groups that protested against the war in Vietnam. *Id.* at 22; *see also id.* at 21 (describing "relentless expansion of domestic intelligence activity"); *id.* at 39 ("The breadth of the FBI's investigation of "subversive infiltration" continued to produce intelligence reports and massive files on lawful groups and law-abiding citizens who happened to associate, even unwittingly, with Communists or with socialists unconnected with the Soviet Union . . . . [and] expanded to cover civil rights protest activity as well as violent 'Klan-type' and 'hate' groups, vocal anticommunists, and prominent opponents of racial integration.").

Civil rights organizations were targeted "without regard for the consequences to American liberties." *Id.* at 22. *Amicus* NAACP, for example, was investigated for more than twenty-five years to determine if it "had connections with" the Communist Party despite the fact that nothing was ever found to rebut a report from the very first year of the investigation that the NAACP had a "strong tendency" to "steer clear of Communist activities." *Id.* at 8. The government gathered extensive inside information about the NAACP's lobbying and advocacy efforts through electronic surveillance. *Id.* at 232. The

FBI's extensive reports on the NAACP were disseminated to military intelligence. "All the national officers and board members were listed, and any data in FBI files on their past 'association' with 'subversives' was included." *Id.* at 81 n.350. Warrantless surveillance also prompted the government to take actions that undermined the NAACP and its work. For example, an FBI memo submitted to President Dwight D. Eisenhower containing misstatements about communist influence on the NAACP "reinforced the President's inclination to passivity on civil rights legislation." *Id.* at 251 n.151a (internal quotation marks omitted).

Other targets of FBI and/or army intelligence collection included the Southern Christian Leadership Conference, Congress on Racial Equality, Student Nonviolent Coordinating Committee, Urban League, and Anti-Defamation League of B'nai B'irth. *Id.* at 105, 167. "FBI Field Offices were directed to report the 'general programs' of *all* 'civil rights organizations' and 'readily available personal background data' on leaders and individuals in the 'civil rights movement.'" *Id.* at 173. (emphasis in original). In addition, the FBI opened intelligence investigations on "every Black Student Union and similar group *regardless of their past or present involvement in disorders*." *Id.* at 177. (emphasis in original). The government maintained files on nearly 100,000 Americans, including civil rights leaders such as Dr. Martin Luther King, Coretta King, Julian Bond, and James Farmer. *Id.* at 81, 174.

Perhaps most notoriously, the FBI targeted Dr. King to "neutralize" him as an effective civil rights leader. *Id.* at 11. After Dr. King's speech at the August 1963 March on Washington, the FBI described him as the "most dangerous and effective Negro leader in the country" and decided to "take him off his pedestal." *Id.* "No holds were barred" in

the FBI's "war" against Dr. King.  *Id.*  The Bureau employed "nearly every intelligence-gathering technique at [its] disposal," including electronic surveillance, to obtain information about the "private activities of Dr. King and his advisors" in order to "completely discredit" them.  *Id.*  For example, the FBI mailed Dr. King a recording from microphones hidden in his hotel rooms made in an attempt to destroy Dr. King's marriage; the recording was accompanied by a note which Dr. King and his advisors interpreted as threatening to release the tape recording unless Dr. King committed suicide.  *Id.*

Warrantless surveillance also targeted countless other Americans on both the political left and right, from the women's liberation movement to conservative Christian groups.  *Id.* at 7.  Student groups, such as Students for a Democratic Society, were wiretapped because of their opposition to the Vietnam War.  *Id.* at 105.  Members of the Socialist Workers Party were investigated and wiretapped for decades by Democratic and Republican administrations that disliked the Party's position on the Vietnam War, food prices, racial matters, and other issues.  *Id.* at 8.  Journalists were often spied on, as were executive branch officials and their relatives.  *Id.* at 106-07, 121.

