# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | | |
|---|---|---|
| AMERICAN CIVIL LIBERTIES UNION; | ) | |
| AMERICAN CIVIL LIBERTIES UNION | ) | |
| FOUNDATION; AMERICAN CIVIL LIBERTIES | ) | Case No.  2:06-CV-10204 |
| UNION OF MICHIGAN; COUNCIL ON | ) | |
| AMERICAN-ISLAMIC RELATIONS; | ) | Hon. Anna Diggs Taylor |
| COUNCIL ON AMERICAN-ISLAMIC | ) | |
| RELATIONS MICHIGAN; GREENPEACE INC.; | ) | |
| NATIONAL ASSOCIATION OF CRIMINAL | ) | |
| DEFENSE LAWYERS; JAMES BAMFORD; | ) | |
| LARRY DIAMOND; CHRISTOPHER | ) | |
| HITCHENS; TARA MCKELVEY; and | ) | |
| BARNETT R. RUBIN, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NATIONAL SECURITY AGENCY/CENTRAL | ) | |
| SECURITY SERVICE; AND LIEUTENANT | ) | |
| GENERAL KEITH B. ALEXANDER, in his | ) | |
| Official capacity as Director of the National | ) | |
| Security Agency/Central Security Service, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Pursuant to Rules 12(b)(1), (b)(6), and 56 of the Federal Rules of Civil Procedure,

Defendants, through their undersigned counsel, hereby move to dismiss this action or, in the

alternative, for summary judgment.  The bases for this motion are (1) that Plaintiffs cannot

establish the requisite standing to bring this action, and (2) that the assertion of the military and

state secrets privilege and other specified statutory privileges by the United States in this action

requires the exclusion of state secrets relevant to the resolution of Plaintiffs' claims and that the

unavailability of this information requires dismissal or the entry of summary judgment in favor of Defendants.

Defendants' arguments in support of this motion are set forth in the classified *in camera, ex parte* and unclassified versions of Defendants' Memorandum of Points and Authorities in Support of the United States' Assertion of the Military and State Secrets Privilege; and Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment; and Defendants' Motion to Stay Consideration of Plaintiffs' Motion for Summary Judgment Memorandum of Points and Authorities, and in the declarations accompanying this motion, including those submitted for *in camera, ex parte* review. *See* Defendants' Notice of Lodging of *In Camera, Ex Parte* Materials.

Pursuant to Local Rule 7.1(a), undersigned counsel consulted with counsel for plaintiffs on May 26, 2006, regarding the nature of the motion and its legal basis and requested but did not obtain concurrence in the relief sought.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

STEPHEN J. MURPHY, III
United States Attorney

CARL J. NICHOLS
Deputy Assistant Attorney General

JOSEPH H. HUNT
Director, Federal Programs Branch

  s/ *Anthony J. Coppolino*
ANTHONY J. COPPOLINO
Special Litigation Counsel

2

 s/ *Andrew H. Tannenbaum*
ANDREW H. TANNENBAUM
Trial Attorney
U.S. Department of Justice, Civil Division
P.O. Box 883
20 Massachusetts Avenue, NW
Washington, DC 20044
(202) 514-4782 (tel); (202) 616-8460 (fax)

*Counsel for Defendants*

DATED: May 26, 2006

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | | |
|---|---|---|
| AMERICAN CIVIL LIBERTIES UNION;<br>AMERICAN CIVIL LIBERTIES UNION<br>FOUNDATION; AMERICAN CIVIL LIBERTIES<br>UNION OF MICHIGAN; COUNCIL ON<br>AMERICAN-ISLAMIC RELATIONS;<br>COUNCIL ON AMERICAN-ISLAMIC<br>RELATIONS MICHIGAN; GREENPEACE, INC.;<br>NATIONAL ASSOCIATION OF CRIMINAL<br>DEFENSE LAWYERS; JAMES BAMFORD;<br>LARRY DIAMOND; CHRISTOPHER<br>HITCHENS; TARA MCKELVEY; and<br>BARNETT R. RUBIN,<br><br>        Plaintiffs,<br><br>        v.<br><br>NATIONAL SECURITY AGENCY/CENTRAL<br>SECURITY SERVICE; and LIEUTENANT<br>GENERAL KEITH B. ALEXANDER, in his<br>official capacity as Director of the National<br>Security Agency and Chief of the<br>Central Security Service<br><br>        Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No.  2:06-cv-10204<br><br>Hon. Anna Diggs Taylor |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE UNITED
STATES' ASSERTION OF THE MILITARY AND STATE SECRETS PRIVILEGE;
DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE,
FOR SUMMARY JUDGMENT; AND DEFENDANTS' MOTION TO STAY
CONSIDERATION OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## (U) TABLE OF CONTENTS

Page

(U) INTRODUCTION                                                                    1

(U) BACKGROUND                                                                      6

A.      (U) September 11, 2001                                                      6

B.      (U) The Continuing Terrorist Threat Posed by al Qaeda                       8

C.      (U) Intelligence Challenges After September 11, 2001                        9

D.      (U) NSA Activities Critical to Meeting Post-9/11 Intelligence Challenges    9

E.      (U) Plaintiffs' Claims                                                      9

(U) ARGUMENT                                                                        10

I.      (U) THE STATE SECRETS PRIVILEGE BARS USE OF PRIVILEGED
        INFORMATION REGARDLESS OF A LITIGANT'S NEED.                                10

        A.      (U) Procedural Requirements                                         10

        B.      (U) Information Covered                                             11

        C.      (U) Standard of Review                                             11

II.     (U) THE UNITED STATES PROPERLY HAS ASSERTED THE STATE
        SECRETS PRIVILEGE AND ITS CLAIM OF PRIVILEGE SHOULD
        BE UPHELD.                                                                  14

        A.      (U) The United States Properly Has Asserted the State Secrets
                Privilege.

        B.      (U) The United States Has Demonstrated that There is a Reasonable   15
                Danger that Disclosure of the Intelligence Information, Sources,
                and Methods Implicated by Plaintiffs' Claims Would Harm the National
                Security of the United States.

        III.    (U) ADJUDICATION OF PLAINTIFFS' CLAIMS REQUIRES OR RISKS      16
                THE DISCLOSURE OF STATE SECRETS, WARRANTING DISMISSAL
                OF THIS ACTION.

        A.      (U) Plaintiffs Cannot Establish Standing to Maintain This Action.   16

i

|     | 1. | (U) Standing Requirements | 17 |
|     | 2. | (U) Plaintiffs' Allegations Are Insufficient to Establish Standing | 18 |
|     | 3. | (U) The State Secrets Privilege Precludes Any Determination of Plaintiffs' Standing. | 25 |
|     | B. | (U) Whether Alleged Surveillance Activities Are Properly Authorized by Law Cannot be Resolved without State Secrets. | 28 |
|     | C. | (U) Plaintiffs' Fourth Amendment Claim Cannot Be Adjudicated Without State Secrets | 39 |
|     | D. | (U) Plaintiffs' First Amendment Claim Cannot Be Adjudicated Without State Secrets. | 44 |
| IV. | | (U) FURTHER LITIGATION WOULD RISK THE DISCLOSURE OF STATE SECRETS, WARRANTING DISMISSAL OF THIS ACTION. | 47 |
| V. | | (U) STATUTORY PRIVILEGE CLAIMS HAVE ALSO BEEN PROPERLY RAISED IN THIS CASE. | 49 |
| VI. | | (U) PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT SHOULD BE STAYED PENDING RESOLUTION OF THE STATE SECRETS PRIVILEGE AND DEFENDANTS' MOTION TO DISMISS. | 51 |
| (U) CONCLUSION | | | 52 |

# (U) INTRODUCTION

(U) This lawsuit puts at issue a classified foreign intelligence program authorized by the President after September 11, 2001, to detect and prevent further terrorist attacks on the United States by al Qaeda and affiliated terrorist organizations.  Plaintiffs claim that the President's actions exceed his constitutional authority and violate statutory law, and also violate the First and Fourth Amendments to the Constitution.

(U) The issues before the Court are obviously significant and of considerable public interest.  The United States submits that the actions authorized by the President are essential to meeting a continuing and grave foreign terrorist threat and are well within lawful bounds.  To demonstrate this, however, would require evidence that must be excluded from consideration under the military and state secrets privilege (hereafter "state secrets privilege") as well as particular statutory privileges.[1]  Adjudication of the merits of Plaintiffs' claims on the scant record they advance, without privileged evidence that must be excluded, is simply not possible and would be clearly erroneous.

(U) At issue is a program the President publicly acknowledged in December 2005, under which he authorized the National Security Agency to intercept the content of certain communications as to which there are reasonable grounds to believe that (1) the communication originated or terminated outside the United States, and (2) a party to such communication is a member of al Qaeda, a member of a group affiliated with al Qaeda, or an agent of al Qaeda or its affiliates.  *See* Press Conference of President Bush (Dec. 19, 2005).[2]  This program is hereafter

---

[1] (U) Hereafter, reference to the state secrets privilege includes applicable statutory privileges.

[2] (U) Available at http://www.white-house.gov//news/releases/2005/12/20051219-2.html.

1

referred to as the Terrorist Surveillance Program ("TSP"). Its purpose is to protect the Nation from foreign attack by detecting and preventing plots by a declared enemy of the United States that has already killed thousands of innocent civilians in the single deadliest foreign attack on U.S. soil in the Nation's history. Contrary to Plaintiffs' view, adjudication of the merits of their challenge to the TSP is not possible without underlying classified information concerning various aspects of the program.

(U) First, Plaintiffs cannot establish their standing to maintain this action without the disclosure of state secrets. Plaintiffs, a group of journalists, academics, attorneys, and nonprofit organizations, believe that their communications fall within the scope of the surveillance at issue because of the nature of their calls and emails, and the identities and locations of those with whom they communicate. Plaintiffs thus claim that the TSP is having a chilling effect on their communications and is thereby disrupting their ability to talk with sources, locate witnesses, conduct scholarship, and engage in advocacy. *See* ACLU Complaint ¶ 2. These allegations are insufficient on their face to establish Plaintiffs' standing. Plaintiffs cannot credibly claim that they face any added marginal chill of surveillance based on the existence of the TSP, when individuals who might be targets of that program may be subject to surveillance pursuant to other means (such as under the Foreign Intelligence Surveillance Act or surveillance conducted overseas). In any event, evidence that would be necessary either to confirm or deny whether the Plaintiffs have been subject to surveillance specifically under the TSP, or whether they have—or do not have—a well-founded fear that their communications might be intercepted, is subject to the state secrets privilege and cannot be disclosed without causing exceptionally grave damage to the national security.

(U) Likewise, even if Plaintiffs could establish their standing, the evidence required to adjudicate the merits of their claims must also be excluded on state secrets grounds. While

2

Plaintiffs contend that statements made by the Government on the public record about the NSA

activities are sufficient to judge their lawfulness, that is simply not the case.  Indeed, to decide

this case on the scant record offered by Plaintiffs, and to consider the extraordinary measure of

enjoining the intelligence tools authorized by the President to detect a foreign terrorist threat on

that record, would be profoundly inappropriate.  As one court held in an analogous context, any

attempt to decide so weighty a matter with so few factual details "would be tantamount to the

issuance of an advisory opinion on the question."  *Halkin v. Helms* (*Halkin II*), 690 F.2d 977,

1000 (D.C. Cir. 1982).

> The notion of deciding either constitutional question—whether a warrant is required in
> certain foreign intelligence surveillances, and if not, whether certain activities are
> "reasonable"—on a record devoid of any details that might serve even to identify the
> alleged victims of a violation is ludicrous.  It calls for the issuance of an opinion on a
> case in which the crucial facts are all necessarily hypothesized—the textbook example of
> a case falling without the federal judicial power.

*Id.* at 1003 n.96.

**(U)** Before an action of the President—particularly one in which he has exercised his core

Article II and statutory powers to protect the Nation from attack—is judged for its lawfulness, an

understanding is required of the specific threat facing the Nation and the particular actions taken

by the President to meet that threat.  Yet, in the context of this civil lawsuit, that understanding is

not possible without revealing to the very adversaries we are trying to defeat what we know

about them and how we are proceeding to stop them.

**(U)** Accordingly, recognizing the importance of this matter, the United States has

asserted the state secrets privilege in this case, and seeks dismissal in order to prevent harm to

U.S. national security.  The law has long recognized a privilege for the protection of information

vital to the Nation's security.  *See United States v. Reynolds,* 345 U.S. 1 (1953); *Jabara v.*

*Kelley*, 75 F.R.D. 475, 481 (E.D. Mich. 1977); *see also Zuckerbraun v. General Dynamics*

3

*Corp.*, 935 F.2d 544 (2d Cir. 1991); *Kasza v. Browner*, 133 F.3d 1159 (9th Cir. 1998); *Edmonds v. U.S. Department of Justice*, 323 F. Supp. 2d 65, 77-82 (D.D.C. 2004), *aff'd*, 161 Fed. Appx. 6 (D.C. Cir. 2005) (*per curiam* judgment), *cert. denied*, 126 S. Ct. 734 (2005).