The FBI's indexing of national security information gained from warrantless surveillance provided a foundation for the Emergency Detention Act of 1950, which authorized the preventive detention of anyone suspected of having the potential for espionage or sabotage – a measure similar to that which permitted the internment of over 120,000 Japanese Americans during World War II.  Pub. L. No. 83-831, Title II, §§ 101-16, 64 Stat. 987, 1019 (Sept. 23, 1950) (codified as amended in scattered sections of 50 U.S.C.), *repealed by* Act of Sept. 25, 1971, Pub. No. 92-128, § 2, 85 Stat. 347, 348.  While the act's detention provision was never used, at least 26,000 people were designated to be

rounded up in case of a "national emergency." Church Committee Book II, *supra*, at 7. In addition, the FBI's intelligence activities led it to work closely with the Immigration and Naturalization Service to round up thousands of noncitizens, even though few were ever found to be "subversives." Ellen Schrecker, "Immigration and Internal Security: Political Deportations During the McCarthy Era," 60 *Science and Society* 393, 399, 412 (1996-1997). In fact, in some instances the goal was not to deport unlawful immigrants but, rather, to harass and instill fear among immigrant communities. *Id.* at 408-09 n.9.

Although justified in terms of national security, surveillance could be "purely political" in aim. Church Committee Book II, *supra*, at 118. The Executive might spy on "citizens on the basis of their political beliefs, even when those beliefs posed no threat of violence or illegal acts on behalf of a hostile foreign power." *Id.* at 5. Federal agents, for example, conducted widespread electronic surveillance around the 1964 Democratic National Convention in Atlantic City, New Jersey. They wiretapped Dr. King's hotel room and the headquarters of the Student Nonviolent Coordinating Committee, a leading civil rights organization. *Id.* at 117. The surveillance yielded "the most intimate details" about the Mississippi Freedom Democratic Party and its potential challenge to President Johnson at the Convention, which the Johnson administration could exploit for political purposes unrelated to the possibility of violent demonstrations. *Id.* at 118.

Intelligence agencies misused the information gained through warrantless surveillance to "discredit the ideas" and "'neutralize' the actions" of Americans engaged in First Amendment-protected speech and advocacy. *Id.* at 3. The FBI's counter-intelligence program known as COINTELPRO, for example, sought to expose, disrupt, misdirect, discredit or otherwise neutralize African-American organizations and their leadership,

- 9 -

spokesmen, members, and supporters.  *Id.* 87.   After gathering intelligence, the FBI resorted to a range of repressive tactics, including: anonymously attacking targets' political beliefs to induce their employers to fire them; provoking IRS tax investigations to deter targets' political activity; anonymously mailing letters to the spouses of intelligence targets to destroy their marriages; and anonymously and falsely labeling targets as government informants to expose them to expulsion or physical attack.  *Id.* at 10-11; *see also* Paul Wolf, COINTELPRO: The Untold American Story, Report Presented to U.N. High Commissioner for Human Rights Mary Robinson at the World Conference Against Racism in Durban, South Africa by members of the Congressional Black Caucus, September 1, 2001,  *at*  <http//www.icdc.com/~paulwolf/cointelpro/coinwcar3.htm>   (describing COINTELPRO tactics of repeatedly arresting activists on false pretenses until they could no longer make bail and utilizing paid informants to present false testimony).

Based on its investigation, the Church Committee concluded that intelligence agencies had unjustifiably invaded the private communications of individuals who "engaged in no criminal activity and who posed no genuine threat to the national security." Church Committee Book II, *supra*, at 12.   It described the inevitable "tendency of intelligence activities to expand beyond their initial scope," increasing the pressure to use the new intelligence against targets.  *Id.*   This pressure, in turn, led to ever-widening surveillance of wholly legitimate civil rights activity, such as the struggle for racial equality, which Democratic and Republican administrations alike mistakenly viewed in Cold War terms.

The Church Committee also explained how the Executive's use of broad labels like "national security" and "subversion" in identifying targets exponentially increased warrantless surveillance.

> The application of vague and elastic standards for wiretapping and bugging has resulted in electronic surveillances which, by any objective measure, were improper and seriously infringed the Fourth Amendment rights of both the targets and those with whom the targets communicated. . . . The inherently intrusive nature of electronic surveillance . . . enabled the Government to generate vast amounts of information – unrelated to any legitimate governmental interest – about the personal and political lives of American citizens.  The collection of this type of information has, in turn, raised the danger of its use for partisan political and other improper ends by senior administration officials.