**(U)** Here, the Director of National Intelligence, John D. Negroponte, supported by the National Security Agency, has formally asserted the state secrets privilege to protect certain intelligence activities, information, sources, and methods that are implicated by Plaintiffs' challenge to the Terrorist Surveillance Program. *See* Public and *In Camera* Declarations of John D. Negroponte, Director of National Intelligence ("DNI"); and Public and *In Camera* Declarations of Major Gen. Richard J. Quirk, Signals Intelligence Director, National Security Agency ("NSA SIGINT Director") (hereafter "NSA Decls.").[3] This claim of privilege protects classified information concerning the Terrorist Surveillance Program and the threat it is designed to address, as well as information that would tend to confirm or deny whether or not Plaintiffs have been subject to surveillance under the TSP or have a well-founded belief that they might be subject to surveillance under the program.

**(U)** Once the privilege is properly invoked, as it has been here, and the Court is satisfied that there is a reasonable danger that national security would be harmed by the disclosure of state secrets, as Director Negroponte amply demonstrates, the privilege is absolute and the information at issue must be excluded from disclosure and use in the case. *Zuckerbraun*, 935 F.2d at 546-47; *Kasza*, 133 F.3d at 1166.  The Court then must decide whether the case can proceed without the excluded evidence.  If either Plaintiffs cannot support their claims or

---

[3] **(U)** The classified declarations of John D. Negroponte, DNI, and Richard J. Quirk, NSA SIGINT Director, as well as the separately lodged memorandum for the Court's *in camera, ex parte* consideration, are currently stored in a proper secure location by the Department of Justice and are available for review by the Court upon request.

Defendants cannot defend against them in the absence of the privileged information, the case must be dismissed. *Zuckerbraun*, 935 F.2d at 547. In addition, in cases where "sensitive military secrets will be so central to the subject matter of the litigation that any attempt to proceed will threaten disclosure of the privileged matters," dismissal is required, most appropriately on summary judgment under Rule 56. *Id.; see also Fitzgerald v. Penthouse Int'l, Ltd.,* 776 F.2d 1236 (4th Cir. 1985).

(U) Here, the "very subject matter" of this lawsuit is a state secret. *Reynolds,* 345 U.S. at 11 n.26. Plaintiffs seek to enjoin a classified foreign intelligence program. The scope and contours of the TSP, and actions taken by the NSA under the program, are not peripheral to the case; they are the very subject of this lawsuit. Indeed, the goal of the lawsuit is to obtain a determination as to whether this classified NSA intelligence activity is lawful. Litigating the matter will necessarily require—and risk—the disclosure of state secrets. Any attempt to work around classified facts by alluding generally to certain information, or by making assumptions about certain facts, can itself reveal a fuller picture of highly classified government activities and cause severe harm to the national security. *See Kasza*, 133 F.3d at 1166; *Halkin v. Helms* (*Halkin I*), 598 F.2d 1, 8 (D.C. Cir. 1978).

**[REDACTED TEXT]**

(U) Director Negroponte and General Quirk demonstrate that disclosure of the privileged information put at issue by Plaintiffs' allegations would harm national security. At the same time, the privileged evidence is central to understanding the nature and scope of the TSP, and is certainly essential to the proper defense of the Plaintiffs' claims, but must be excluded as a consequence of the state secrets assertion. For the foregoing reasons, the Defendants have moved to dismiss this action or, in the alternative, for summary judgment. See *Zuckerbraun*, 953 F.3d at 547 (dismissal appropriate under Rule 56 where exclusion of state secrets renders

5

adjudication of the merits impossible).

(U) In addition, Defendants have also moved to stay consideration of Plaintiffs' pending motion for partial summary judgment until after the Court rules on the state secrets privilege and motion to dismiss. It should be clear that Defendants' claim of privilege and dispositive motion present evidentiary and jurisdictional issues that logically precede consideration of Plaintiffs' summary judgment motion on a limited evidentiary record. This is particularly so because Defendants cannot properly and fully respond to Plaintiffs' summary judgment motion in light of the facts protected by the privilege. Accordingly, the Court should refrain from any adjudication of the merits until it has resolved Defendants' assertion of privilege and motion to dismiss.

## (U) BACKGROUND

### A.   (U) September 11, 2001

(U) On September 11, 2001, the al Qaeda terrorist network launched a set of coordinated attacks along the East Coast of the United States. Four commercial jetliners, each carefully selected to be fully loaded with fuel for a transcontinental flight, were hijacked by al Qaeda operatives. Those operatives targeted the Nation's financial center in New York with two of the jetliners, which they deliberately flew into the Twin Towers of the World Trade Center. Al Qaeda targeted the headquarters of the Nation's Armed Forces, the Pentagon, with the third jetliner. Al Qaeda operatives were apparently headed toward Washington, D.C. with the fourth jetliner when passengers struggled with the hijackers and the plane crashed in Shanksville, Pennsylvania. The intended target of this fourth jetliner was most evidently the White House or the Capitol, strongly suggesting that al Qaeda's intended mission was to strike a decapitation blow to the Government of the United States—to kill the President, the Vice President, or Members of Congress. The attacks of September 11 resulted in approximately 3,000 deaths—the highest single-day death toll from hostile foreign attacks in the Nation's history. In addition,

6

these attacks shut down air travel in the United States, disrupted the Nation's financial markets and Government operations, and caused billions of dollars of damage to the economy.

(U) On September 14, 2001, the President declared a national emergency "by reason of the terrorist attacks at the World Trade Center, New York, New York, and the Pentagon, and the continuing and immediate threat of further attacks on the United States." Proclamation No. 7463, 66 Fed. Reg. 48199 (Sept. 14, 2001). The United States also launched a massive military response, both at home and abroad. In the United States, combat air patrols were immediately established over major metropolitan areas and were maintained 24 hours a day until April 2002. The United States also immediately began plans for a military response directed at al Qaeda's training grounds and haven in Afghanistan. On September 14, 2001, both Houses of Congress passed a Joint Resolution authorizing the President "to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks" of September 11. Authorization for Use of Military Force, Pub. L. No. 107-40 § 21(a), 115 Stat. 224, 224 (Sept. 18, 2001) ("AUMF"). Congress also expressly acknowledged that the attacks rendered it "necessary and appropriate" for the United States to exercise its right "to protect United States citizens both at home and abroad," and acknowledged in particular that the "the President has authority under the Constitution to take action to deter and prevent acts of international terrorism against the United States." *Id.* pmbl.

(U) As the President made clear at the time, the attacks of September 11 "created a state of armed conflict." Military Order, § 1(a), 66 Fed. Reg. 57833, 57833 (Nov. 13, 2001). Indeed, shortly after the attacks, NATO took the unprecedented step of invoking article 5 of the North Atlantic Treaty, which provides that an "armed attack against one or more of [the parties] shall be considered an attack against them all." North Atlantic Treaty, Apr. 4, 1949, art. 5, 63 Stat. 2241, 2244, 34 U.N.T.S. 243, 246; see also Statement by NATO Secretary General Lord

7

Robertson (Oct. 2, 2001), available at http://www.nato.int/docu/speech/2001/s011002a.htm ("[I]t has now been determined that the attack against the United States on 11 September was directed from abroad and shall therefore be regarded as an action covered by Article 5 of the Washington Treaty . . . ."). The President also determined that al Qaeda terrorists "possess both the capability and the intention to undertake further terrorist attacks against the United States that, if not detected and prevented, will cause mass deaths, mass injuries, and massive destruction of property, and may place at risk the continuity of the operations of the United States Government," and he concluded that "an extraordinary emergency exists for national defense purposes." Military Order, § 1(c), (g), 66 Fed. Reg. at 57833-34.

**B.    (U) The Continuing Terrorist Threat Posed by al Qaeda**

(U) With the attacks of September 11, al Qaeda demonstrated its ability to introduce agents into the United States undetected and to perpetrate devastating attacks. But, as the President has made clear, "[t]he terrorists want to strike America again, and they hope to inflict even more damage than they did on September the 11th." Press Conference of President Bush (Dec. 19, 2005).[4] For this reason, as the President explained, finding al Qaeda sleeper agents in the United States remains one of the paramount national security concerns to this day. *See id.*

(U) Since the September 11 attacks, al Qaeda leaders have repeatedly promised to deliver another, even more devastating attack on America. For example, in October 2002, al Qaeda leader Ayman al-Zawahiri stated in a video addressing the "citizens of the United States": "I promise you that the Islamic youth are preparing for you what will fill your hearts with horror." In October 2003, Osama bin Laden stated in a released videotape that "We, God willing, will continue to fight you and will continue martyrdom operations inside and outside the United

---

[4]  (U) *See* http://www.white-house.gov//news/releases/2005/12/20051219-2.html.

8

States . . . ."  And again in a videotape released on October 24, 2004, bin Laden warned U.S. citizens of further attacks and asserted that "your security is in your own hands."  In recent months, al Qaeda has reiterated its intent to inflict a catastrophic terrorist attack on the United States.  On December 7, 2005, al-Zawahiri professed that al Qaeda "is spreading, growing, and becoming stronger," and that al Qaeda is "waging a great historic battle in Iraq, Afghanistan, Palestine, and even in the Crusaders' own homes."  Finally, as is well known, since September 11, al Qaeda has staged several large-scale attacks around the world, including in Indonesia, Madrid, and London, killing hundreds of innocent people.

**[REDACTED TEXT]**

**C.        (U) Intelligence Challenges After September 11, 2001**

**[REDACTED TEXT]**

**D.        (U) NSA Activities Critical to Meeting Post-9/11 Intelligence Challenges**

**[REDACTED TEXT]**

**E.        (U) Plaintiffs' Claims**

(U) Against this backdrop, Plaintiffs allege that they believe the NSA is undertaking unlawful surveillance of their communications, in excess of the President's statutory or constitutional authority and in violation of their constitutional rights.  Plaintiffs thus claim that the TSP is disrupting their ability to "talk with sources, locate witnesses, conduct scholarship, and engage in advocacy."  ACLU Compl. ¶ 2.

(U) Plaintiffs seek declaratory and injunctive relief on the grounds that the President's authorization of the TSP allegedly violates statutory authority governing the collection of foreign intelligence under the Foreign Intelligence Surveillance Act, Pub. L. No. 95-511, 92 Stat. 1783 (1978) (codified at 50 U.S.C. §§ 1801-1862), and, thus, also violates the Administrative Procedure Act, *see* 5 U.S.C. § 706(2)(A), §706(2)(C).  *See* ACLU Compl. ¶¶ 4, 195; ACLU's

9

Memorandum in Support of Motion for Partial Summary Judgment (hereafter "ACLU MSJ" at

9.)

(**U**)  In addition, Plaintiffs claim that the President's authorization of the TSP exceeded

his authority under Article II of the Constitution in violation of the separation of powers doctrine.

*See* ACLU Compl. ¶ 194; ACLU MSJ at 17-23.  Finally, the Plaintiffs allege that the TSP

violates their rights under the Fourth Amendment and the First Amendment.  *See* ACLU Compl.

¶¶ 192-93; ACLU MSJ at 25, 36.

### (U) ARGUMENT

**I.**    **(U) THE STATE SECRETS PRIVILEGE BARS USE OF PRIVILEGED INFORMATION REGARDLESS OF A LITIGANT'S NEED.**

(**U**) The ability of the Executive to protect military or state secrets from disclosure has

been recognized from the earliest days of the Republic.  *See Totten v. United States*, 92 U.S. 105

(1875); *United States v. Burr*, 25 F. Cas. 30 (C.C.D. Va. 1807); *Reynolds,* 345 U.S. at 6-7.  The

privilege derives from the President's Article II powers to conduct foreign affairs and provide for

the national defense.  *United States v. Nixon*, 418 U.S. 683, 710 (1974).  Accordingly, it "must

head the list" of evidentiary privileges.  *Halkin I*, 598 F.2d at 7; *see also El Masri v. Tenet*, 2006

WL 1391390, at *3 (E.D. Va. May 12, 2006) ("Given the vitally important purposes it serves, it

is clear that while the state secrets privilege is commonly referred to as 'evidentiary' in nature, it

is in fact a privilege of the highest dignity and significance.").

**A.**    **(U) Procedural Requirements**

(**U**) As a procedural matter, "[t]he privilege belongs to the Government and must be

asserted by it; it can neither be claimed nor waived by a private party."  *Reynolds*, 345 U.S. at 7;

*see also Zuckerbraun*, 935 F.2d at 546; *Kasza*, 133 F.3d at 1165.  "There must be a formal claim

of privilege, lodged by the head of the department which has control over the matter, after actual

personal consideration by the officer." *Reynolds*, 345 U.S. at 7-8 (footnotes omitted);

*Zuckerbraun*, 935 F.2d at 546.  Thus, the responsible agency head must personally consider the

matter and formally assert the claim of privilege.

**B.      (U) Information Covered**

**(U)** The privilege protects a broad range of state secrets, including information that would

result in "impairment of the nation's defense capabilities, disclosure of intelligence-gathering

methods or capabilities, and disruption of diplomatic relations with foreign Governments."