Senate Select Comm. to Study Governmental Operations with Respect to Intelligence Activities, Supplementary Detailed Staff Reports on Intelligence Activities and the Rights of Americans (Book III), S. Rep. No. 94-755, at 332 (1976) ("Church Committee Book III").  Even civil rights leaders now recognized as national heroes, including Dr. King and members of *amicus* NAACP, were spied on in the name of national security.  Warrantless surveillance, moreover, continued for decades without any basis to justify it.  *Id.* at 5 (Surveillance of "groups deemed potentially dangerous," as well as those groups merely "suspected of associating with [them,] continued for decades, despite the fact that those groups did not engage in unlawful activity.").  As the Church Committee concluded, unchecked surveillance activity inevitably "exceed[s] the restraints on the exercise of governmental power which are imposed by our country's Constitution, laws, and traditions."  Church Committee Book II, *supra*, at 2.

### B.  The NSA's History Highlights The Dangers Of Warrantless Surveillance.

Nowhere were the dangers of unchecked surveillance more acute during the Cold War than in the NSA.  President Truman created the NSA within the Department of Defense by secret directive in October 1952 to marshal the Nation's electronic surveillance resources for the Cold War.  Church Committee Book III, *supra*, at 736.  The NSA's primary task involved collection of signals intelligence, or "SIGINT."[2]  Until 1992, the agency operated without legislative charter, *cf.* Intelligence Authorization Act for FY1993, Pub. L. No. 102-496, § 705, and, until 1981, no publicly available executive order limited the NSA's power or set forth its responsibilities, *cf.* Exec. Order No. 12,333, § 1.12(b), *reprinted in* 50 U.S.C. § 401; Lawrence D. Sloan, "Echelon and the Legal Restraints on Signals Intelligence: A Need for Reevaluation," 50 *Duke L.J.* 1467, 1497-99 (2001) (describing E.O. 12,333).

Through most of the Cold War, therefore, the NSA's surveillance apparatus operated entirely outside statutory regulation.  Unchecked by the legislative or judicial branches, the NSA grew "into a vast mechanical octopus, reaching sensitive tentacles into every continent in search of information on the intentions and capabilities of other nations."  Loch K. Johnson, *America's Secret Power: The CIA in a Democratic Society* 52 (1989).

For decades, the NSA conducted sweeping, indiscriminate surveillance of electronic communications of law-abiding American citizens and organizations.  It then disseminated its yield among government agencies, including the FBI, CIA, Secret Service, Defense Department, and narcotics bureaus.  Church Committee Book III, *supra*, at 735.

---

[2] SIGINT comprises: (a) "the interception of communications between two parties"; (b) "the pick-up of data relayed by weapons during tests"; and (c) "the pickup or electronic emissions from modern weapons and tracking systems."  Mark M. Lowenthal, *Intelligence: From Secrets to Policy* 64 (2000); *see also* National Security Council Directive No. 9, December 29, 1952, *at* <http://www.gwu.edu/~nsarchiv/NSAEBB/NSAEBB23/02-16.htm> (describing responsibilities of NSA director); Church Committee Book III, *supra*, at 737.

Two programs of the NSA trenched deeply on First and Fourth Amendment rights. First, "Operation Shamrock" involved blanket surveillance of all cables coming in and out of the United States.  Second, the NSA maintained a "watch-list" of suspect Americans -- including many civil rights advocates -- targeted due to their First Amendment-protected speech.

In Shamrock, the NSA "received copies of millions of international telegrams sent to, from, or transiting the United States," and was "the largest governmental interception program affecting Americans" of the Cold War era, dwarfing the CIA's mail opening program by comparison.  Church Committee Book III, *supra*, at 740.  Shamrock initially siphoned out only "enciphered telegrams of certain foreign targets," but, in the absence of legislative limits and judicial oversight, spun out of control until *every* international cable was being intercepted.  *Id.*  Indeed, the "daily rush" of indiscriminate information swept up by the NSA was compared to a "firehose."  Johnson, *America's Secret Power*, *supra*, at 64, *cf.* Lowell Bergman et al., *Spy Agency Data After Sept. 11 Led F.B.I. to Dead Ends*, N.Y. Times, at A1. (Jan. 17, 2006) (reporting that after September 11, NSA sent "a flood" of telephone numbers, e-mail addresses and names to the FBI in search of terrorists, "requiring hundreds of agents to check out thousands of tips a month," virtually all of which "led to dead ends or innocent Americans").  Not only were there no external constraints, but the Executive branch's command-and-control structure was so poor that the massive Shamrock program was run by "only one lower-level manager" without monitoring from senior officials within the agency, James Bamford, *Body of Secrets: Anatomy of the Ultra-Secret National Security Agency* 437 (2002), a startling lack of internal agency supervision replicated by the current NSA program, *see* Press Briefing by