*Ellsberg v. Mitchell*, 709 F.2d 51, 57 (D.C. Cir. 1983), *cert. denied sub nom. Russo v. Mitchell*,

465 U.S. 1038 (1984) (footnotes omitted); *accord Kasza*, 133 F.3d at 1166 ("[T]he Government

may use the state secrets privilege to withhold a broad range of information;"); *see also Halkin*

*II*, 690 F.2d at 990 (state secrets privilege protects intelligence sources and methods involved in

NSA surveillance).  In addition, the privilege extends to protect information that, on its face, may

appear innocuous but which in a larger context could reveal sensitive classified information.

*Halkin I,* 598 F.2d at 8*; Kasza*, 133 F.3d at 1166.

> It requires little reflection to understand that the business of foreign intelligence
> gathering in this age of computer technology is more akin to the construction of a
> mosaic than it is to the management of a cloak and dagger affair.  Thousands of
> bits and pieces of seemingly innocuous information can be analyzed and fitted
> into place to reveal with startling clarity how the unseen whole must operate.

*Halkin I*,  598 F.2d at 8.  "Accordingly, if seemingly innocuous information is part of a

classified mosaic, the state secrets privilege may be invoked to bar its disclosure and the

court cannot order the Government to disentangle this information from other classified

information." *Kasza*, 133 F.3d at 1166.

**C.      (U) Standard of Review**

**(U)** An assertion of the state secrets privilege "must be accorded the 'utmost deference'

and the court's review of the claim of privilege is narrow." *Zuckerbraun*, 935 F.2d at 547.

11

Aside from ensuring that the privilege has been properly invoked as a procedural matter, the sole

determination for the court is whether, "under the particular circumstances of the case, 'there is a

reasonable danger that compulsion of the evidence will expose military matters which, in the

interest of national security, should not be divulged.'" *Zuckerbraun*, 935 F.2d at 547 (quoting

*Reynolds*, 345 U.S. at 10); *see also In re United States*, 872 F.2d 472, 475-76 (D.C. Cir. 1989).

(U) Thus, in assessing whether to uphold a claim of privilege, the court does not balance

the respective needs of the parties for the information. Rather, once the privilege is properly

invoked and the court is satisfied that there is a reasonable danger that national security would be

harmed by the disclosure of state secrets, the privilege is absolute.

> Where there is a strong showing of necessity, the claim of privilege should not be
> lightly accepted, but even the most compelling necessity cannot overcome the
> claim of privilege if the court is ultimately satisfied that military secrets are at
> stake.

*Reynolds*, 345 U.S. at 11; *Zuckerbraun*, 935 F.2d at 547; *Kasza*, 133 F.3d at 1166; *see also In re*

*Under Seal*, 945 F.2d at 1287 n.2 (state secrets privilege "renders the information unavailable

regardless of the other party's need in furtherance of the action"); *Northrop Corp. v. McDonnell*

*Douglas Corp.*, 751 F.2d 395, 399 (D.C. Cir. 1984) (state secrets privilege "cannot be

compromised by any showing of need on the part of the party seeking the information");

*Ellsberg*, 709 F.2d at 57 ("When properly invoked, the state secrets privilege is absolute. No

competing public or private interest can be advanced to compel disclosure of information found

to be protected by a claim of privilege.").

(U) The absolute nature of the state secrets privilege applies to exclude the evidence

regardless of the nature or significance of the claim at issue, including where constitutional

claims are at stake. *See Halkin I; Halkin II, supra* (state secrets protected in constitutional

challenge to alleged unlawful surveillance); *Molerio v. FBI*, 749 F.2d 815 (D.C. Cir. 1984) (state

12

secrets protected where First Amendment associational rights at issue); *El Masri*, 2006 WL 1391390 (state secrets protected in constitutional tort challenge to alleged unlawful rendition by CIA). The court may consider the necessity of the information to the case only in connection with assessing the sufficiency of the Government's showing that there is a reasonable danger that disclosure of the information at issue would harm national security. "[T]he more plausible and substantial the Government's allegations of danger to national security, in the context of all the circumstances surrounding the case, the more deferential should be the judge's inquiry into the foundations and scope of the claim." *Ellsberg*, 709 F.2d at 59.

(U) Judicial review of whether the claim of privilege has been properly asserted and supported does not require the submission of classified information to the court for *in camera*, *ex parte* review. *Zuckerbraun*, 935 F.2d at 548. In particular, where it is possible to satisfy the court, from all the circumstances of the case, that there is a reasonable danger that disclosure of the evidence will expose state secrets which, in the interest of national security, should not be divulged, "the occasion for the privilege is appropriate, and the court should not jeopardize the security which the privilege is meant to protect by insisting upon an examination of the evidence, even by the judge alone, in chambers." *Reynolds*, 345 U.S. at 8. Indeed, one court has observed that *in camera*, *ex parte* review itself may not be "entirely safe."

> It is not to slight judges, lawyers or anyone else to suggest that any such disclosure carries with it serious risk that highly sensitive information may be compromised. In our own chambers, we are ill equipped to provide the kind of security highly sensitive information should have.

*Clift v. United States,* 597 F.2d 826, 829 (2d Cir. 1979) (quoting *Alfred A. Knopf, Inc. v. Colby*, 509 F.2d 1362, 1369 (4th Cir. 1975).

(U) Nonetheless, the submission of classified declarations for *in camera*, *ex parte* review is "unexceptional" in cases where the state secrets privilege is invoked. *Kasza*, 133 F.3d at 1169

(citing *Black v. United States*, 62 F.3d 1115 (8th Cir. 1995); *Fitzgerald v. Penthouse Int'l, Ltd.*, 776 F.2d 1236 (4th Cir. 1985); *Molerio v. FBI*, 749 F.2d 815, 819, 822 (D.C. Cir. 1984); *Farnsworth Cannon, Inc. v. Grimes*, 635 F.2d 268, 281 (4th Cir. 1980) (en banc); *see also, e.g.*, *In re United States*, 872 F.2d at 474 (classified declaration of assistant director of the FBI's Intelligence Division submitted for *in camera* review in support of Attorney General's formal invocation of state secrets privilege).

II.    **(U) THE UNITED STATES PROPERLY HAS ASSERTED THE STATE SECRETS PRIVILEGE AND ITS CLAIM OF PRIVILEGE SHOULD BE UPHELD.**

    A.    **(U) The United States Properly Has Asserted the State Secrets Privilege**.

**(U)** It cannot be disputed that the United States properly has asserted the state secrets privilege in this case. The Director of National Intelligence, who bears statutory authority as head of the United States Intelligence Community to protect intelligence sources and methods, *see* 50 U.S.C. § 403-1(i)(l), has formally asserted the state secrets privilege after personal consideration of the matter. *See Reynolds*, 345 U.S. at 7-8.[5] DNI Negroponte has submitted an unclassified declaration and an *in camera*, *ex parte* classified declaration, both of which state that the disclosure of the intelligence information, sources, and methods described herein would cause exceptionally grave harm to the national security of the United States. *See Public* and *In Camera, Ex Parte* Declarations of John D. Negroponte, Director of National Intelligence. Based on this assertion of privilege by the head of the United States Intelligence Community, the Government's claim of privilege has been properly lodged.

---

    [5] **(U)** *See* 50 U.S.C. § 401a(4) (including the National Security Agency in the United States "Intelligence Community").

**B.**   **(U) The United States Has Demonstrated that There is a Reasonable Danger that Disclosure of the Intelligence Information, Sources, and Methods Implicated by Plaintiffs' Claims Would Harm the National Security of the United States**.

(U) The United States also has demonstrated that there is a reasonable danger that disclosure of the information subject to the state secrets privilege would harm U.S. national security. *Zuckerbraun*, 935 F.2d at 547.   While "the Government need not demonstrate that injury to the national interest will inevitably result from disclosure," *Ellsberg*, 709 F.2d at 58, the showing made here is more than reasonable; it is highly compelling.

(U) DNI Negroponte, supported by NSA SIGINT Director Quirk, has asserted the state secrets privilege and demonstrated the exceptional harm that would be caused to U.S. national security interests by disclosure of each of the following categories of privileged information at issue in this case: (1) information regarding the nature of the al Qaeda threat, (2) further information regarding the Terrorist Surveillance Program, and (3) information that would confirm or deny whether individuals have been targeted for surveillance by the NSA.

**[REDACTED TEXT]**

(U) Each of the foregoing categories of information is subject to DNI Negroponte's state secrets privilege claim, and he and NSA SIGINT Director Quirk have amply demonstrated a reasoned basis that disclosure of this information would cause exceptionally grave damage to the national security and, therefore, that this information should be excluded from this case.

III.    **(U) ADJUDICATION OF PLAINTIFFS' CLAIMS REQUIRES OR RISKS THE DISCLOSURE OF STATE SECRETS, WARRANTING DISMISSAL OF THIS ACTION.**

**(U)** Once a court has upheld a claim of the state secrets privilege, the evidence and information identified in the privilege assertion is removed from the case, and the court must undertake a separate inquiry to determine the consequences of this exclusion on further proceedings. If the plaintiff cannot make out a prima facie case in support of its claims absent the excluded state secrets, the case must be dismissed. *See Zuckerbraun*, 935 F.2d at 547; *Kasza*, 133 F.3d at 1166; *Halkin II*, 690 F.2d at 998-99; *Fitzgerald*, 776 F.2d at 1240-41. And if the privilege "'deprives the *defendant* of information that would otherwise give the defendant a valid defense to the claim, then the court may grant summary judgment to the defendant.'" *Kasza*, 133 F.3d at 1166 (quoting *Bareford v. General Dynamics Corp.*, 973 F.2d 1138, 1141 (5th Cir. 1992) (emphasis in original)); *see also Zuckerbraun*, 935 F.2d at 547; *Molerio v. FBI*, 749 F.2d 815, 825 (D.C. Cir. 1984) (granting summary judgment where state secrets privilege precluded the Government from using a valid defense).

A.    **(U) Plaintiffs Cannot Establish Standing to Maintain This Action.**

**(U)** Before proceeding to address why the merits of Plaintiffs claims cannot be addressed in light of the United States' assertion of the state secrets privilege in this case, it is necessary to address first the issue of Plaintiffs' standing. As a threshold matter, Plaintiffs allegations are inadequate to establish their standing even on the face of the Complaint. But, more fundamentally, the states secrets assertion by the United States precludes adjudication of Plaintiffs' standing as a factual matter. That is, Plaintiffs will not have access to the evidence they would need to establish their standing, and Defendants could not demonstrate why Plaintiffs cannot establish standing, without the disclosure of state secrets that must remain privileged

16

because they would tend to confirm or deny who may—or may not—be subject to surveillance.

**1.      (U) Standing Requirements**

(U) Article III of the Constitution limits the role of federal courts to the resolution of cases and controversies. U.S. Const. art. III, § 2. An "essential and unchanging part" of that case-or-controversy requirement is the doctrine of standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). To establish standing, a plaintiff must, at an "irreducible constitutional minimum," demonstrate (1) an injury-in-fact, (2) a causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision. *Lujan*, 504 U.S. at 560–61. The party invoking federal jurisdiction bears the burden of establishing these elements and of coming forward with evidence of specific facts which prove standing. *See, e.g., id.* at 561. A plaintiff must demonstrate a concrete and particularized injury that is actual or imminent, not speculative or hypothetical. *Id.* at 560. A particularized injury is one that directly affects a plaintiff "in a personal and individual way." *Id.* at 561 n.1; *see also Raines v. Byrd*, 521 U.S. 811, 819 (1997). Moreover, to obtain prospective relief, it is not enough that a plaintiff may have suffered a past injury. *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983); *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974). Instead, the plaintiff must show that he is "immediately in danger of sustaining some direct injury" as the result of the challenged conduct. *Lyons*, 461 U.S. at 102; *accord McConnell v. FEC*, 540 U.S. 93, 226 (2003); *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990).

(U) In addition to satisfying the prerequisites for constitutional standing, a plaintiff must also meet prudential standing requirements. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 804 (1985).[6] The specific requirements of prudential standing include that a party "assert his own

---

[6] (U) These additional restrictions on standing are based on the principle that the

17

legal interests rather than those of third parties," *id.*, and that a claim not be a "generalized grievance" shared in substantially equal measure by all or a large class of citizens, *Warth*, 422 U.S. at 499.

(U) Standing requirements demand the "strictest adherence" when constitutional questions are presented and "when matters of great national significance are at stake." *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004); *see also Raines*, 521 U.S. at 819-20 ("[O]ur standing inquiry has been especially rigorous when reaching the merits of the dispute would force us to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional."); *see also Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 221 (1974). Even in cases within Article III jurisdiction, the Supreme Court has noted the "deeply rooted commitment not to pass on questions of constitutionality unless adjudication of the constitutional issue is necessary." *Elk Grove*, 542 U.S. at 11 (internal quotation marks omitted).