- 13 -

Attorney General Alberto Gonzales and General Michael Hayden, Principal Deputy Director for National Intelligence (Dec. 19, 2005), *at* <http://www.whitehouse.gov/news/releases/2005/12/20051219-1.html> (disclosing that "shift supervisor" has final authority to approve surveillance under the current NSA program).

The second, even more intrusive, facet of NSA surveillance involved "watch-lists" of suspect Americans. "From the early 1960s until 1973, NSA intercepted and disseminated international communications of selected American citizens and groups on the basis of lists of names supplied by other Government agencies," lists that included individuals and groups "involved in domestic antiwar and civil rights activities." Church Committee Book III, *supra*, at 739. No judicial warrants were sought, Church Committee Book II, *supra*, at 202, and senior Justice Department officials were often left in the dark, *id.* at 189. Surveillance was justified by targets' First Amendment activities. FBI Director J. Edgar Hoover, for example, explained his need for open-ended surveillance to the NSA Director by speculating about foreign influence over domestic speech, including the First Amendment-protected speech of civil rights advocates. According to Hoover, "New Leftists" might be engaged in "international cooperation," and "black racial extremists" were "natural allies of foreign enemies of the United States." Church Committee Book III, *supra*, at 751 (emphasis omitted); *see also* Church Committee Book II, *supra*, at 108 (Army Chief of Staff for Intelligence requesting NSA surveillance of "U.S. 'peace' groups and 'Black Power' organizations"); David Cunningham, *There's Something Happening Here: The New Left, The Klan, and FBI Counterintelligence* 192-93 (2004) (describing NSA surveillance of left-wing groups). Indeed, this was precisely the logic used to justify

the extensive surveillance -- and worse -- of Dr. King.  *See supra* at 7-9; *see also* Church

Committee Book II, *supra*, at 71 (describing FBI's belief that Dr. King might "abandon his

supposed 'obedience' to 'white, liberal doctrines' (nonviolence) and embrace black

nationalism").

      The Church Committee pinpointed a "multiplier effect" embedded in the NSA's

logic:

> [I]f an organization is targeted, all its member's communications may be
> intercepted; if an individual is on the watch list, all communications to,
> from, or mentioning that individual may be intercepted…. For example, a
> communication mentioning the wife of a U.S. Senator was intercepted by
> NSA, as were communications discussing a peace concert, a
> correspondent's report from Southeast Asia to his magazine in New York,
> and a pro-Vietnam war activist's invitation to speakers for a rally.

Church Committee Book III, *supra*, at 750.  NSA surveillance was not restricted to

specified targets but extended indiscriminately to the tens if not hundreds of thousands of

law-abiding Americans who came into contact with them in the course of protected First

Amendment activity.[3]  The history of NSA surveillance thus underscores the dangers that

unregulated surveillance poses to basic constitutional freedoms of civil rights advocates

and other Americans.

      **C .**    **The Church Committee Demonstrated The Need For New Legislation
To Prevent More Abusive Surveillance.**

---

[3] If experience is any guide, moreover, the public picture of the scope of present NSA domestic spying is only the tip of the iceberg.  *Cf.* James Risen, *State of War: The Secret History of the CIA and the Bush Administration* 48-60 (2006) (describing NSA domestic eavesdropping).  According to a staff member of the Church Committee responsible for investigating the NSA, scant information about NSA activity was initially available.  Until 1976, neither the public nor Congress had reason to suspect the NSA of abusive conduct. Nevertheless, Church Committee staff faced a "bureaucratic logjam" in attempts to secure information about NSA activities.  Full details of the NSA's spying on Americans emerged only in March 1976, after hearings had finished.  *See* L. Britt Snider, "Recollections from the Church Committee's Investigation of NSA," at <www.gwu.edu/~nsarchiv/NSAEBB/NSAEBB178/surv18.pdf>; *see also* Church Committee Book III, *supra*, at 767.