### 2.   (U) Plaintiffs' Allegations Are Insufficient to Establish Standing

(U) In describing their alleged injuries, Plaintiffs primarily claim that the Terrorist Surveillance Program has had a chilling effect on their ability to communicate with people overseas. *See* ACLU Compl. ¶ 2. Specifically, Plaintiffs claim that the TSP "is disrupting [their ability] to talk with sources, locate witnesses, conduct scholarship, and engage in advocacy" due to the fear that their communications are being intercepted. *Id.* Plaintiffs' purported fear of interception is based on allegations that they (1) "frequently communicate by telephone and email with people outside the United States, including in the Middle East and Asia," *id.*, (2) communicate with people believed to be terrorist suspects, *id.* ¶ 57, (3) "communicate about

---

judiciary should "avoid deciding questions of broad social import where no individual rights would be vindicated." *Id.* at 804; *see also Warth v. Seldin*, 422 U.S. 490, 500 (1975).

subjects that are likely to trigger scrutiny" under the TSP, *id.* ¶ 58, (4) "conduct research on the Internet concerning topics that are likely to trigger scrutiny" under the TSP, *id.* ¶ 59, and (5) have protested government policies or published books or articles likely to trigger monitoring under the TSP, *id.* ¶¶ 121, 152.

(U) Plaintiffs' claim of a subjective chilling effect, however, is foreclosed by *Laird v. Tatum*, 408 U.S. 1 (1972). In *Laird*, the Supreme Court held that a group of plaintiffs lacked standing to challenge an Army surveillance program designed to gather information about potential domestic civil disturbances. The Court rejected the plaintiffs' primary claim that existence of the surveillance program had a chilling effect on the exercise of their First Amendment rights, holding that "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of present objective harm or a threat of specific future harm." 408 U.S. at 13-14. The Court noted that in certain cases constitutional violations had been found to arise from the chilling effect of governmental action, but only where such action "was regulatory, proscriptive, or compulsory in nature, and the complainant was either presently or prospectively subject to the regulations, proscriptions, or compulsions that he was challenging." *Id.* at 11. In the absence of a showing that the *Laird* plaintiffs were chilled by "any specific action of the Army *against them*," *id.* at 3 (emphasis added), the Court refused to grant the plaintiffs what they effectively would have obtained in pursuing the litigation: "a broad-scale investigation, conducted by themselves as private parties armed with the subpoena power of a federal district court and the power of cross-examination, to probe into the Army's intelligence-gathering activities," with the district court ultimately determining, in an advisory fashion, the appropriateness of those activities. *Id.* at 14.[7]

_____

[7] (U) *See also Laird*, 408 U.S. at 15 ("Carried to its logical end, [plaintiffs'] approach

(U) Since *Laird*, other courts have held that plaintiffs lack standing to challenge intelligence-gathering efforts where the primary harm alleged was a chilling effect. In *Halkin v. Helms* (*Halkin II*), 690 F.2d 977 (D.C. Cir. 1982), a number of individuals and organizations alleged that they were subject to unlawful surveillance by the NSA and CIA (and other agencies) due to their opposition to the Vietnam War. Plaintiffs argued that Executive Orders authorizing intelligence surveillance programs rendered them "likely targets of surveillance," because they were "engaged in political activities [in] opposition to current United States foreign policies" and were "in contact with foreign organizations and individuals." 690 F.2d at 1002 n.89. The plaintiffs further alleged that they were "deterred" by the Executive Orders from "continuing such lawful activity." *Id.* The Court rejected this claim of a chilling effect as a basis for injury, holding that the case was "squarely controlled" by *Laird. Id.* at 1002.

(U) A similar challenge was rejected in *United Presbyterian Church v. Reagan*, 738 F.2d 1375 (D.C. Cir. 1984), in which the plaintiffs alleged the chilling of constitutionally protected activities due to the fear that such activities would cause them to be targeted for surveillance. *Id.* at 1377. As in *Halkin II*, the Court held that a chilling effect produced by the fear of being subjected to illegal surveillance was precluded by *Laird* as a basis for standing. *Id.* at 1378. The Court noted that all of the Supreme Court cases employing the concept of a chilling effect "involve situations in which the plaintiff has unquestionably suffered some concrete harm (past or immediately threatened) apart from the 'chill' itself." *Id.* The Court reached this result even though the plaintiffs claimed that they were currently and previously subjected to unlawful

---

would have the federal courts as virtually continuing monitors of the wisdom and soundness of Executive action; such a role is appropriate for the Congress acting through its committees and the 'power of the purse'; it is not the role of the judiciary, absent actual present or immediately threatened injury resulting from unlawful governmental action.").

surveillance, that they were in immediate danger of being subject to surveillance, and that their activities (which involved "considerable foreign travel and contact with foreigners") made them particularly susceptible to such surveillance. *Id.* at 1377, 1380. As the Court held, the fact that the plaintiffs might be at greater risk of surveillance than the public at large fell "far short" of the genuine threat required to support standing. *Id.* at 1380.[8]

(U) Plaintiffs' claim here of a subjective fear of surveillance likewise falls far short of the injury necessary to establish either constitutional or prudential standing. As an initial matter, Plaintiffs' claim of a chill is unreasonable because it covers a wide range of communications and activities that are well outside the potential scope of the TSP. As the President has described, the NSA is authorized under the TSP only to intercept international communications into and out of the United States where one party to the communication is reasonably believed to be a member or affiliate of al Qaeda. Plaintiffs' fear of surveillance, however, is not limited to such communications; in fact, a number of Plaintiffs do not even allege that they are in contact with members or affiliates of al Qaeda. Rather, much of the alleged fear is based on claims that

---

[8] **(U)** In addition to the foreign intelligence cases discussed in the text, *see also, e.g.*, *Sinclar v. Schriber*, 916 F.2d 1109, 1115 (6th Cir. 1990) (relying on *Laird* in upholding dismissal of claims asserting that the plaintiffs' First Amendment rights were violated by acknowledged warrantless FBI surveillance of their telephone conversations, including attorney-client conversations); *Gordon v. Warren Consolidated Bd. of Educ.*, 706 F.2d 778, 780-81 (6th Cir. 1983) (holding that high school teachers and students, who were specifically targeted by an undercover officer sitting in on classrooms to investigate drug trafficking, merely suffered a nonjusticiable "subjective chilling" of their First Amendment rights despite allegations that they were targeted based on their political beliefs, that classroom speech had been chilled and teaching materials altered, and that they suffered reputational harm); *Fifth Avenue Peace Parade Committee v. Gray*, 480 F.2d 326, 330-33 (2d Cir. 1973) (rejecting, under *Laird*, claim that participants and organizers of anti-war demonstration were chilled in the exercise of their constitutional rights by FBI investigation into the demonstration, where investigation included examination of bank and bus company records to determine identity and number of persons planning to attend).

Plaintiffs are in frequent contact with people overseas[9] and that they discuss or research certain topics related to terrorism, politics, or international affairs.[10] Others merely claim to fear surveillance due to their publication of certain works or their protesting of government policies.[11] The running assumption throughout the Complaint that TSP monitoring is triggered by political views, contacts with the Middle East, or the mere discussion or research of terrorism-related topics is flatly contrary to the President's narrow description of the program. Thus, to the extent that Plaintiffs' allege activities other than actual international communications with members or affiliates of al Qaeda, it is clear that Plaintiffs cannot reasonably suffer any chill. *See Hankard v. Town of Avon*, 126 F.3d 418, 424 (2d Cir. 1997) (rejecting allegations of chilling effect that were

---

[9] **(U)** Plaintiffs repeatedly note that they communicate with people in the Middle East, as if such individuals are automatically presumed to be affiliated with al Qaeda. *See* ACLU Compl. ¶¶ 2, 56, 76, 80, 85, 91, 92, 95, 115, 138, 141, 145, 146, 154, 156, 162, 164, 170, 171, 173, 176, 182, 191. One plaintiff even alleges a chill based on his communications "with advocates of *democracy* in the Middle East, Asia, and Africa." *Id.* ¶ 162 (emphasis added).

[10] **(U)** *See, e.g.,* ACLU Compl. ¶¶ 58-59 (alleging that Plaintiffs "communicate about subjects" and "conduct research on the Internet concerning topics," that are "likely to trigger scrutiny under the Program"); *id.* ¶ 65 ("The international communications of ACLU and ACLUF staff members concern a range of subjects that are likely to trigger scrutiny under the Program."); *id.* ¶¶ 79-80 (alleging that former ACLU attorney Noel Saleh has "communicated with family members about various political topics and . . . current events," and that Mr. Saleh fears surveillance because of his "frequent communications with numerous people in the Middle East and other foreign countries about topics likely to trigger monitoring"); *id.* ¶ 95 (alleging that ACLU attorney Nabih Ayad avoids "discussing certain political topics with family and friends abroad for fear that such conversations will trigger monitoring"); *id.* ¶ 133 (alleging that attorney Joshua Dratel conducts Internet research on terrorism-related subjects); *id.* ¶ 139 (alleging that attorney Nancy Hollander "conducts research on the Internet about terrorism, religion, and politics in the Middle East and South Asia"); *id.* ¶ 171 ("Because of the subject matter of his reporting, many of Mr. Hitchens' communications involve discussions of Islamic fundamentalism, terrorism, jihad, Osama bin Laden, and Saddam Hussein.").

[11] **(U)** *See, e.g.,* ACLU Compl. ¶ 121 (alleging that Greenpeace is "a likely target for government surveillance," because it has "repeatedly engaged the Bush administration through public protest and activism" over the past several years); *id.* ¶¶ 152-53 (alleging that author James Bamford's recent works on "intelligence, 9/11, and the wars in Iraq and Afghanistan," have "made it likely that his communications are being intercepted by the NSA").

"speculative, indirect, and remote").

(U) To the extent that Plaintiffs allege that they are personally chilled in communicating

with members or agents of al Qaeda or its affiliates—a much narrower claim than the one they

advance—such allegations also fall short of establishing standing. As the Supreme Court held in

*Laird*, an actionable chilling effect cannot arise "merely from the individual's knowledge that a

governmental agency was engaged in certain activities." 408 U.S. at 11.[12]  Here, the only facts

Plaintiffs allege to suggest that they or others are subject to TSP monitoring are the existence of

the TSP and the nature of the people with whom they communicate. Although the NSA is

authorized to intercept international communications involving al Qaeda or its affiliates, it does

not necessarily follow from that general authorization that Plaintiffs' communications with such

individuals are in fact being intercepted. *See United Presbyterian*, 738 F.2d at 1380 (finding it

significant that Executive Order 12333 "does not *direct* intelligence-gathering activities against

all persons who could conceivably come within its scope, but merely *authorizes* them")

(emphasis in original). Thus, even if Plaintiffs' contacts were presumed to fall within the

potential scope of the TSP because of their links to al Qaeda, Plaintiffs can only speculate as to

whether those contacts are actually targeted for interception under the TSP. *See Halkin II*, 690

---

[12] (U) Rather, the individual must *actually* be subject to government action that is "regulatory, proscriptive, or compulsory," *id.*, and must suffer some "concrete harm (past or immediately threatened) apart from the 'chill' itself," *United Presbyterian*, 738 F.2d at 1378. Thus, as noted in *Laird*, the Supreme Court found claims involving chilling effects justiciable in cases where a plaintiff was actually denied admission to the bar for refusing to answer a question about her membership in the Communist Party, *see Baird v. State of Arizona*, 401 U.S. 1 (1971), was actually discharged from state employment due to political acts or associations, *see Keyishian v. Board of Regents*, 385 U.S. 589 (1967), was actually denied the delivery of mail deemed to be "communist political propaganda," *Lamont v. Postmaster General*, 381 U.S. 301, 302 (1965), and was actually required to take an oath as a condition of state employment, *see Baggett v. Bullitt*, 377 U.S. 360 (1964).

23

F.2d at 1001.[13]

(U) Perhaps more fundamentally, even to the extent that Plaintiffs allege that they communicate with members or agents of al Qaeda, or its affiliates, they cannot legitimately claim that such communications are chilled in any significant sense by their knowledge of the existence of the TSP. Instead, any reasonable person who communicates with individuals associated with al Qaeda or affiliated terrorist groups must assume that his or her communications with such individuals could be subject to surveillance by other means or entities—including an order of the Foreign Intelligence Surveillance Court,[14] a Title III law enforcement warrant, or by other governments or law enforcement authorities. Even if the TSP did not exist, Plaintiffs who communicate with individuals who are affiliated with al Qaeda would "always run the risk" that those communications are monitored through these other means; thus, they should already be

---

[13] (U) See Jabara v. Kelley, 476 F. Supp. 561 (E.D. Mich. 1979) ("Clearly Tatum forecloses the possibility of a justiciable subjective chill arising from a general system of public surveillance, data gathering and dissemination, absent some sort of harassment.") (emphasis added). Plaintiffs' allegations, in fact, stand in stark contrast to those at issue in Jabara, a case involving NSA surveillance where the district court found the plaintiff's First Amendment claims to be justiciable. In Jabara, the government admitted investigating the plaintiff over the course of eight years and obtaining information about him in a variety of ways, including by physical surveillance (through the use of informants who followed the plaintiff and reported on his activities), inspection of his bank records, and warrantless NSA and FBI electronic surveillance. See id. at 564-65, 578. The plaintiff also alleged that the FBI distributed false and misleading reports of his activities to other entities and that he suffered harm to his reputation and business as a result of publicity of the FBI's investigation of him. See id. at 568. The court held that these specific and individualized allegations of "a system of independently unlawful intrusions into [the plaintiff's] life as the result of his lawfully held and lawfully expressed political views," was sufficient to take any alleged chilling effect "outside the realm of speculation and subjectivity." Id. Plaintiffs' claims here of a chilling effect resulting from the general existence of an intelligence program aimed at al Qaeda come nowhere near the level of individualized harm alleged in Jabara.