Based upon its lengthy and thorough investigation, the Church Committee concluded that "[t]he Constitutional system of checks and balances ha[d] not adequately controlled intelligence activities."  Church Committee Book II, *supra*, at 6.  Congress, it explained, had "failed to exercise sufficient oversight," while the courts had been reluctant to grapple with the few cases that came before them.  *Id.*; *see also id.* at 15 (describing "clear and sustained failure . . . to control the intelligence community and to ensure its accountability").  The Church Committee's message could not have been starker or its warning clearer: if "new and tighter controls" were not established, "domestic intelligence agencies threaten[ed] to undermine our democratic society and fundamentally alter its nature."  *Id.* at 1.

The Committee, accordingly, urged Congress to enact legislation restricting surveillance by the NSA and other intelligence agencies to prevent repeated intrusions on Americans' privacy and speech rights, intrusions which jeopardized their ability to engage in constitutionally protected civil rights activity and meaningful public debate.  Specifically, it recommended that the NSA be limited by "a precisely drawn legislative charter" prohibiting the agency from "select[ing] for monitoring any communication to, from, or about an American" unless "a warrant approving such monitoring is obtained in accordance with procedures similar to those contained [under the federal wiretapping statute]."  *Id.* at 309.  The NSA retained "wide discretion for selecting not only the communication channels to be monitored, but also what information was disseminated."  Church Committee Book III, *supra*, at 761.  While NSA spying had ceased in 1973 due to the activities of Attorney General Elliot Richardson and others, the Committee recognized

that the agency could resume illegal activity "at any time upon order of the Executive" if Congress did not establish specific legislative controls. *Id.*

## II. FISA WAS ENACTED TO ELIMINATE WARRANTLESS SURVEILLANCE BY THE NSA AND OTHER INTELLIGENCE AGENCIES AND TO PREVENT FURTHER ABUSES.

In 1978, Congress enacted FISA in response to the Church Committee's "revelations that warrantless electronic surveillance in the name of national security ha[d] been seriously abused." S. Rep. No. 95-604 (I), at 7-8, *reprinted in* 1978 U.S.C.C.A.N. 3904, 3908-09; *see also United States v. Belfield*, 692 F.2d 141, 145 (D.C. Cir. 1982) (FISA enacted in response to "concerns about the Executive's use of warrantless electronic surveillance" and "establish[ed] a regularized procedure for use in the foreign intelligence and counterintelligence field"). Congress intended FISA to restore and preserve Americans' confidence in their ability to engage in the "public activ[ity]" and "dissent from official policy" at the heart of civil rights advocacy and meaningful public debate. S. Rep. No. 95-604 (I), at 8, 1978 U.S.C.C.A.N. at 3909-10; *cf. New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) (describing "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials"). In enacting FISA, Congress struck a balance between liberty and security, authorizing the Executive to conduct electronic surveillance of Americans to obtain foreign intelligence information but subjecting that surveillance to explicit statutory controls to preserve constitutional freedoms. S. Rep. No. 95-604 (I), at 8, 1978 U.S.C.C.A.N. at 3906. FISA thus demonstrates "a recognition by both the Executive

Branch and the Congress that the statutory rule of law must prevail in the area of foreign intelligence surveillance." *Id.* at 6, 1978 U.S.C.C.A.N. at 3908.