[14] (U) Section 101(a)(4) and (b)(2)(C) of the FISA defines "foreign power" and agent of a "foreign power" to include a group or person engaged in international terrorism. See 50 U.S.C. § 1801(a)(4) and (b)(2)C).

24

chilled with respect to engaging in such communications. *See, e.g., Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 357 (1985) (rejecting chilling effect claim where the challenged authority presented no greater risk than the plaintiff ordinarily faced). Because Plaintiffs can have no reasonable expectation that such individuals are not subject to surveillance, they likewise cannot suffer any reasonable chill solely as the result of the TSP, and thus cannot suffer any injury of this kind.[15]

### 3. (U) The State Secrets Privilege Precludes Any Determination of Plaintiff's Standing.

(U) Even if Plaintiffs' allegations of injury were sufficient to get past the pleading stage, the crux of their standing problem in this case is that it could never be proven or defeated with actual facts. Aside from claiming they have been chilled by the existence of the TSP, Plaintiffs allege that they have a "well-founded belief that their communications are being intercepted under the Program." ACLU Compl. ¶ 2. But the Government's state secrets privilege assertion covers, for example, any information tending to confirm or deny whether a particular individual is a target of the TSP or whether certain communications have been intercepted. Without such information, Plaintiffs will not be able to establish any alleged injury. Furthermore, Defendants would be unable to present facts that would bear upon the question of standing—for example, by showing that they have not been targeted for surveillance, or that by virtue of how the TSP operates, have no reasonable fear of being targeted; conversely, if any Plaintiff had actually been targeted, that this fact likewise could not be disclosed.

(U) In like circumstances, courts have held that the assertion of the state secrets privilege

---

[15] (U) For this reason, Plaintiffs not only fail to satisfy in the injury-in-fact requirement, but they also cannot show that any alleged chill would be redressed by a favorable decision, which would not preclude the United States from monitoring al Qaeda members and affiliates by other means, as a result of which the asserted chill would remain.

requires dismissal of the case because the facts necessary to demonstrate standing were not available. In *Halkin I*, for example, a number of individuals and organizations claimed that they were subject to unlawful surveillance by the NSA and CIA (among other agencies) due to their opposition to the Vietnam War. *See* 598 F.2d at 3. The D.C. Circuit upheld an assertion of the state secrets privilege regarding the identities of individuals subject to NSA surveillance, rejecting the plaintiffs' argument that the privilege could not extend to the "mere fact of interception." *Id.* at 8. The court of appeals recognized that the "identification of the individuals or organizations whose communications have or have not been acquired presents a reasonable danger that state secrets would be revealed . . . [and] can be useful information to a sophisticated intelligence analyst." *Halkin I*, 598 F.2d at 9.

(U) A similar state secrets assertion was upheld in *Halkin II*, where privilege was asserted as to the identities of individuals subject to CIA surveillance. *See* 690 F.2d at 991. The D.C. Circuit again held that the plaintiffs were incapable of demonstrating that they had standing to challenge the alleged surveillance. *Id.* at 998 ("We hold that appellants' inability to adduce proof of actual acquisition of their communications now prevents them from stating a cognizable claim in the federal courts. In particular, we find appellants incapable of making the showing necessary to establish their standing to seek relief."); *see also id.*[16] The court thus found

_____

[16] (U) *See also id.* at 999-1000 ("[T]he absence of proof of actual acquisition of appellants' communications is fatal" to their claims."); *id.* at 997 (quoting district court's ruling that "plaintiffs cannot show any injury from having their names submitted to NSA because NSA is prohibited from disclosing whether it acquired any of plaintiffs' communications"); *id.* at 990 ("Without access to the facts about the identities of particular plaintiffs who were subjected to CIA surveillance (or to NSA interception at the instance of the CIA), direct injury in fact to any of the plaintiffs would not have been susceptible of proof."); *id.* at 987 ("Without access to documents identifying either the subjects of . . . surveillance or the types of surveillance used against particular plaintiffs, the likelihood of establishing injury in fact, causation by the defendants, violations of substantive constitutional provisions, or the quantum of damages was

dismissal warranted because the plaintiffs' alleged injuries could be no more than speculative in the absence of their ability to prove that their communications were intercepted. *Id.* at 999, 1001.[17]

(U) Similarly, in *Ellsberg v. Mitchell*, 709 F.2d 51 (D.C. Cir. 1983), a group of individuals filed suit after learning during the course of the "Pentagon Papers" criminal proceedings that one or more of them had been subject to warrantless electronic surveillance. Although two such wiretaps were admitted, the Attorney General asserted the state secrets privilege, refusing to disclose to the plaintiffs whether any other such surveillance occurred. *See id.* at 53-54. As a result of the privilege assertion, the court upheld the district court's dismissal of the claims brought by the plaintiffs the Government had not admitted overhearing, because those plaintiffs could not prove actual injury. *See id.* at 65.

(U) The same result is required here. In light of the state secrets assertion, Plaintiffs cannot prove that communications with their clients are intercepted under the TSP and, conversely, Defendants cannot present necessary facts in their defense. *See Halkin I*, 598 F.2d at 11 (rejecting plaintiffs' argument that the acquisition of a plaintiff's communications may be presumed because this "would be unfair to the individual defendants who would have no way to rebut it"). Accordingly, like other similar cases before it, this action must be dismissed.

---

clearly minimal."); *Halkin I*, 598 F.2d at 7 ("[T]he acquisition of the plaintiffs' communication is a fact vital to their claim," and "[n]o amount of ingenuity of counsel . . . can outflank the Government's objection that disclosure of this fact is protected by privilege.").

[17] (U) In *Halkin II*, because the CIA conceded that nine plaintiffs were subjected to certain types of non-NSA surveillance, the D.C. Circuit held that those plaintiffs had demonstrated an injury-in-fact. *See Halkin II*, 690 F.2d at 1003. Nonetheless, the nine plaintiffs were precluded from seeking injunctive and declaratory relief because they could not demonstrate the likelihood of future injury or a live controversy in light of the fact that the CIA had terminated the specific intelligence methods at issue. *See id.* at 1005–09.

[REDACTED TEXT]

(U) In sum, without access to information, Plaintiffs' claims of actual interception are necessarily speculative and, in any event, cannot be adjudicated. *See Halkin II*, 690 F.2d at 1001 (holding that, in light of the government's state secrets assertion, "it can only be a matter of speculation" as to whether the individual plaintiffs were subject to NSA surveillance); *see also Mounsey v. Allied-Signal, Inc.*, CV 95-4309, 2000 WL 34017116, at * 11 (C.D. Cal. Apr. 10, 2000) ("Without access to classified state secrets, Plaintiffs can only speculate" as to the cause of military accident). Even if Plaintiffs' allegations were deemed sufficient to survive a motion to dismiss on the face of the Complaint, Plaintiffs could not ultimately prove their standing as a factual matter, nor could the Government present evidence on the issue, due to the state secrets assertion.

### B.     (U) Whether Alleged Surveillance Activities Are Properly Authorized by Law Cannot be Resolved without State Secrets.

(U) Plaintiffs argue that the President lacked authority to authorize the NSA to intercept one-end foreign communications related to al Qaeda under the TSP. First, Plaintiffs contend that the Foreign Intelligence Surveillance Act is the exclusive means by which foreign intelligence surveillance may be conducted inside the United States, including the interception of "one-end" foreign communications such as those at issue under the TSP. *See* ACLU MSJ at 11-16. As a general matter, the FISA requires that the Attorney General approve an application for an order from a special court composed of Article III judges—the Foreign Intelligence Surveillance Court. *See* 50 U.S.C. §§ 1804-1804. That application must demonstrate, among other things, that there is probable cause to believe that the target is a foreign power or agent of a foreign power. *See id.* § 1805(a)(3)(A). The Government must also certify that the information sought is foreign intelligence information that cannot be obtained by normal investigative means, and

28

must state that the facilities at which the surveillance will be directed are being used, or about to be used, by a foreign power or agent of a foreign power. *See id.* §§ 1804(a)(7), 1804(a)(4), (a)(8). Plaintiffs argue that FISA only grants the President a limited window to conduct warrantless surveillance for 15 days during times of declared war, during which period the President must seek an amendment to FISA if he believes further warrantless surveillance is necessary. ACLU MSJ at 13 (*citing* 50 U.S.C. § 1811).

(U) Second, Plaintiffs argue that the Authorization for the Use of Military Force (AUMF), which was enacted immediately after the 9/11 attacks, did not grant the President authority to undertake the surveillance authorized by the TSP. *See id.* at 13-15.[18]

(U) Third, Plaintiffs contend that Congress has the authority to regulate whatever inherent authority the President has to undertake foreign intelligence surveillance, has

---

[18] (U) Plaintiffs' motion for summary judgment addresses arguments set forth in a public paper prepared by the Department of Justice, which describes certain legal authorities supporting the lawfulness of the TSP. *See* ACLU MSJ at 13; *Legal Authorities Supporting the Activities of the National Security Agency Described by the President* (Jan. 19, 2006) ("DOJ Memo"), available at http://www.usdoj.gov/opa/whitepaperonnsalegalauthorities.pdf. Plaintiffs are thus likely to contend that this paper demonstrates that their claims can be adjudicated absent further facts. Obviously, however, legal arguments that can be presented for purposes of public information and debate are of a much different nature from the factual information that is required in a *judicial* process where injunctive relief is at stake—particularly an injunction that would halt a presidentially authorized national security program targeted at detecting a terrorist threat to the United States. The United States has consistently made clear in all of its public discussions and analyses that a complete understanding of the issues would require disclosure of classified information. *See, e.g.,* DOJ Memo at 1 ("This paper addresses, *in an unclassified* form, the legal basis for the NSA activities described by the President."); *see id.* at 34 n.18 (noting that, in order to avoid further compromising vital national security activities, a full explanation of the basis for the President's determination that the speed and agility required to carry out the NSA activities could not be achieved under FISA cannot be given in an unclassified document). The United States' effort to explain as publicly as possible the legal authorities supporting the TSP do not preclude the United States from demonstrating in a judicial forum, where the issue is whether the challenged actions may proceed, that the unavailable classified record is essential to adjudication of the claims.

established the exclusive means for doing so through the FISA,[19] and thus has not impermissibly interfered with the President's inherent authority under Article II of the Constitution as Commander-in-Chief. *See* ACLU MSJ at 17-22. In particular, citing Justice Jackson's concurring opinion in *Youngstown Sheet & Tube v. Sawyer*, 343 U.S. 579, 637-38 (1952) (Jackson, J. concurring), Plaintiffs argue that the President's action is at the "lowest ebb" of Presidential power since it conflicts with the FISA and, thus, can only be sustained if Congress is "disabled from acting upon the subject." ACLU MSJ at 19.

(U) Thus, at bottom, Plaintiffs' argument is that, before the President may seek to detect and prevent another terrorist attack by al Qaeda on the U.S. homeland by seeking to surveil the enemy through the interception of their international calls to and from the United States, he is required to follow a Congressionally-devised process and obtain advance judicial approval for such interception. From Plaintiffs' perspective, the essential facts necessary to decide this issue are that surveillance under the TSP occurs in the United States and is undertaken outside of the "exclusive" FISA process for seeking a court order and demonstrating probable cause to a court.

(U) Defendants obviously believe that Plaintiffs are wrong in contending that the President lacked statutory and constitutional authority to authorize the TSP. To demonstrate why this is so, however, is not possible based on the highly limited facts Plaintiffs put forward, but instead would require review of classified information as to what the President has done and why. Indeed, the clear thrust of Plaintiffs' presentation is that this is a simple case, readily disposed of on summary judgment at the outset, primarily by reference to legal arguments that rely on the statutory provisions of the FISA, which Plaintiffs assume establish the definitive bounds of the law on foreign intelligence surveillance. That assumption is wrong and far from

---

[19] (U) *See* ACLU MSJ at 1 (*citing* 18 U.S.C. § 2511(2)(f) (providing that FISA shall be the exclusive means for conducting electronic surveillance as defined in the Act)).

the correct approach in a case of this magnitude.

(U) "In cases like the present one, the significance of the constitutional questions involved cannot obviate the need for proceeding upon a 'full-bodied' record." *Halkin II*, 690 F.2d at 1000 n.81. Here, the most significant of the President's powers—his obligation to protect the Nation from foreign attack—is at issue. Adjudication of so profound a constitutional question as whether the President has discharged his Commander in Chief authority lawfully requires a full understanding of the context in which the President has acted and the specific steps he has authorized. Indeed, where the stakes are so great—where an adverse decision might enjoin a tool the President deems necessary to prevent a potentially catastrophic attack on the United States by a foreign power—taking any course short of one that considers the context in which the President acted and the specific steps he authorized would be inappropriate. Even in *Youngstown*, a seminal separation-of-powers case that assessed the President's wartime authority, the Supreme Court carefully considered the specific action at issue and its nexus to the President's authority to direct action against an enemy. *See* 343 U.S. at 587.