Specifically, FISA requires that the Executive obtain a warrant based upon probable cause that the electronic surveillance target is a foreign power or agent of a foreign power. 50 U.S.C. § 1805(a)(3); *see also* S. Rep. No. 95-604 (I), at 6, 1978 U.S.C.C.A.N. at 3908 (FISA "spell[ed] out that the Executive cannot engage in electronic surveillance within the United States without a prior Judicial warrant"). FISA, together with Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III"),[4] provide "the *exclusive means* by which electronic surveillance . . . and the interception of domestic wire, oral, and electronic communications may be conducted." 18 U.S.C. § 2511(2)(f) (emphasis added). FISA states that no one may engage in electronic surveillance "except as authorized by statute," 50 U.S.C. § 1809(a)(1), and to further deter warrantless surveillance, FISA and Title III impose civil and criminal sanctions against those who conduct such surveillance without statutory authority, *id.* §§ 1809, 1810; 18 U.S.C. §§ 2511, 2520. FISA, in short, was specifically "designed . . . to curb the practice by which the Executive Branch may conduct warrantless electronic surveillance on its own unilateral determination that national security justifies it." S. Rep. No. 95-604(I), at 8-9, 1978 U.S.C.C.A.N. at 3910.

As the Church Committee report makes clear, wartime heightens the risk of unchecked executive surveillance of civil rights advocates and others engaged in politically controversial matters since the tendency is to mistakenly view their wholly legitimate activities through the prism of national security. So, while Congress authorized warrantless electronic surveillance in FISA as an emergency wartime measure, it expressly limited such

---

[4] Pub. L. No. 90-351, 82 Stat 211 (codified as amended at 18 U.S.C. §§ 2510 *et seq.*). Title III allows the government to conduct electronic surveillance in investigations of certain enumerated criminal offenses, 18 U.S.C. § 2516, if it obtains prior judicial approval, *id.* § 2518.

surveillance to the first fifteen days after a formal declaration of war.  50 U.S.C. § 1811.

Further, Congress specifically rejected a proposal that would have allowed for warrantless

surveillance for periods of up to one year after a formal declaration of war.  H.R. Conf.

Rep. No. 95-1720, at 34 (1978), *reprinted in* 1978 U.S.C.C.A.N. 4048, 4063.

Certainly, Congress did not intend to allow any administration to evade FISA's

strictures by conducting warrantless electronic surveillance of Americans in an amorphous

"war on terrorism" that, according to the present administration, could last for generations.

Indeed, Congress enacted FISA during the Cold War, a conflict that also lacked defined

boundaries and prioritized intelligence-gathering, acknowledging the need to "safeguard[ ]

national security" against foreign intelligence activities.  S. Rep. No. 95-604(I), at 9, 1978

U.S.C.C.A.N. at 3910.   FISA's purpose was to ensure that those activities would

henceforth be conducted within a "secure framework" consistent with "this Nation's

commitment to privacy and individual rights."  *Id.*

The government's contention that Congress sanctioned the secret NSA program

through its resolution authorizing military action in Afghanistan immediately after

September 11, *see* Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat.

224 (2001), is fundamentally inconsistent with FISA's language, purpose, history, and

deeply considered statutory scheme.  As described above, FISA expressly addresses the

question of domestic wiretapping during wartime, mandating that such wiretapping be

conducted *exclusively* through the procedures established under the statute.   FISA's

specific and unambiguous directive – enacted in response to the documented decades-long

unregulated electronic surveillance of Americans – must prevail over the broadly worded

AUMF.  *Morales v. TWA, Inc.*, 504 U.S. 374, 384-85 (1992) (specific and "carefully

drawn" statutes trump general statues when there is a conflict) (quoting *International Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987)).

Further, FISA has been amended numerous times since it was enacted in 1978, including after September 11, demonstrating that the Executive knows well that the only permissible means to adjust the statute's carefully calibrated procedures is through new legislation.  *See, e.g.*, USA PATRIOT Act, Pub. L. No. 107-56, § 218, 115 Stat. 272, 291 (2001) (amending 50 U.S.C. § 1804(a)(7)(B)) (amending FISA's warrant requirement so that only "a significant purpose," rather than "the [primary] purpose," of electronic surveillance must be to obtain foreign intelligence information).   Here, however, the administration has circumvented FISA, "tak[ing] measures incompatible with the expressed . . . will of Congress" and undermining "the equilibrium established by our constitutional system."  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 609, 637-38 (1952) (Jackson, J., concurring).  In short, the government's argument that the AUMF authorizes secret NSA wiretapping ignores past abuses and flouts the comprehensive statutory controls Congress enacted to prevent those abuses from reoccurring, "disrespect[ing] the whole legislative process and the constitutional division of authority between the President and Congress."  *Id.* at 609 (Frankfurter, J., concurring); *see also Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004) (plurality op.) ("[A] state of war is not a blank check for the President when it comes to the rights of the Nation's citizens.").