(U) Contrary to Plaintiffs' simplistic presentation, a range of considerations, including relevant constitutional and statutory authority, bear upon the question at hand, as set forth below. Throughout the Nation's history, the President has directed during times of war that the enemy be subject to surveillance, including through the interception of international communications in the United States. Courts have repeatedly recognized the President's constitutional authority to authorize such activities, including most recently the Foreign Intelligence Surveillance Court of Review in 2002. *See In re Sealed Case,* 310 F.3d 717, 742 (Foreign Intel. Surv. Ct. of Rev. 2002). Indeed, when it enacted the FISA, Congress itself recognized that it was proceeding on fragile and unsettled constitutional ground, noting that it was seeking to press its own

31

constitutional powers to their limit, that it was unsettled what that limit was, and that the
Supreme Court might therefore find that it had unconstitutionally intruded on the President's
powers. This history illustrates that various statutory and constitutional powers are implicated by
this case, involving areas of unsettled boundaries between the Executive and Legislative
branches. These difficult constitutional issues, acknowledged by Congress in 1978 and now
raised in this suit, cannot be resolved solely by the kind of absolute, categorical legal assertions
that Plaintiffs advance on summary judgment.

(**U**) In this regard, it is well-established that the President's most basic constitutional duty
is to protect the Nation from armed attack. As the Supreme Court has emphasized in the *Prize
Cases*, the President is "bound to resist force by force"; he need not await any congressional
sanction to defend the Nation from attack and "[h]e must determine what degree of force the
crisis demands." *The Prize Cases,* 67 (2 Black) U.S. 635, 668, 670 (1863).[20] In addition, the
Authorization for Use of Military Force ("AUMF"), *supra,* granted the President broad
discretion to deal with the al Qaeda threat in response to the 9/11 attacks. The President was
specifically authorized to use "*all* necessary and appropriate force against those . . .
organizations, or persons *he determines* planned, authorized, committed, or aided the terrorist
attacks that occurred on September 11, 2001 in order to prevent any future acts of terrorism
against the United States." AUMF § 2(a) (emphasis added). Congress also acknowledged in
particular that "the President has authority under the Constitution to take action to deter and
prevent acts of international terrorism against the United States." *Id.* pmbl.

---

[20] (**U**) *See also Hamilton v. Dillin*, 88 U.S. (21 Wall.) 73, 87 (1874) (The "President
alone" is "constitutionally invested with the entire charge of hostile operations."); *United States
v. Sweeny*, 157 U.S. 281, 284 (1895) ("[T]he object of the [Commander-in-Chief Clause] is
evidently to vest in the President . . . such supreme and undivided command as would be
necessary to the prosecution of a successful war.")

(**U**) It is also well-established that the President may exercise his statutory and constitutional authority to gather intelligence information about foreign enemies. *See, e.g., Totten v. United States*, 92 U.S. 105, 106 (1876) (recognizing President's authority to hire spies); *see also Chicago & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948) ("The President, both as Commander in Chief and as the Nation's organ for foreign affairs, has available intelligence services whose reports neither are not and ought not to be published to the world."); *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936) (The President "has his confidential sources of information. He has his agents in the form of diplomatic, consular, and other officials.").[21]  Wartime interception of international communications on public networks to identify enemy communications is a historical and necessary incident of warfare and within the authority of the Commander in Chief.[22]

(**U**)  It is therefore not surprising that, as noted, the legislative history of FISA demonstrates that Congress understood that it was pressing or even exceeding constitutional limits in regulating the President's authority in the field of foreign intelligence.  For example, the final House Conference includes the extraordinary acknowledgement that "[t]he conferees agree

---

[21]  Congress itself has recognized the significance of these activities by enacting statutory protections on intelligence sources and methods. *See* Section V, *infra.*

[22]  President Wilson, for example, relying on his constitutional powers and a congressional authorization for use of force, authorized the interception of all telephone, telegraph, and cable communications into and out of the United States during World War I. *See* Exec. Order 2604 (Apr. 28, 1917).  Similarly, President Roosevelt authorized the interception of "all . . . telecommunications traffic" into or out of the United States the day after the Pearl Harbor attack, December 8, 1941. *See* Memorandum for the Secretaries of War, Navy, State, and Treasury, the Postmaster General, and the Federal Communications Commission from Franklin D. Roosevelt (Dec. 8, 1941). *See* Jack A. Gottschalk, *"Consistent with Security" . . . . A History of American Military Press Censorship*, 5 Comm. & L 35, 39 (1983); *see also United States v. United States District Court,* 444 F.2d 651, 670 (6th Cir. 1971) (Appendix A) (reproducing memoranda of President's Roosevelt, Truman, and Johnson on foreign intelligence surveillance).

that the establishment by this act of exclusive means by which the President may conduct electronic surveillance does not foreclose a different decision by the Supreme Court." H.R. Conf. Rep. No. 95-1720, at 35, *reprinted in* 1978 U.S.C.C.A.N. 4048, 4062. Indeed, the report acknowledged that Congress intended to leave the President at the "lowest ebb" of his power under Justice Jackson's concurrence in *Youngstown* and, thus, leave him solely to rely on any inherent constitutional authority, without attempting to delineate what the scope of that inherent authority might be, or what specific, factual circumstances might call for its lawful exercise. *Id.*

(U)  Finally, both before and after the enactment of the Foreign Intelligence Surveillance Act, every federal appellate court to address the issue has concluded that, even in peacetime, the President has inherent constitutional authority, consistent with the Fourth Amendment, to conduct searches for foreign intelligence purposes without securing a court order. *See In re Sealed Case,* 310 F.3d 717, 742 (Foreign Intel. Surv. Ct. of Rev. 2002) ("[A]ll the other courts to have decided the issue [have] held that the President did have inherent authority to conduct warrantless searches to obtain foreign intelligence information . . . . *We take for granted that the President does have that authority and, assuming that is so, FISA could not encroach on the President's constitutional power*.") (emphasis added); *accord, e.g., United States v. Truong Dinh Hung,* 629 F.2d 908 (4th Cir. 1980); *United States v. Butenko,* 494 F.2d 593 (3d Cir. 1974) (en banc); *United States v. Brown,* 484 F.2d 418 (5th Cir. 1973). *But cf. Zweibon v. Mitchell,* 516 F.2d 594 (D.C. Cir. 1975) (en banc) (dictum in plurality opinion suggesting that a warrant would be required even in a foreign intelligence investigation).

(U)  It therefore cannot be disputed that the President retains inherent constitutional and statutory authority in the field of foreign intelligence, and that Congress can regulate only to the extent of *its* constitutional power. The question presented here is whether the President has acted

within his constitutional and statutory authority in establishing the TSP to meet the al Qaeda threat, and whether, in the face of that threat, application of the FISA to the President's specific actions would present serious constitutional concerns. The answer to these questions turns not simply on the construction of one statute, but on how the particular facts apply within the confines of all competing principles. As set forth below, however, any assessment of how the foregoing authority should be applied to the facts at issue in this case would necessarily require the disclosure of classified details protected by the state secrets privilege.

1. **(U)** *The Continuing al Qaeda Threat:*  As a threshold matter, it is impossible to decide the issue of the President's authority without understanding the severe threat to the Nation's security that the President must meet. The nature of this threat can be described to some extent on the public record. *See supra.*  But the threat cannot merely be stipulated to; the exigent nature of the threat and the various means being utilized by the enemy are compelling evidence as to the need for the Terrorist Surveillance Program as authorized by the President. In light of the severe threat of further mass-casualty attacks by a foreign power, the President's action to authorize the TSP falls squarely within his Article II powers as Commander in Chief, as well as his authority under the AUMF.

**[REDACTED TEXT]**

(**U**) The nature of this continuing threat underscores both the compelling need for the TSP and effective means it provides to detect the al Qaeda threat. The President has acted well within his authority in utilizing the resources of the NSA in an armed conflict to defend the nation against the threat of a renewed attack at the hands of an enemy that has already inflicted the single deadliest foreign attack in the Nation's history. Further information about this threat cannot be disclosed, however, and to decide whether the President acted within his power

without a full understanding of the exigency of the circumstances at issue would be to unmoor his actions from the reasons for them and decide the case in a vacuum.

2. (**U**) *The Terrorist Surveillance Program*:

**[REDACTED TEXT]**

(**U**)  The mere fact that the TSP is a publicly acknowledged program does not undercut the state secrets assertion here as to the classified aspects of that program.  Indeed, in the recent *El Masri* decision, the district court dismissed claims relating to an alleged unlawful "rendition" program, noting that even where there might be "public affirmation of the existence of a" program, there is a "critical distinction" between an admission that a program exists and the admission or denial of the specific facts at issue.  *See El Masri,* 2006 WL 1391390, at *6.  "A general admission provides no details as to the means and methods" involved in the program, and such "operational details" are "validly claimed as state secrets."  *Id.*

(**U**)  The classified record would further demonstrate, in particular, that the President's action in authorizing the TSP is not fairly comparable to the presidential action at issue in *Youngstown Sheet & Tube Co. v. Sawyer, supra.*  There, the President's action to seize a steel mill was deemed far too attenuated from his core Commander in Chief authority, *see* 343 U.S. at 587, and to extend into the sphere of Congress's power to regulate domestic matters under the Commerce Clause, *id.* at 588.  The facts underlying the TSP demonstrate that the activities authorized by the President are not several steps removed from the actual conduct of a military campaign but are an essential part of that campaign.  Yet to demonstrate that this is so would require an exposition of evidence that cannot be publicly disclosed.[23]

---

[23] (**U**) This evidence would also address Plaintiffs' contention that the AUMF does not constitute a sufficient statutory exception to the requirements of FISA.  *See* ACLU MSJ at 13-14. Section 109 of the FISA prohibits any person from intentionally "engaging . . . in electronic

(U) Likewise, Plaintiffs' reliance on *Little v. Barreme*, 6 U.S. (2 Cranch) 170 (1804), for

the proposition that Congress can invalidate executive action taken during wartime that is in

conflict with a statute, *see* ACLU MSJ at 25, is not only inapposite, but further demonstrates

Defendants' central point:   any assessment of the President's action must be undertaken by

reference to specific facts and evidence.   In *Barreme,* where a statute had authorized the

President to seize American ships bound *to* France, the President had authorized seizure of an

American ship coming *from* a French Port.   But, in concluding that the President's action

exceeded statutory authority, the Court examined on how the facts related to specific powers

under the Constitution.   As an initial matter, the statutory provision at issue fell squarely within

Congress's responsibility under Article I to regulate foreign commerce.   *See id.* at 170.

Moreover, the Court's decision was fundamentally based on the premise that the state of affairs

at issue with France—a factual issue, of course—was *not* akin to a full-scale war in which the

President could invoke his own inherent authority.   Indeed, the Court made clear that "*[i]f* a war

of common nature had existed between the United States and France, no question would be made

but" that the facts warranted seizure of the ship.   *See id.* at 173 (emphasis added).   Chief Justice

Marshall then observed that "in the then-existing state of things" there was not a sufficiently

clear state of war that might have supported the President's actions.   *Id.* at 177.

---

surveillance under color of law *except as authorized by statute*." *See* 50 U.S.C. § 1809(a)(1)
(emphasis added). *See* ACLU MSJ at 14 n.42 (discussing *Hamdi v. Rumsfeld*, 542 U.S. 507
(2004) (holding that the detention of combatants who fought against the United States and
known to have supported al Qaeda "is so fundamental and accepted an incident to war as to be an
exercise of the 'necessary and appropriate' force Congress authorized in the AUMF.) The
classified record would demonstrate that the TSP is well within the rubric of an accepted incident
of war and easily falls within the authorization of the President's authority under the AUMF and,
thus, that the AUMF may indeed be considered a statutory enactment that permits foreign
intelligence surveillance outside the scope of FISA. Again, however, the merits of this particular
question cannot be resolved without state secrets that demonstrate the nature and scope of the
program.

(U) Thus, as properly read and understood, *Barreme* demonstrates that the specific "existing state of affairs" must be examined, along with the respective authorizations of power delegated to Congress and the President under the Constitution, in examining precisely the kind of questions now before the Court, *i.e.*, whether the President has acted lawfully in taking a particular action to defend the Homeland from attack. The "existing state of affairs"—the severe threat of a foreign terrorist attack on the United States, the specific actions taken by the President to address it, and their relation to his authority under Article II and the AUMF—make clear that those actions were well within the President's lawful authority. Again, however, the evidence to demonstrate that this is so is unavailable here.

3. **(U)** *The Foreign Intelligence Surveillance Act:* Third, the President has determined that the current threat to the United States demands that signals intelligence be carried out with a speed and methodology that cannot be achieved by seeking judicial approval through the traditional FISA process for the interception of individual communications. This judgment is well supported by the facts and falls within the President's authority, but evidence demonstrating why this is so cannot be disclosed without causing grave harm to national security.

**[REDACTED TEXT]**

**(U)** The foregoing evidence would show that, in a wartime situation, in which swift and decisive action in collecting intelligence may spell the difference between a thwarted attack and another 3,000 or more deaths, the President's decision not to cede control over this vital intelligence collection effort to the potential delays and uncertainties of a judicial process is well-supported and constitutional. But to demonstrate the point would require an exposition of evidence that must remain protected for national security reasons.