III.   **THE SECRET NSA PROGRAM CIRCUMVENTS FISA AND THE INTER-BRANCH CHECKS AND BALANCES DESIGNED TO PREVENT ABUSIVE SURVEILLANCE.**

The secret program of NSA surveillance at issue here circumvents the requirements of FISA and Congress's specific intent to prevent future administrations from spying on Americans.   Administration officials have publicly acknowledged that "electronic surveillance," as defined by FISA, has been conducted under the current NSA program. Indeed, according to one official, this program was used "in lieu" of FISA.   Index of Exhibits in Support of Plaintiffs' Motion for Partial Summary Judgment, Ex. B, at 3 ("Pls.' Index").   The President has reauthorized this program more than 30 times, and has stated that he intends to continue reauthorizing it as long as he deems it necessary.   Pls.' Index, Ex. D, at 1885.

The NSA's secret program has precisely the chilling effect on civil rights advocacy and other First Amendment freedoms that FISA was designed to prevent.  S. Rep. No. 95-604(I) at 8, 1978 U.S.C.C.A.N. at 3909-10 (FISA was intended to counter the "formidable" chilling effect that warrantless surveillance had on those who "were not targets of the surveillance, but who perceived themselves, whether reasonably or unreasonably, as potential targets").   This program, whose existence was first divulged only months ago, has already interfered with the ability of attorneys to communicate confidentially with their clients as well as with witnesses, potential experts, and others in the Middle East, Pls.' Index, Exs. J, at 6-9 & L, at 3-6; journalists to communicate with sources to effectively and accurately report on politically controversial issues, *id.*, Ex. K, at 3-5; and scholars to study democracy in the Middle East and other pressing issues of the day, Ex. I, at 3-7.  As the history of Executive branch spying shows, it is crucial to prevent the chilling of these core

speech and expression rights by subjecting electronic surveillance to judicial review.  *Cf. NAACP v. Button*, 371 U.S. 415, 434 (1963) (restriction on legal advocacy presents "gravest danger of smothering all discussion looking to the eventual institution of litigation on behalf of the rights of members of an unpopular minority"); *NAACP v. Alabama ex. rel Patterson*, 357 U.S. 449, 462-63 (1958) (disclosure of membership lists could "induce members [of the organization] to withdraw" and "dissuade others from joining").

In sum, the secret NSA program challenged here violates both the letter and spirit of the laws Congress enacted to restrict electronic surveillance of Americans in the name of national security.  Congress struck the balance once, based upon an extensive investigation of past abuses.  It is up to Congress to re-strike that balance, within constitutionally permissible limits, and not for the Executive to change it of its own accord.

## CONCLUSION

For the reasons described above, this Court should grant Plaintiffs' motion for partial summary judgment.

Respectfully submitted,

s/Saul A. Green
Miller, Canfield, Paddock and Stone, P.L.C.
150 West Jefferson, Suite 2500
Detroit, MI  48226
(313)  963-6420
greens@millercanfield.com
P14317

May 8, 2006

**CERTIFICATE OF SERVICE**

I hereby certify that on May 8, 2006, I electronically filed the foregoing paper with the Clerk to the Court using the ECF system which will send notification of such filing to the following:

- **Ann Beeson**
  annb@aclu.org

- **Anthony J. Coppolino**
  tony.coppolino@usdoj.gov

- **Margaret A. Costello**
  mcostello@dykema.com aweber@dykema.com

- **Jameel Jaffer**
  jjaffer@aclu.org citaya@aclu.org

- **Michael J. Steinberg**
  msteinberg@aclumich.org bbove@aclumich.org

- **Andrew Tannenbaum**
  andrew.tannenbaum@usdoj.gov

s/Saul A. Green
Miller, Canfield, Paddock and Stone, P.L.C.
150 West Jefferson, Suite 2500
Detroit, MI  48226
(313)  963-6420
greens@millercanfield.com
P14317

DELIB:2723401.1\066666-50357