**C.    (U) Plaintiffs' Fourth Amendment Claim Cannot Be Adjudicated Without State Secrets**

(**U**) Plaintiffs also claim that the TSP violates the Fourth Amendment because it authorizes the NSA to intercept communications without either a warrant or probable cause. *See* ACLU Compl. ¶ 193; ACLU MSJ at 25-36.  Once again, however, this claim cannot be proven or defended without information covered by the state secrets assertion.  With respect to the warrant requirement, the very authority on which Plaintiffs rely makes clear that the need for a warrant turns on the facts and circumstances at issue.   Likewise, the extent to which probable cause is required for the searches at issue and, more generally, whether those searches are reasonable under the Fourth Amendment, are inherently factual considerations.

(**U**)  Plaintiffs cite *United States v. United States District Court,* 407 U.S. 297 (1972) ("*Keith*"), in which the Supreme Court concluded that the Fourth Amendment's warrant requirement applies to investigations of wholly *domestic* threats to security—such as domestic political violence and other crimes.  But the Court made clear that it was not addressing the President's authority to conduct *foreign* intelligence surveillance (even within the United States) without a warrant and that it was expressly reserving that question: "[T]he instant case requires no judgment on the scope of the President's surveillance power with respect to the activities of foreign powers, within or without this country." *Id.* at 308; *see also id.* at 321-22 & n.20 ("We have not addressed, and express no opinion as to, the issues which may be involved with respect to activities of foreign powers or their agents.").[24]

---

[24]  (**U**) *Keith* made clear that one of the significant concerns driving the Court's conclusion in the domestic security context was the inevitable connection between perceived threats to domestic security and political dissent.  As the Court explained: "Fourth Amendment protections become the more necessary when the targets of official surveillance may be those suspected of unorthodoxy in their political beliefs. The danger to political dissent is acute where the Government attempts to act under so vague a concept as the power to protect 'domestic

(U)   That *Keith* does not apply in the context of protecting against a foreign attack has

been confirmed by the lower courts. Plaintiffs note only in passing, *see* ACLU MSJ at 33 n.56,

34, the decisions of three courts of appeals that have squarely considered the question and

concluded—expressly taking the Supreme Court's decision into account—that the President has

inherent authority to conduct warrantless surveillance in the foreign intelligence context. *See,*

*e.g.*, *Truong Dinh Hung,* 629 F.2d at 913-14; *Butenko*, 494 F.2d at 603; *Brown*, 484 F.2d 425-26.

As one court put it:

> [F]oreign intelligence gathering is a clandestine and highly unstructured activity,
> and the need for electronic surveillance often cannot be anticipated in advance.
> Certainly occasions arise when officers, acting under the President's authority, are
> seeking foreign intelligence information, where exigent circumstances would
> excuse a warrant. To demand that such officers be so sensitive to the nuances of
> complex situations that they must interrupt their activities and rush to the nearest
> available magistrate to seek a warrant would seriously fetter the Executive in the
> performance of his foreign affairs duties.

*Butenko*, 494 F.2d 605. As also noted, the Foreign Intelligence Surveillance Court of Review

itself observed in dictum in 2002 that the President has inherent authority in this area. *See In re*

*Sealed Case,* 310 F.3d at 742 ("[A]ll the other courts to have decided the issue [have] held that

the President did have inherent authority to conduct warrantless searches to obtain foreign

intelligence information . . . . *We take for granted that the President does have that authority*

*and, assuming that is so, FISA could not encroach on the President's constitutional power*.")

(emphasis added). Thus, Plaintiffs are wrong in suggesting that *Keith* resolves the warrant

requirement issue in this case. See ACLU MSJ at 29-30. The requirement of a warrant

---

security.'" *Keith,* 407 U.S. at 314; *see also id.* at 320 ("Security surveillances are especially
sensitive because of the inherent vagueness of the domestic security concept, the necessarily
broad and continuing nature of intelligence gathering, and the temptation to utilize such
surveillances to oversee political dissent."). Surveillance of domestic groups raises a First
Amendment concern that generally is not present when the subjects of the surveillance are
foreign powers or their agents.

supported by probable cause is not universal but turns on the particular circumstances at issue. The Supreme Court has made clear that, while a search must be supported, as a general matter, by a warrant issued upon probable cause, it also has repeatedly "reaffirm[ed] a longstanding principle that neither a warrant nor probable cause, nor, indeed, any measure of individualized suspicion, is an indispensable component of reasonableness in every circumstance." *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 665 (1989). Here, whether a court order is required for the challenged surveillance turns on (i) whether the TSP is in fact a foreign intelligence program targeted at agents of a foreign power; and (ii) whether the particular facts and circumstances at issue render the warrant requirement impractical.

**(U)** Similarly, in authority Plaintiffs also cite, the Supreme Court has held that the warrant requirement is inapplicable in situations involving "special needs" that go beyond a routine interest in law enforcement. *Vernonia Sch. Dist. v. Acton,* 515 U.S. 646, 653 (1995) (there are circumstances "'when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable'") (quoting *Griffin v. Wisconsin,* 483 U.S. 868, 873 (1987)); *Illinois v. McArthur*, 531 U.S. 326, 330 (2001) ("When faced with special law enforcement needs, diminished expectations of privacy, minimal intrusions, or the like, the Court has found that certain general, or individual, circumstances may render a warrantless search or seizure reasonable."). Plaintiffs attempt to limit these authorities to their facts—thereby proving that the facts matter as to the doctrine's applicability. Plaintiffs argue, for example, that these "special needs" cases apply to standardized, minimally intrusive stops. *See* ACLU MSJ at 34. This argument misreads those cases; the Supreme Court has made clear that the warrant requirement is inapplicable in circumstances in which the Government faces an increased need to be able to react swiftly and flexibly, or where interests in public safety beyond

41

the interests in ordinary law enforcement are at stake. *See, e.g., Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 634 (1989) (drug testing of railroad personnel involved in train accidents).

(U)  Ultimately, however, whether this body of law—including the caselaw that recognizes a foreign intelligence exception to the warrant requirement—applies here, can only be judged on the facts of the particular circumstances at issue here, and doing so would clearly require the disclosure of state secrets.

**[REDACTED TEXT]**

(U) Beyond the warrant requirement, further analysis of Plaintiffs' Fourth Amendment claim requires a fact-intensive inquiry regarding whether a particular search satisfies the Fourth Amendment's "central requirement . . . of reasonableness." *McArthur*, 531 U.S. at 330; *see also Board of Educ. v. Earls,* 536 U.S. 822, 828 (2002).  What is reasonable, of course, "depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." *United States v. Montoya de Hernandez,* 473 U.S. 531, 537 (1985).  Thus, the permissibility of a particular practice "is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate Governmental interests." *Delaware v. Prouse,* 440 U.S. 648, 654 (1979); *see also United States v. Knights*, 534 U.S. 112, 118-19 (2001) (quoting *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999)).

(U) Indeed, in specifically addressing a Fourth Amendment challenge to warrantless electronic surveillance, the court in *Halkin II* observed that "the focus of the proceedings would necessarily be upon 'the "reasonableness" of the search and seizure in question.'"  690 F.2d at 1001 (quoting *Keith*, 407 U.S. at 308).  But, as the court held, the "valid claim of the state secrets privilege makes consideration of that question impossible." *Id.*  Without evidence of the detailed

42

circumstances in which alleged surveillance activities were being conducted—that is, without "the essential information on which the legality of executive action (in foreign intelligence surveillance) turns"—the court in *Halkin II* held that "it would be inappropriate to resolve the extremely difficult and important fourth amendment issue presented." *Id.*[25] This holding fully applies here.

(U) Plaintiffs' Fourth Amendment argument also tends to assume that *no* probable cause determinations are made under the TSP program. *See* ACLU Compl. ¶ 42; ACLU MSJ at 33-34, 35. That assumption is based on a misreading of the public record.[26] Nonetheless, to demonstrate how the NSA determines that there is a reasonable basis to conclude that the target of a TSP intercept is a member or agent of al Qaeda or an affiliated organization, and that the NSA's actions are otherwise reasonably focused on such targets, would unquestionably require a showing of not only how the program works but the compelling interests at stake. Plaintiffs themselves put the facts at issue by asserting that TSP surveillance is decided by a "shift supervisor" operating without any probable cause. *See* ACLU MSJ at 34, 35. Once again, a number of facts covered by the state secrets privilege would be relevant to adjudicating the reasonableness of the NSA's actions under the Fourth Amendment.

---

[25] (U) *See also Halkin II*, 690 F.2d at 1000 ("Determining the reasonableness of warrantless foreign intelligence watchlisting under conditions of such informational poverty [due to the state secrets assertion] . . . would be tantamount to the issuance of an advisory opinion on the question.").

[26] (U) Plaintiffs parse inaccurately statements made on the public record on this point. See ACLU Statement of Material Facts ¶¶ 6(A)-(K). Gen. Hayden stated that NSA must have a "reasonable basis" to conclude that the target of TSP interception is a member or agent of al Qaeda or its affiliate terrorist organizations. *See id.* ¶ 6(H), (I). The Attorney General has also stated that this is a probable cause standard for the surveillance of a foreign intelligence target. *See id* ¶ 6(F),(G),(J) . The "reasonable grounds to believe" standard is a "probable cause" standard of proof. *See Maryland v. Pringle,* 540 U.S. 366, 371 (2003) ("[T]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt.").

**[REDACTED TEXT]**

(**U**) One other factor in evaluating reasonableness of the searches being challenged is the efficacy of the means for addressing the problem. *Veronica*, 515 U.S. at 663; *see also Earls,* 536 U.S. at 834. In this regard as well, state secrets would be necessary to support the reasonableness of the NSA's actions but could not be disclosed.

**[REDACTED TEXT]**

(**U**) None of these substantial constitutional issues can be properly decided on the limited, incomplete public record of what has been disclosed about the Terrorist Surveillance Program. Any effort to determine the reasonableness of allegedly warrantless foreign intelligence activities under such conditions "would be tantamount to the issuance of an advisory opinion on the question." *Halkin II*, 690 F.2d at 1001 (citing *Chagnon v. Bell*, 642 F.2d 1248, 1263 (D.C. Cir. 1980)). In sum, the lawfulness of the alleged activities cannot be determined without a full factual record, and that record cannot be made in litigation without seriously compromising U.S. national security interests.

>  **D.**      (**U**) **Plaintiffs' First Amendment Claim Cannot Be Adjudicated Without State Secrets.**

(**U**) In addition to alleging Fourth Amendment violations, Plaintiffs also claim that the TSP intrudes on their First Amendment free speech and associational rights. ACLU MSJ at 36-42; *see also* ACLU Compl. ¶ 192. As with their Fourth Amendment claim, however, Plaintiffs cannot prove any First Amendment violation without facts subject to the state secrets privilege. Indeed, in the context of law enforcement or national security investigations, the protections of the First Amendment are coextensive with those of the Fourth Amendment. *See, e.g., Reporters Committee for Freedom of the Press v. Am. Tel. & Tel. Co.*, 593 F.2d 1030, 1054 (D.C. Cir. 1978) (holding that the First Amendment does not impose substantive or procedural limitations

on good faith criminal investigative action above and beyond the limitations imposed by the Fourth and Fifth Amendments); *Jabara*, 476 F. Supp. at 572 ("[T]he first amendment and the fourth amendment provide coextensive zones of privacy in the context of a good faith criminal investigation," and this principle "applies with equal force to good faith national security investigations which are not strictly criminal in nature").[27]

(U) Thus, to prove their First Amendment claim, Plaintiffs would have to show essentially the same facts that are required under the Fourth Amendment: that their individual communications were actually intercepted (without a warrant), that a warrant was required under the specific factual circumstances, and that the interceptions were unreasonable.[28] All potential

---

[27] (U) Thus, Plaintiffs are simply incorrect in suggesting that the First Amendment always requires the Government as a "procedural" matter to obtain a warrant before intercepting a communication implicating "protected speech." ACLU MSJ at 41. For that misguided proposition, Plaintiffs rely primarily on *Marcus v. Search Warrant*, 367 U.S. 717 (1961), *Lee Art Theatre, Inc. v. Virginia*, 392 U.S. 636 (1968), and *Roaden v. Kentucky*, 413 U.S. 496 (1973). Each of those cases, however, involved seizures of materials under obscenity statutes—a far cry from foreign intelligence gathering conducted to detect and prevent a catastrophic terrorist attack within the United States. Of course, if Plaintiffs were correct, the Fourth Amendment and the well-recognized exceptions to its warrant requirements would be rendered meaningless. Moreover, as the district court in *Jabara* recognized, applying protections of speech greater than those afforded by the Fourth Amendment in the context of law enforcement or national security investigations would place "an insurmountable burden on any good faith investigation," because such investigations almost always "implicate some first amendment rights." 476 F. Supp. at 572; *see also id.* ("Physical surveillance, the use of informers and discussions with other persons about the subject will necessarily reveal some of the subject's associations, beliefs, expressions and communications of all kinds. To tailor investigations so as to avoid implicating a subject's first amendment activities would be impossible.").

[28] (U) The need for Plaintiffs to show actual unlawful interception of their communications in order to prove their First Amendment claim is underscored by the nature of the claim, which is essentially a restatement of Plaintiffs' "chilling effect" allegations. As already discussed, a chilling effect cannot alone form the basis of a justiciable claim; rather, a plaintiff must suffer some concrete harm beyond the chill itself in order to bring an action. *See United Presbyterian*, 738 F.2d at 1378. Thus, to prove a First Amendment claim based on the TSP, Plaintiffs would have to show, at the very least, that their communications were unlawfully intercepted. That requirement is consistent with the notion that First and Fourth Amendment protections are coextensive in the law enforcement and national security investigation context.

45

facts going to these issues are subject to the state secrets assertion and are therefore removed from this case. Plaintiffs, accordingly, cannot make out a prima facie First Amendment claim.

(U) Even under Plaintiffs' own interpretation of the substantive requirements imposed by the First Amendment, facts subject to the state secrets privilege would clearly be necessary to resolve their claim. Plaintiffs specifically acknowledge that "the protection of national security is certainly a compelling interest," but argue that the TSP does not meet "the narrow tailoring requirement that the Constitution demands." ACLU MSJ at 40. To show that the TSP is or is not narrowly tailored to serve the compelling interest of surveilling al Qaeda and its affiliates, however, would require an exposition of the factual and operational details of the program—all of which are classified and subject to the state secrets assertion. *See* Public Declaration of John D. Negroponte, DNI, ¶ 11. Indeed, in claiming that the TSP is not narrowly tailored, Plaintiffs argue that "an NSA shift supervisor can initiate eavesdrops of unspecified scope and duration on anyone in America whom the shift supervisor believes may be affiliated with terrorist organizations." ACLU MSJ at 40. Precisely how the NSA selects targets for collection under the TSP, however, is clearly a factual issue that cannot be litigated in the abstract.

(U) Moreover, to the extent Plaintiffs suggest that the TSP impermissibly targets "protected speech," ACLU MSJ at 36-38, Plaintiffs would need to show exactly which communications were intercepted and the reasons for the interceptions (*i.e.,* why the specific speech intercepted was protected and why the interception was allegedly impermissible). As with Plaintiffs' Fourth Amendment claim, the notion of deciding these First Amendment questions "on a record devoid of any details" is "ludicrous." *Halkin*, 690 F.2d at 1003 n.96.

IV.   (U) **FURTHER LITIGATION WOULD RISK THE DISCLOSURE OF STATE SECRETS, WARRANTING DISMISSAL OF THIS ACTION.**

(U) Finally, this case is a paradigmatic example of one that should be dismissed on state secrets grounds. If "the 'very subject matter of the action' is a state secret, then the court should dismiss the plaintiff's action based solely on the invocation of the state secrets privilege." *Zuckerbraun*, 935 F.2d at 547 (citing *Reynolds,* 345 U.S. at 11 n. 26); *see also Totten v. United States*, 92 U.S. (2 Otto) 105, 107, 23 L.Ed. 605 (1875) ("[P]ublic policy forbids the maintenance of any suit in a court of justice, the trial of which would inevitably lead to the disclosure of matters which the law itself regards as confidential, and respecting which it will not allow the confidence to be violated."). In such cases, "sensitive military secrets will be so central to the subject matter of the litigation that any attempt to proceed will threaten disclosure of the privileged matters." *Fitzgerald*, 776 F.2d at 1241-42. *See also, e.g., Tilden v. Tenet,* 140 F. Supp. 2d 623, 626 (E.D. Va. 2000); *Maxwell v. First National Bank of Maryland*, 143 F.R.D. 590, 598-99 (D. Md. 1992). Once again, the significance of the claim, including whether constitutional claims are at issue, is not relevant to whether a case should be dismissed in order to protect state secrets. *See Halkin I; Halkin II, supra* (constitutional challenge to alleged unlawful surveillance dismissed where protected state secrets precluded establishment of standing); *Molerio v. FBI*, 749 F.2d 815 (D.C. Cir. 1984) (summary judgment entered for government where state secrets precluded adjudication of First Amendment claim); *El Masri v. Tenet*, 2006 WL 1391390 (E.D. Va. May 12, 2006) (constitutional tort challenge to alleged unlawful rendition by CIA dismissed to protect state secrets); *Edmonds v. U.S. Department of Justice*, 323 F. Supp. 2d at 77-82 (First and Fifth Amendment challenge to employment termination dismissed to protect state secrets).

(U) On its face, Plaintiffs' Complaint openly challenges the conduct of secret

47

intelligence gathering activities. The entire point of the lawsuit is to adjudicate the merits of those activities. By the very nature of the claims, Plaintiffs cannot establish facts to show their standing or make out a *prima facie* case on the merits, and the Defendants cannot defend their actions, without the disclosure of state secrets. This lawsuit is, thus, one in which state secrets are "so central to the subject matter of the litigation that any attempt to proceed will threaten disclosure of the privileged matters." *Fitzgerald*, 776 F.2d at 1241-42.

(U) The fact that Plaintiffs believe that they can present their case on the public record does not mitigate this risk, because Defendants and the Court would obviously need to present and consider a fuller picture of the activities at issue and the threat they are designed to meet. Any effort to "work around" classified facts as the case proceeds could tend to reveal and risk the disclosure of state secrets, particularly those crucial details that go to the ultimate issues in the case. "[B]its and pieces of seemingly innocuous information can be analyzed and fitted into place to reveal with startling clarity how the unseen whole must operate." *Halkin* I, 598 F.2d at 8. For this reason, DNI Negroponte and Gen. Quirk have both concluded that, given the subject matter of this case, further proceedings in this case would risk grave harm to national security interests.

(U) The United States is mindful that the "denial of a forum provided under the Constitution for the resolution of disputes is a drastic remedy," *Fitzgerald v. Penthouse*, 776 F.2d at 1243. Nonetheless, "the state secrets doctrine finds the greater public good—ultimately the less harsh remedy—to be dismissal." *Bareford*, 973 F.2d at 1141; *Kasza*, 133 F.3d at 1167. Courts have found that this is the "result required" even where allegations of unlawful or unconstitutional actions are at issue. *See Halkin I*, 690 F.2d at 1001; *Maxwell*, 143 F.R.D. at 598 (successful invocation of the state secrets privilege and other statutory privileges "may defeat

worthy claims"). The Plaintiffs' interests are not the only ones at stake, and the results would be harsh in either direction. Proceeding to litigate the subject matter of this dispute would cause grave harm of another kind—one that would potentially impact the security of all Americans. *See El Masri*, 2004 WL 1391390, at *7 (while dismissal of complaint deprives plaintiff of judicial forum, controlling legal principles require that "private interests must give way to the national interest in preserving state secrets").

(**U**) This is not to say there is no forum to air the weighty matters at issue, which remains a matter of considerable public interest and debate, but that the resolution of these issues must be left to the political branches of government.

## V.   (U) STATUTORY PRIVILEGE CLAIMS HAVE ALSO BEEN PROPERLY RAISED IN THIS CASE.

(**U**) Two statutory protections also apply to the intelligence-related information, sources and methods described herein, and both have been properly invoked here as well. First, Section 6 of the National Security Agency Act of 1959, Pub. L. No. 86-36, § 6, 73 Stat. 63, 64, codified at 50 U.S.C. § 402 note, provides:

> [N]othing in this Act or any other law . . . shall be construed to require the disclosure of the organization or any function of the National Security Agency, of any information with respect to the activities thereof, or of the names, titles, salaries, or number of persons employed by such agency.

*Id.* Section 6 reflects a "congressional judgment that in order to preserve national security, information elucidating the subjects specified ought to be safe from forced exposure." *The Founding Church of Scientology of Washington, D.C., Inc. v. Nat'l Security Agency*, 610 F.2d 824, 828 (D.C. Cir. 1979); *accord Hayden v. Nat'l Security Agency*, 608 F.2d 1381, 1389 (D.C. Cir. 1979). In enacting Section 6, Congress was "fully aware of the 'unique and sensitive' activities of the [NSA] which require 'extreme security measures.'" *Hayden*, 608 F.2d at 1390

49

(citing legislative history). Thus, "[t]he protection afforded by section 6 is, by its very terms, absolute. If a document is covered by section 6, the NSA is entitled to withhold it . . . ." *Linder v. Nat'l Security Agency*, 94 F.3d 693, 698 (D.C. Cir. 1996).

(**U**) The second applicable statute is Section 102A(i)(1) of the Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-458, 118 Stat. 3638 (Dec. 17, 2004), codified at 50 U.S.C. § 403-1(i)(1). This statute requires the Director of National Intelligence to protect intelligence sources and methods from unauthorized disclosure. The authority to protect intelligence sources and methods from disclosure is rooted in the "practical necessities of modern intelligence gathering," *Fitzgibbon v. CIA*, 911 F.2d 755, 761 (D.C. Cir. 1990), and has been described by the Supreme Court as both "sweeping," *CIA* v. *Sims*, 471 U.S. 159, 169 (1985), and "wideranging." *Snepp v. United States*, 444 U.S. 507, 509 (1980). Sources and methods constitute "the heart of all intelligence operations," *Sims*, 471 U.S. at 167, and "[i]t is the responsibility of the [intelligence community], not that of the judiciary to weigh the variety of complex and subtle factors in determining whether disclosure of information may lead to an unacceptable risk of compromising the . . . intelligence-gathering process." *Id.* at 180.

(**U**) These statutory privileges have been properly asserted as to any intelligence-related information, sources and methods implicated by Plaintiffs' claims, and the information covered by these privilege claims is at least co-extensive with the assertion of the state secrets privilege by the DNI. *See* Public Declaration of John D. Negroponte, Director of National Intelligence, and Public Declaration of Richard J. Quirk, Director of Signals Intelligence, National Security Agency.

**VI.   (U) PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT SHOULD BE STAYED PENDING RESOLUTION OF THE STATE SECRETS PRIVILEGE AND DEFENDANTS' MOTION TO DISMISS.**

(**U**) Finally, and for reasons that should be apparent, Defendants have also moved to stay consideration of Plaintiffs' pending motion for summary judgment.  Resolution of the United States' assertion of the state secrets privilege, and accompanying motion to dismiss the case because of the unavailability of evidence, should precede any attempt to decide the merits. Defendants' motion puts at issue the very question of whether, as a result of the state secrets assertion, Plaintiffs can establish their standing and whether their claims can be decided on the merits.  Accordingly, Plaintiffs' request for summary judgment should be deferred until these obvious threshold issues are decided.

(**U**) As the Supreme Court has held, every court has an "inherent" power to exercise its discretion to "control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for the litigants." *Landis v. North American Co.,* 299 U.S. 248, 254 (1936); *see also Stone v. INS,* 514 U.S. 386 (1995) ("we have long recognized that courts have inherent power to stay proceedings and 'to control the disposition of the causes on its docket . . .'" (quoting *Landis, supra*); *WorldCrisa Corp. v.* Armstrong, 129 F.3d 71 (1997); *Ohio Environmental Council v. U.S. District Court,* 565 F.2d 393, 396 (6th Cir.  1977) ("the entry of an order to stay proceedings ordinarily rests with the sound discretion of the District Court").

(**U**) In addition, courts often recognize that preliminary issues should be decided before the merits are addressed.  *See, e.g., Hahn v. Star Bank*, 190 F.3d 708, (6th Cir. 1999) (trial courts have broad power to stay proceedings until preliminary questions that may dispose of the case are determined); *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94-95 (1998) (jurisdiction is a threshold inquiry that should be decided before proceeding to the merits of an

51

action).

(U) Because Defendants' motion raises threshold issues as to whether this case can even proceed, the Court should exercise its discretion to defer Plaintiffs' motion for summary judgment until ruling on the state secrets assertion and Defendants' motion to dismiss.

### (U) CONCLUSION

(U) For the foregoing reasons, the Court should:

1.      (U) Uphold the Government's assertion of the military and state secrets privilege and applicable statutory privileges and exclude from this case the information identified in the Declarations of John D. Negroponte, Director of National Intelligence of the United States, and Richard J. Quirk, Signals Intelligence Director, NSA; and

2.      (U) Dismiss this action because adjudication of Plaintiffs' claims risks or requires the disclosure of protected state secrets and would thereby risk or cause exceptionally grave harm to the national security of the United States.

Respectfully Submitted,

PETER D. KEISLER
Assistant Attorney General

CARL J. NICHOLS
Deputy Assistant Attorney General

DOUGLAS N. LETTER
Terrorism Litigation Counsel

JOSEPH H. HUNT
Director, Federal Programs Branch

 *s/ Anthony J. Coppolino*
ANTHONY J. COPPOLINO
Special Litigation Counsel
tony.coppolino@usdoj.gov

52

_s/ Andrew H. Tannenbaum_
ANDREW H. TANNENBAUM
Trial Attorney
andrew.tannenbaum@usdoj.gov
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW
Washington, D.C. 20001
Phone: (202) 514-4782/(202) 514-4263
Fax: (202) 616-8460/(202) 616-8202

Attorneys for the United States of America

DATED: May 26, 2006