**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

AMERICAN CIVIL LIBERTIES UNION;
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION; AMERICAN CIVIL
LIBERTIES UNION OF MICHIGAN;
COUNCIL ON AMERICAN-ISLAMIC                    Case No.  06-CV-10204
RELATIONS; COUNCIL ON AMERICAN
ISLAMIC RELATIONS MICHIGAN;                    Hon. Anna Diggs Taylor
GREENPEACE, INC.; NATIONAL
ASSOCIATION OF CRIMINAL DEFENSE
LAWYERS; JAMES BAMFORD; LARRY
DIAMOND; CHRISTOPHER HITCHENS;
TARA MCKELVEY; and BARNETT R. RUBIN,

                Plaintiffs,

v.

NATIONAL SECURITY AGENCY / CENTRAL
SECURITY SERVICE; and LIEUTENANT
GENERAL KEITH B. ALEXANDER, in his official
capacity as Director of the National Security Agency
and Chief of the Central Security Service,

                Defendants.

_____/

**<u>MEMORANDUM OPINION</u>**

*I. Introduction*

       This is a challenge to the legality of a secret program (hereinafter "TSP") undisputedly

inaugurated by the National Security Agency (hereinafter "NSA") at least by 2002 and continuing

today, which intercepts without benefit of warrant or other judicial approval, prior or subsequent,

the international telephone and internet communications of numerous persons and organizations

1

within this country.  The TSP has been acknowledged by this Administration to have been authorized by the President's secret order during 2002 and reauthorized at least thirty times since.[1]

Plaintiffs are a group of persons and organizations who, according to their affidavits, are defined by the Foreign Intelligence Surveillance Act (hereinafter "FISA") as "U.S. persons."[2] They conducted regular international telephone and internet communications for various uncontestedly legitimate reasons including journalism, the practice of law, and scholarship.  Many of their communications are and have been with persons in the Middle East.  Each Plaintiff has alleged a "well founded belief" that he, she, or it, has been subjected to Defendants' interceptions, and that the TSP not only injures them specifically and directly, but that the TSP substantially chills and impairs their constitutionally protected communications.  Persons abroad who before the program spoke with them by telephone or internet will no longer do so.

Plaintiffs have alleged that the TSP violates their free speech and associational rights, as guaranteed by the First Amendment of the United States Constitution; their privacy rights, as guaranteed by the Fourth Amendment of the United States Constitution; the principle of the Separation of Powers because the TSP has been authorized by the President in excess of his Executive Power under Article II of the United States Constitution, and that it specifically violates the statutory limitations placed upon such interceptions by the Congress in FISA because it is conducted without observation of any of the procedures required by law, either statutory or Constitutional.

Before the Court now are several motions filed by both sides.  Plaintiffs have requested a

---

[1]Available at http://www.white-house.gov//news/releases/2005/12/20051219-2.html

[2]Pub. L. 95-511, Title I, 92 Stat 1976 (Oct. 25, 1978), codified as amended at 50 U.S.C. §§ 1801 *et seq*.

permanent injunction, alleging that they sustain irreparable damage because of the continued existence of the TSP.  Plaintiffs also request a Partial Summary Judgment holding that the TSP violates the Administrative Procedures Act ("APA"); the Separation of Powers doctrine; the First and Fourth Amendments of the United States Constitution, and the statutory law.

Defendants have moved to dismiss this lawsuit, or in the alternative for Summary Judgment, on the basis of the state secrets evidentiary privilege and Plaintiffs' lack of standing.

## II.  State Secrets Privilege

Defendants argue that the state secrets privilege bars Plaintiffs' claims because Plaintiffs cannot establish standing or a *prima facie* case for any of their claims without the use of state secrets.  Further, Defendants argue that they cannot defend this case without revealing state secrets. For the reasons articulated below, the court rejects Defendants' argument with respect to Plaintiffs' claims challenging the TSP.  The court, however, agrees with Defendants with respect to Plaintiffs' data- mining claim and grants Defendants' motion for summary judgment on that claim.

The state secrets privilege is an evidentiary rule developed to prevent the disclosure of information which may be detrimental to national security.  There are two distinct lines of cases covering the privilege.  In the first line of cases the doctrine is more of a rule of "non-justiciability because it deprives courts of their ability to hear suits against the Government based on covert espionage agreements." *El-Masri v. Tenet*, 2006 WL 1391390 at 7 (E.D.Va., 2006). The seminal decision in this line of cases is *Totten v. United States* 92 U.S. 105 (1875).  In *Totten*, the plaintiff brought suit against the government seeking payment for espionage services he had provided during the Civil War.  In affirming the dismissal of the case, Justice Field wrote:

> The secrecy which such contracts impose precludes any action for
> their enforcement. The publicity produced by an action would itself

be a breach of a contract of that kind, and thus defeat a recovery.
*Totten,* 92 U.S. at 107.

The Supreme Court reaffirmed *Totten* in *Tenet v. Doe,* 544 U.S. 1, (2005). In *Tenet,* the plaintiffs, who were former Cold War spies, brought estoppel and due process claims against the United States and the Director of the Central Intelligence Agency (hereinafter "CIA") for the CIA's alleged failure to provide them with the assistance it had allegedly promised in return for their espionage services. *Tenet,* 544 U.S. at 3. Relying heavily on *Totten,* the Court held that the plaintiffs claims were barred. Delivering the opinion for a unanimous Court, Chief Justice Rehnquist wrote:

> We adhere to *Totten*. The state secrets privilege and the more frequent use of *in camera* judicial proceedings simply cannot provide the absolute protection we found necessary in enunciating the *Totten* rule. The possibility that a suit may proceed and an espionage relationship may be revealed, if the state secrets privilege is found not to apply, is unacceptable: "Even a small chance that some court will order disclosure of a source's identity could well impair intelligence gathering and cause sources to 'close up like a clam.'" (citations omitted). *Tenet,* 544 U.S. at 11.

The second line of cases deals with the exclusion of evidence because of the state secrets privilege. In *United States v. Reynolds,* 345 U.S. 1 (1953), the plaintiffs were the widows of three civilians who died in the crash of a B-29 aircraft. *Id.* at 3-4. The plaintiffs brought suit under the Tort Claims Act and sought the production of the Air Force's official accident investigation report and the statements of the three surviving crew members. *Id.* The Government asserted the states secret privilege to resist the discovery of this information, because the aircraft in question and those aboard were engaged in a highly secret mission of the Air Force. *Id.* at 4. In discussing the state secrets privilege and its application, Chief Justice Vinson stated:

> The privilege belongs to the Government and must be asserted by it;

4

> it can neither be claimed nor waived by a private party.  It is not to be lightly invoked.  There must be formal claim of privilege, lodged by the head of the department which has control over the matter, after actual personal consideration by that officer.  The court itself must determine whether the circumstances are appropriate for the claim of privilege, and yet do so without forcing a disclosure of the very thing the privilege is designed to protect.  *Reynolds,* 345 U.S. at 8.

The Chief Justice further wrote:

> In each case, the showing of necessity which is made will determine how far the court should probe in satisfying itself that the occasion for invoking the privilege is appropriate. Where there is a strong showing of necessity, the claim of privilege should not be lightly accepted, but even the most compelling necessity cannot overcome the claim of privilege if the court is ultimately satisfied that military secrets are at stake.  *Reynolds,* 345 U.S. at 11.

The Court sustained the Government's claim of privilege, finding the plaintiffs' "necessity" for the privileged information was "greatly minimized" by the fact that the plaintiffs had an available alternative. *Reynolds,* 345 U.S. at 11.  Moreover, the Court found that there was nothing to suggest that the privileged information had a "causal connection with the accident" and that the plaintiffs could "adduce the essential facts as to causation without resort to material touching upon military secrets." *Id.*

In *Halkin v. Helms,* 598 F.2d 1 (D.C.Cir.1978) (*Halkin I* ), the District of Columbia Circuit Court applied the holding in *Reynolds* in a case in which the plaintiffs, Vietnam War protestors, alleged that the defendants, former and present members of the NSA, the CIA, Defense Intelligence Agency, the Federal Bureau of Investigation and the Secret Service engaged in warrantless surveillance of their international wire, cable and telephone communications with the cooperation of telecommunications providers. *Id.* at 3.  The telecommunications providers were also named as defendants. *Id.*  The plaintiffs specifically challenged the legality of two separate NSA surveillance

operations undertaken from 1967 to 1973 named operation MINARET and operation SHAMROCK.[3]
*Id.* at 4.

The Government asserted the state secrets privilege and moved for dismissal for the following reasons: (1) discovery would "confirm the identity of individuals or organizations whose foreign communications were acquired by NSA"; (2) discovery would lead to the disclosure of "dates and contents of such communications"; or (3) discovery would "divulge the methods and techniques by which the communications were acquired." *Halkin,* 598 F.2d at 4-5. The district court held that the plaintiffs' claims against operation MINARET had to be dismissed "because the ultimate issue, the fact of acquisition, could neither be admitted nor denied." *Id.* at 5. The district court, however, denied the Government's motion to dismiss the plaintiffs' claims regarding operation SHAMROCK, because it "thought congressional committees investigating intelligence matters had revealed so much information about operation SHAMROCK that such a disclosure would pose no threat to the NSA mission." *Id.* at 10.

On appeal, the District of Columbia Circuit Court affirmed the district court's dismissal of the plaintiffs' claims with respect to operation MINARET but reversed the court's ruling with respect to operation SHAMROCK. In reversing the district court ruling regarding SHAMROCK, the circuit court stated:

> . . . we think the affidavits and testimony establish the validity of the state secrets claim with respect to both SHAMROCK and MINARET acquisitions; our reasoning applies to both. There is a "reasonable danger", (citation omitted) that confirmation or denial that a particular plaintiff's communications have been acquired would

---

[3]Operation MINARET was part of the NSA's regular intelligence activity in which foreign electronic signals were monitored. Operation SHAMROCK involved the processing of all telegraphic traffic leaving or entering the United States. *Hepting v. AT & T Corp* 2006 WL 2038464 (N.D.Cal.2006) quoting *Halkin*.

disclose NSA capabilities and other valuable intelligence information to a sophisticated intelligence analyst. *Halkin,* 598 F.2d at 10.

The case was remanded to the district court and it dismissed the plaintiffs' claims against the NSA and the individuals connected with the NSA's alleged monitoring. *Halkin v. Helms,* 690 F.2d 977, 984 (D.C. Cir.1982) (*Halkin II*).

In *Halkin II,* 690 F.2d 977, the court addressed plaintiffs' remaining claims against the CIA, which the district court dismissed because of the state secrets privilege. In affirming the district court's ruling, the District of Columbia Circuit stated:

> It is self-evident that the disclosures sought here pose a "reasonable danger" to the diplomatic and military interests of the United States. Revelation of particular instances in which foreign governments assisted the CIA in conducting surveillance of dissidents could strain diplomatic relations in a number of ways-by generally embarrassing foreign governments who may wish to avoid or may even explicitly disavow allegations of CIA or United States involvements, or by rendering foreign governments or their officials subject to political or legal action by those among their own citizens who may have been subjected to surveillance in the course of dissident activity. *Halkin II,* 690 F.2d at 993.

*Ellsberg v. Mitchell,* 709 F.2d 51 (D.C. Cir.1983) was yet another case where the District of Columbia Circuit dealt with the state secrets privilege being raised in the defense of a claim of illegal wiretapping. In *Ellsberg,* the plaintiffs, the defendants and attorneys in the "Pentagon Papers" criminal prosecution brought suit when, during the course of that litigation, they discovered "that one or more of them had been the subject of warrantless electronic surveillance by the federal Government." *Id.* at 51. The defendants admitted to two wiretaps but refused to respond to some of the plaintiffs' interrogatories, asserting the state secrets privilege. *Id.* at 54. The plaintiffs sought an order compelling the information and the district court denied the motion, sustaining the Government's assertion of the state secrets privilege. *Id.* at 56. Further, the court dismissed the

plaintiffs' claims that pertained "to surveillance of their foreign communications." *Ellsberg v. Mitchell,* 709 F.2d at 56.

On appeal, the District of Columbia Circuit reversed the district court with respect to the plaintiffs' claims regarding the Government's admitted wiretaps, because there was no reason to "suspend the general rule that the burden is on those seeking an exemption from the Fourth Amendment warrant requirement to show the need for it." *Ellsberg,* 709 F.2d at 68. With respect to the application of the state secrets privilege, the court stated:

> When properly invoked, the state secrets privilege is absolute. No competing public or private interest can be advanced to compel disclosure of information found to be protected by a claim of privilege. However, because of the broad sweep of the privilege, the Supreme Court has made clear that "[i]t is not to be lightly invoked." Thus, the privilege may not be used to shield any material not strictly necessary to prevent injury to national security; and, whenever possible, sensitive information must be disentangled from nonsensitive information to allow for the release of the latter. *Ellsberg,* 709 F.2d at 56.

In *Kasza v. Browner,* 133 F.3d 1159 (9th Cir.1998), the plaintiffs, former employees at a classified United States Air Force facility, filed suit against the Air Force and the Environmental Protection Agency under the Resource Conservation and Recovery Act, alleging violations at the classified facility. *Id.* at 1162. The district court granted summary judgment against the plaintiffs, because discovery of information necessary for the proof of the plaintiffs' claims was impossible due to the state secrets privilege. *Id.* In affirming the district court's grant of summary judgment against one of the plaintiffs, the Ninth Circuit stated:

> Not only does the state secrets privilege bar [the plaintiff] from establishing her prima facie case on any of her eleven claims, but any further proceeding in this matter would jeopardize national security. No protective procedure can salvage [the plaintiff's] suit. *Kasza,* 133 F.3d at 1170.

8

The *Kasza* court also explained that "[t]he application of the state secrets privilege can have . . . three effects." *Kasza,* 133 F.3d at 1166. First, when the privilege is properly invoked "over particular evidence, the evidence is completely removed from the case." *Id.* The plaintiff's case, however, may proceed "based on evidence not covered by the privilege." *Id.* "If . . . the plaintiff cannot prove the *prima facie* elements of her claim with nonprivileged evidence, then the court may dismiss her claim as it would with any plaintiff who cannot prove her case." *Id.* Second, summary judgement may be granted, "if the privilege deprives the defendant of information that would otherwise give the defendant a valid defense to the claim." *Id.* Lastly, "notwithstanding the plaintiff's ability to produce nonprivileged evidence, if the 'very subject matter of the action' is a state secret, then the court should dismiss the plaintiff's action based solely on the invocation of the state secrets privilege." *Id.*

The Sixth Circuit delivered its definitive opinion regarding the states secrets privilege, in *Tenenbaum v. Simonini,* 372 F.3d 776 (6th Cir. 2004). In that case, the plaintiffs sued the United States and various employees of federal agencies, alleging that the defendants engaged in criminal espionage investigation of the plaintiff, David Tenenbaum, because he was Jewish. *Id.* at 777. The defendants moved for summary judgment, arguing that they could not defend themselves against the plaintiffs' "claims without disclosing information protected by the state secrets doctrine." *Id.* The district court granted the defendants' motion and the Sixth Circuit affirmed stating:

> We further conclude that Defendants cannot defend their conduct with respect to Tenenbaum without revealing the privileged information. Because the state secrets doctrine thus deprives Defendants of a valid defense to the Tenenbaums' claims, we find that the district court properly dismissed the claims. *Tenenbaum,* 372 F.3d at 777.

Predictably, the War on Terror of this administration has produced a vast number of cases,

in which the state secrets privilege has been invoked.[4]  In May of this year, a district court in the Eastern District of Virginia addressed the state secrets privilege in *El-Masri v. Tenet,* 2006 WL 1391390,  (E.D. Va. May 12, 2006).   In *El Masri*, the plaintiff, a German citizen of Lebanese descent,  sued the former director of the CIA and others, for their alleged involvement in a program called Extraordinary Rendition.  *Id.* at 1.   The court dismissed the plaintiff's claims, because they could not be fairly litigated without the disclosure of state secrets.[5]  *Id.* at 6.

In *Hepting v. AT & T Corp.,* 2006 WL 2038464, (E.D. Cal. June 20, 2006), which is akin to our inquiry in the instant case, the plaintiffs brought suit, alleging that AT & T Corporation was collaborating with the NSA in a warrantless surveillance program, which illegally tracked the domestic and foreign communications and communication records of millions of Americans.  *Id.* at 1.  The United States intervened and moved that the case be dismissed based on the state secrets privilege.  *Id.*  Before applying the privilege to the plaintiffs' claims, the court first examined the information that had already been exposed to the public, which is essentially the same information that has been revealed in the instant case.   District Court Judge Vaughn Walker found that the Government had admitted:

> . . . it monitors "contents of communications where * * * one party to the communication is outside the United States and the government has a reasonable basis to conclude that one party to the communication is a member of al Qaeda, affiliated with al Qaeda, or a member of an organization affiliated with al Qaeda, or working in support of al Qaeda."  (citations omitted).  *Hepting*, 2006 WL

---

[4]In *Terkel v. AT & T Corp.,* 2006 WL 2088202 (N.D. Ill. July 25, 2006), the plaintiffs alleged that AT&T provided information regarding their telephone calls and internet communications to the NSA.  *Id.* at 1.  District Court Judge Matthew F. Kennely dismissed the case because the state secrets privilege made it impossible for the plaintiffs to establish standing.  *Id.* at 20.

[5]Further, the court was not persuaded by the plaintiff's argument that the privilege was negated because the Government had admitted that the rendition program existed because it found the Government's admissions to be without details.

2038464, at 19.

Accordingly Judge Walker reasoned that "[b]ased on these public disclosures," the court could not "conclude that the existence of a certification regarding the 'communication content' program is a state secret." *Id.*

Defendants' assertion of the privilege without any request for answers to any discovery has prompted this court to first analyze this case under *Totten/Tenet*, since it appears that Defendants are arguing that this case should not be subject to judicial review. As discussed *supra,* the *Totten/Tenet* cases provide an absolute bar to any kind of judicial review. *Tenet,* 544 U.S. at 8. This rule should not be applied in the instant case, however, since the rule applies to actions where there is a secret espionage relationship between the Plaintiff and the Government. *Id.* at 7-8. It is undisputed that Plaintiffs' do not claim to be parties to a secret espionage relationship with Defendants. Accordingly, the court finds the *Totten/Tenet* rule is not applicable to the instant case. The state secrets privilege belongs exclusively to the Executive Branch and thus, it is appropriately invoked by the head of the Executive Branch agency with control over the secrets involved. *Reynolds,* 345 U.S. at 1. In the instant case, the court is satisfied that the privilege was properly invoked. Defendants' publicly-filed affidavits from Director of National Intelligence John D. Negroponte and Signal Intelligence Director, NSA Major General Richard J. Quirk, set forth facts supporting the Government's contention that the state secrets privilege and other legal doctrines required dismissal of the case. Additionally, Defendants filed classified versions of these declarations *ex parte* and *in camera* for this court's review. Defendants also filed *ex parte* and *in camera* versions of its brief along with other classified materials, further buttressing its assertion of the privilege. Plaintiffs concede that the public declaration from Director Negroponte satisfies the

procedural requirements set forth in *Reynolds*. Therefore, this court concludes that the privilege has been appropriately invoked.

Defendants argue that Plaintiffs' claims must be dismissed because Plaintiffs cannot establish standing or a *prima facie* case for any of its claims without the disclosure of state secrets. Moreover, Defendants argue that even if Plaintiffs are able to establish a *prima facie* case without revealing protected information, Defendants would be unable to defend this case without the disclosure of such information. Plaintiffs argue that Defendants' invocation of the state secrets privilege is improper with respect to their challenges to the TSP, since no additional facts are necessary or relevant to the summary adjudication of this case. Alternatively, Plaintiffs argue, that even if the court finds that the privilege was appropriately asserted, the court should use creativity and care to devise methods which would protect the privilege but allow the case to proceed.

The "next step in the judicial inquiry into the validity of the assertion of the privilege is to determine whether the information for which the privilege is claimed qualifies as a state secret." *El Masri,* 2006 WL 1391390, at 4. Again, the court acknowledges that it has reviewed all of the materials Defendants submitted *ex parte* and *in camera.* After reviewing these materials, the court is convinced that the privilege applies "because a reasonable danger exists that disclosing the information in court proceedings would harm national security interests, or would impair national defense capabilities, disclose intelligence-gathering methods or capabilities, or disrupt diplomatic relations with foreign governments." *Tenenbaum,* 372 F.3d at 777.

Plaintiffs, however, maintain that this information is not relevant to the resolution of their claims, since their claims regarding the TSP are based solely on what Defendants have publicly admitted. Indeed, although the instant case appears factually similar to *Halkin,* in that they both

involve plaintiffs challenging the legality of warrantless wiretapping, a key distinction can be drawn. Unlike *Halkin* or any of the cases in the *Reynolds* progeny, Plaintiffs here are not seeking any additional discovery to establish their claims challenging the TSP.[6]

Like Judge Walker in *Hepting,* this court recognizes that simply because a factual statement has been made public it does not necessarily follow that it is true. *Hepting,* 2006 WL 2038464 at 12. Hence, "in determining whether a factual statement is a secret, the court considers only public admissions or denials by the [G]overnment." *Id.* at 13. It is undisputed that Defendants have publicly admitted to the following: (1) the TSP exists; (2) it operates without warrants; (3) it targets communications where one party to the communication is outside the United States, and the government has a reasonable basis to conclude that one party to the communication is a member of al Qaeda, affiliated with al Qaeda, or a member of an organization affiliated with al Qaeda, or working in support of al Qaeda. As the Government has on many occasions confirmed the veracity of these allegations, the state secrets privilege does not apply to this information.

Contrary to Defendants' arguments, the court is persuaded that Plaintiffs are able to establish a *prima facie* case based solely on Defendants' public admissions regarding the TSP. Plaintiffs' declarations establish that their communications would be monitored under the TSP.[7] Further, Plaintiffs have shown that because of the existence of the TSP, they have suffered a real and concrete harm. Plaintiffs' declarations state undisputedly that they are stifled in their ability to

---

[6]In *Halkin,* the plaintiffs were requesting that the Government answer interrogatories and sought to depose the secretary of defense. *Halkin,* 598 F.2d at 6.

[7]See generally, in a Declaration, attorney Nancy Hollander stated that she frequently engages in international communications with individuals who have alleged connections with terrorist organizations. (Exh. J, Hollander ). Attorney William Swor also provided a similar declaration. (Exh. L, Swor Decl. ). Journalist Tara McKelvey declared that she has international communications with sources who are suspected of helping the insurgents in Iraq. (Exh. K, McKelvey Decl.).

vigorously conduct research, interact with sources, talk with clients and, in the case of the attorney Plaintiffs, uphold their oath of providing effective and ethical representation of their clients.[8]  In addition, Plaintiffs have the additional injury of incurring substantial travel expenses as a result of having to travel and meet with clients and others relevant to their cases.  Therefore, the court finds that Plaintiffs need no additional facts to establish a *prima facie* case for any of their claims questioning the legality of the TSP.

The court, however, is convinced that Plaintiffs cannot establish a *prima facie* case to support their data- mining claims without the use of privileged information and further litigation of this issue would  force the disclosure of the very thing the privilege is designed to protect.  Therefore, the court grants Defendants' motion for summary judgment with respect to this claim.

Finally, Defendants assert that they cannot defend this case without the exposure of state secrets.  This court disagrees.  The Bush Administration has repeatedly told the general public that there is a valid basis in law for the TSP.[9]  Further, Defendants have contended that the President has the authority under the AUMF and the Constitution to authorize the continued use of the TSP.  Defendants have supported these arguments without revealing or relying on any classified information.  Indeed, the court has reviewed the classified information and is of the opinion that this information is not necessary to any viable defense to the TSP.  Defendants have presented support

---

[8]Plaintiffs' Statement of Undisputed Facts (hereinafter "SUF") SUF 15 (Exh. J, Hollander Decl. ¶¶12, 16, 25; Exh. L, Swor Decl. ¶¶9, 11-12, 14-16);Plaintiffs;' Reply Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment (hereinafter "Pl.'s Reply") (Exh. P,  Dratel Decl. ¶¶9-11; Exh. Q, Abdrabboh Decl. ¶¶7-8; Exh. R. Ayad. Decl. ¶¶ 4, 6-8); (Exh. M  Niehoff Decl. ¶ 12 ).

[9]On December 17, 2005, in a radio address, President Bush stated:

> In the weeks following the terrorist attacks on our nation, I authorized the National Security Agency, consistent with U.S. law and the Constitution, to intercept the international communications of people with known links to al Qaeda and related terrorist organizations.
> http://www.whitehouse.gov/news/releases/2005/12/20051217.html

for the argument that "it . . is well-established that the President may exercise his statutory and constitutional authority to gather intelligence information about foreign enemies."[10] Defendants cite to various sources to support this position. Consequently, the court finds Defendants' argument that they cannot defend this case without the use of classified information to be disingenuous and without merit.

In sum, the court holds that the state secrets privilege applies to Plaintiffs' data-mining claim and that claim is dismissed. The privilege, however, does not apply to Plaintiffs' remaining claims challenging the validity of the TSP, since Plaintiffs are not relying on or requesting any classified information to support these claims and Defendants do not need any classified information to mount a defense against these claims.[11]

### III.  Standing

Defendants argue that Plaintiffs do not establish their standing. They contend that Plaintiffs' claim here is merely a subjective fear of surveillance which falls short of the type of injury necessary to establish standing. They argue that Plaintiffs' alleged injuries are too tenuous to be recognized, not "distinct and palpable" nor  "concrete and particularized."

Article III of the U.S. Constitution limits the federal court's jurisdiction to "cases" and "controversies". *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). To have a genuine case or controversy, the plaintiff must establish standing. "[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v.*

---

[10]Defendants' Brief in Support of Summary Judgment pg. 33.

[11]Defendants also contend that Plaintiffs' claims are barred because they properly invoked statutory privileges under the National Security Agency Act of 1959, 50 U.S.C. § 402 and the Intelligence Reform and Terrorism Prevention Act of 2004, 50 U.S.C. § 403-(i)(1).  Again, these privileges are not availing to Defendants with respect to Plaintiffs' claims challenging the TSP, for the same reasons that the state secrets privilege does not bar these claims.

*Defenders of Wildlife*, 504 U.S. at 560.  To establish standing under Article III, a plaintiff must satisfy the following three requirements: (1) "the plaintiff must have suffered an injury in fact - an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) "there must be a causal connection between the injury and the conduct complained of", and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id*. at 560-561.  The party invoking federal jurisdiction bears the burden of establishing these elements. *Id*. at 561.

"An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests it seeks to protect are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 181 (2000) (citing *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 342 (1977)).

"At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presume that general allegations embrace those specific facts that are necessary to support the claim.' " *Id*. at 561 (quoting *Lujan v. National Wildlife Federation*, 497 U.S. 871, 889 (1990)).  "In response to a motion for summary judgment, however, the plaintiff can no longer rest upon such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts' Fed.R.Civ.Proc. 56(e), which for purposes of the summary judgment motion will be taken to be true." *Id.*  This court is persuaded that Plaintiffs in this case have set forth the necessary facts to have satisfied all three of the prerequisites listed above to establish standing.

16

To determine whether Plaintiffs have standing to challenge the constitutionality of the TSP, we must examine the nature of the injury-in-fact which they have alleged. "The injury must be ... 'distinct and palpable,' and not 'abstract' or 'conjectural' or 'hypothetical.'" *National Rifle Association of America v. Magaw*, 132 F.3d 272, 280 (6th Cir. 1997) (citing *Allen v. Wright,* 468 U.S 737, 751 (1982)).

Plaintiffs here contend that the TSP has interfered with their ability to carry out their professional responsibilities in a variety of ways, including that the TSP has had a significant impact on their ability to talk with sources, locate witnesses, conduct scholarship, engage in advocacy and communicate with persons who are outside of the United States, including in the Middle East and Asia. Plaintiffs have submitted several declarations to that effect. For example, scholars and journalists such as plaintiffs Tara McKelvey, Larry Diamond, and Barnett Rubin indicate that they must conduct extensive research in the Middle East, Africa, and Asia, and must communicate with individuals abroad whom the United States government believes to be terrorist suspects or to be associated with terrorist organizations.[12] In addition, attorneys Nancy Hollander, William Swor, Joshua Dratel, Mohammed Abdrabboh, and Nabih Ayad indicate that they must also communicate with individuals abroad whom the United States government believes to be terrorist suspects or to be associated with terrorist organizations,[13] and must discuss confidential information over the phone and email with their international clients.[14] All of the Plaintiffs contend that the TSP has caused clients, witnesses and sources to discontinue their communications with plaintiffs out of fear that

---

[12]SUF 15B (Exh. I, Diamond Decl. ¶9; Exh. K, McKelvey Decl. ¶8-10).

[13]SUF 15B (Exh. J, Hollander Decl. ¶¶12-14, 17-24; Exh. L, Swor Decl. ¶¶5-7, 10);Pl.'s Reply ( Exh. M, Dratel Decl. ¶¶5-6; Exh. Q, Abdrabboh Decl. ¶¶3-4; Exh. R, Ayad Decl. ¶¶ 5, 7-9).

[14]SUF 15 (Exh. J, Hollander Decl. ¶¶12, 16, 25; Exh. L, Swor Decl. ¶¶9, 11-12, 14-16); Pl.'s Reply (Exh. P, Dratel Decl. ¶¶5-6; Exh. Q, Abdrabboh Decl. ¶¶3-4; Exh. R, Ayad Decl. ¶¶ 6-7).

their communications will be intercepted.[15]  They also allege injury based on the increased financial burden they incur in having to travel substantial distances to meet personally with their clients and others relevant to their cases.[16]

The ability to communicate confidentially is an indispensable part of the attorney-client relationship.  As University of Michigan legal ethics professor Leonard Niehoff explains, attorney-client confidentiality is "central to the functioning of the attorney-client relationship and to effective representation."[17]  He further explains that Defendants' TSP "creates an overwhelming, if not insurmountable, obstacle to effective and ethical representation" and that although Plaintiffs are resorting to other "inefficient" means for gathering information, the TSP continues to cause "substantial and ongoing harm to the attorney-client relationships and legal representations."[18]  He explains that the increased risk that privileged communications will be intercepted forces attorneys to cease telephonic and electronic communications with clients to fulfill their ethical responsibilities.[19]

Defendants argue that the allegations present no more than a "chilling effect" based upon purely speculative fears that the TSP subjects the Plaintiffs to surveillance.  In arguing that the injuries are not constitutionally cognizable, Defendants rely heavily on the case of *Laird v. Tatum*, 408 U.S. 1 (1972).

---

[15]SUF 15 (Exh. J, Hollander Decl. ¶¶12, 16, 25; Exh. L, Swor Decl. ¶¶9, 11-12, 14-16);Pl.'s Reply (Exh. P, Dratel Decl. ¶¶9-11; Exh. Q, Abdrabboh Decl. ¶¶7-8; Exh. R. Ayad. Decl. ¶¶ 4, 6-8).

[16]SUF 15 (Exh. J, Hollander Decl. ¶¶20, 23-25; Exh. L, Swor Decl. ¶¶13-14); Pl.'s Reply (Exh. P, Dratel Decl. ¶¶9-11; Exh. Q, Abdrabboh Decl. ¶¶7-8; Exh. R, Ayad Decl. ¶¶ 6-8).

[17]Pl.'s Reply (Exh. M  Niehoff Decl. ¶¶ 12 )

[18]Pl.'s Reply (Exh. M  Niehoff Decl. ¶¶ 19-20 )

[19]Pl.'s Reply (Exh. M  Niehoff Decl. ¶¶ 15-20 )

In *Laird*, the plaintiffs sought declaratory and injunctive relief on their claim that their rights were being invaded by the Army's domestic surveillance of civil disturbances and "public activities that were thought to have at least some potential for civil disorder." *Id.* at 6. The plaintiffs argued that the surveillance created a chilling effect on their First Amendment rights caused by the existence and operation of the surveillance program in general. *Id.* at 3. The Supreme Court rejected the plaintiffs' efforts to rest standing upon the mere "chill" that the program cast upon their associational activities. It said that the "jurisdiction of a federal court may [not] be invoked by a complainant who alleges that the exercise of his First Amendment rights is being chilled by the mere existence, *without more*, of a governmental investigative and data-gathering activity." *Id.* (emphasis added)

*Laird*, however, must be distinguished here. The plaintiffs in *Laird* alleged only that they *could conceivably* become subject to the Army's domestic surveillance program. *Presbyterian Church v. United States*, 870 F.2d 518, 522 (1989) (citing *Laird v. Tatum*, 408 U.S at 13) (emphasis added). The Plaintiffs here are not merely alleging that they "could conceivably" become subject to surveillance under the TSP, but that continuation of the TSP has damaged them. The President indeed has publicly acknowledged that the types of calls Plaintiffs are making are the types of conversations that would be subject to the TSP.[20]

Although *Laird* establishes that a party's allegation that it has suffered a subjective "chill" alone does not confer Article III standing, *Laird* does not control this case. As Justice (then Judge)

---

[20]In December 2005, the President publicly acknowledged that the TSP intercepts the contents of certain communications as to which there are reasonable grounds to believe that (1) the communication originated or terminated outside the United States, and (2) a party to such communication is a member of al Qaeda, a member of a group affiliated with al Qaeda, or an agent of al Qaeda or its affiliates. Available at http://www.white-house.gov//news/releases/2005/12/20051219-2.html.

Breyer has observed, "[t]he problem for the government with Laird . . . lies in the key words 'without more.'" *Ozonoff v. Berzak*, 744 F.2d 224, 229 (1ˢᵗ Cir. 1984). This court agrees with Plaintiffs' position that "standing here does not rest on the TSP's 'mere existence, without more.'" The Plaintiffs in this case are not claiming simply that the Defendants' surveillance has "chilled" them from making international calls to sources and clients. Rather, they claim that Defendants' surveillance has chilled their sources, clients, and potential witnesses from communicating with them. The alleged effect on Plaintiffs is a concrete, actual inability to communicate with witnesses, sources, clients and others without great expense which has significantly crippled Plaintiffs, at a minimum, in their ability to report the news and competently and effectively represent their clients. See *Presbyterian Church v. United States*, 870 F.2d 518 (1989) (church suffered substantial decrease in attendance and participation of individual congregants as a result of governmental surveillance). Plaintiffs have suffered actual concrete injuries to their abilities to carry out their professional responsibilities. The direct injury and objective chill incurred by Plaintiffs are more than sufficient to place this case outside the limitations imposed by *Laird*.

The instant case is more akin to *Friends of the Earth,* in which the Court granted standing to environmental groups who sued a polluter under the Clean Water Act because environmental damage caused by the defendant had deterred members of the plaintiff organizations from using and enjoying certain lands and rivers. *Friends of the Earth*, 528 U.S. at 181-183. The Court there held that the affidavits and testimony presented by plaintiffs were sufficient to establish reasonable concerns about the effects of those discharges and were more than "general averments" and "conclusory allegations." *Friends of the Earth*, 528 U.S. at 183-184. The court distinguished the case from *Lujan,* in which the Court had held that no actual injury had been established where

plaintiffs merely indicated "'some day' intentions to visit endangered species around the world." *Friends of the Earth*, 528 U.S. at 184 (quoting *Lujan*, 504 U.S. at 564). The court found that the affiants' conditional statements that they would use the nearby river for recreation if defendant were not discharging pollutants into it was sufficient to establish a concrete injury. *Id*. at 184.

Here, Plaintiffs are not asserting speculative allegations. Instead, the declarations asserted by Plaintiffs establish that they are suffering a present concrete injury in addition to a chill of their First Amendment rights. Plaintiffs would be able to continue using the telephone and email in the execution of their professional responsibilities if the Defendants were not undisputedly and admittedly conducting warrantless wiretaps of conversations. As in *Friends of the Earth,* this damage to their interest is sufficient to establish a concrete injury.

Numerous cases have granted standing where the plaintiffs have suffered concrete profession-related injuries comparable to those suffered by Plaintiffs here. For example, the First Circuit conferred standing upon claimants who challenged an executive order which required applicants for employment with the World Health Organization to undergo a "loyalty" check that included an investigation into the applicant's associations and activities. The court there determined that such an investigation would have a chilling effect on what an applicant says or does, a sufficient injury to confer standing. *Ozonoff,* 744 F.2d at 228-229. Similarly, the District of Columbia Circuit Court of Appeals granted standing to a reshelver of books at the Library of Congress who was subjected to a full field FBI investigation which included an inquiry into his political beliefs and associations and subsequently resulted in his being denied a promotion or any additional employment opportunities; the court having determined that plaintiff had suffered a present objective harm, as well as an objective chill of his First Amendment rights and not merely a

21

potential subjective chill as in *Laird.*  Also, the Supreme Court in *Presbyterian Church v. United States*, granted standing to a church which suffered decreased attendance and participation when the government actually entered the church to conduct surveillance.  *Presbyterian Church,* 870 F.2d at 522.  Lastly, in *Jabara v. Kelley*, 476 F.Supp. 561 (E.D. Mich. 1979), *vac'd on other grounds sub. nom. Jabara v. Webster*, 691 F.2d 272 (6th Cir. 1982), the court held that an attorney had standing to sue to enjoin unlawful FBI and NSA surveillance which had deterred others from associating with him and caused "injury to his reputation and legal business."  *Id.* at 568.

These cases constitute acknowledgment that substantial burdens upon a plaintiff's professional activities are an injury sufficient to support standing.  Defendants ignore the significant, concrete injuries which Plaintiffs continue to experience from Defendants' illegal  monitoring of their telephone conversations and email communications.  Plaintiffs undeniably have cited to distinct, palpable, and substantial injuries that have resulted from the TSP.

This court finds that the injuries alleged by Plaintiffs are "concrete and particularized", and not "abstract or conjectural."  The TSP is not hypothetical, it is an actual surveillance program that was admittedly instituted after September 11, 2001, and has been reauthorized by the President more than thirty times since the attacks.[21]   The President has, moreover, emphasized that he intends to continue to reauthorize the TSP indefinitely.[22]  Further, the court need not speculate upon the kind of activity the Plaintiffs want to engage in - they want to engage in conversations with individuals abroad without fear that their First Amendment rights are being infringed upon.  Therefore, this court concludes that Plaintiffs have satisfied the requirement of alleging "actual or threatened

---

[21]Available at http://www.white-house.gov//news/releases/2005/12/20051219-2.html

[22]*Id.*

injury" as a result of Defendants' conduct.

It must now be determined whether Plaintiffs have shown that there is a causal connection between the injury and the complained of conduct. *Lujan*, 504 U.S. at 560-561. The causal connection between the injury and the conduct complained of is fairly traceable to the challenged action of Defendants. The TSP admittedly targets communications originated or terminated outside the United States where a party to such communication is in the estimation of Defendants, a member of al Qaeda, a member of a group affiliated with al Qaeda, or an agent of al Qaeda or its affiliates.[23] The injury to the Plaintiffs stems directly from the TSP and their injuries can unequivocally be traced to the TSP.

Finally, it is likely that the injury will be redressed by the requested relief. A determination by this court that the TSP is unconstitutional and a further determination which enjoins Defendants from continued warrantless wiretapping in contravention of FISA would assure Plaintiffs and others that they could freely engage in conversations and correspond via email without concern, at least without notice, that such communications were being monitored. The requested relief would thus redress the injury to Plaintiffs caused by the TSP.

Although this court is persuaded that Plaintiffs have alleged sufficient injury to establish standing, it is important to note that if the court were to deny standing based on the unsubstantiated minor distinctions drawn by Defendants, the President's actions in warrantless wiretapping, in contravention of FISA, Title III, and the First and Fourth Amendments, would be immunized from judicial scrutiny. It was never the intent of the Framers to give the President such unfettered control, particularly where his actions blatantly disregard the parameters clearly enumerated in the Bill of

---

[23]Available at http://www.white-house.gov//news/releases/2005/12/20051219-2.html

Rights.  The three separate branches of government were developed as a check and balance for one another.   It is within the court's duty to ensure that power is never "condense[d] ... into a single branch of government." *Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004) (plurality opinion).  We must always be mindful that "[w]hen the President takes official action, the Court has the authority to determine whether he has acted within the law." *Clinton v. Jones*, 520 U.S. 681, 703 (1997).   "It remains one of the most vital functions of this Court to police with care the separation of the governing powers . . . . When structure fails, liberty is always in peril." *Public Citizen v. U.S. Dept. of Justice*, 491 U.S. 440, 468 (1989) (Kennedy, J., concurring).

Because of the very secrecy of the activity here challenged, Plaintiffs each must be and are given standing to challenge it, because each of them, is injured and chilled substantially in the exercise of First Amendment rights so long as it continues.  Indeed, as the perceived need for secrecy has apparently required that no person be notified that he is aggrieved by the activity, and there have been no prosecutions, no requests for extensions or retroactive approvals of warrants, no victim in America would be given standing to challenge this or any other unconstitutional activity, according to the Government.  The activity has been acknowledged, nevertheless.

Plaintiffs have sufficiently alleged that they suffered an actual, concrete injury traceable to Defendants and redressable by this court.  Accordingly, this court denies Defendants' motion to dismiss for lack of standing.

### IV.  The History of Electronic Surveillance in America

Since the Court's 1967 decision of *Katz v. U.S.,* 389 U.S. 347 (1967), it has been understood that the search and seizure of private telephone conversations without physical trespass required

24

prior judicial sanction, pursuant to the Fourth Amendment.  Justice Stewart there wrote for the Court that searches conducted without prior approval by a judge or magistrate were per se unreasonable, under the Fourth Amendment.  *Id.* at 357.

Congress then, in 1968, enacted Title III of the Omnibus Crime Control and Safe Streets Act (hereinafter "Title III")[24] governing all wire and electronic interceptions in the fight against certain listed major crimes.  The Statute defined an " aggrieved person",[25] and gave such person standing to challenge any interception allegedly made without a judicial order supported by probable cause, <u>after</u> requiring notice to such person of any interception made.[26]

The statute also stated content requirements for warrants and applications under oath therefor made,[27] including time, name of the target, place to be searched and proposed duration of that search, and provided that upon showing of an emergency situation, a post-interception warrant could be obtained within forty-eight hours.[28]

In 1972 the court decided *U.S. v. U.S. District Court*, 407 U.S. 297 (1972) (the *Keith* case) and held that, for lawful electronic surveillance even in domestic security matters, the Fourth Amendment requires a prior warrant.

In 1976 the Congressional "Church Committee"[29] disclosed that every President since 1946

---

[24]Pub. L. 90-351, 82 Stat. 211, codified as amended at 18 U.S.C. §§ 2510 *et seq.*

[25]18 U.S.C. § 2510(11) ("aggrieved person" means a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed.)

[26]18 U.S.C. § 2518

[27]18 U.S.C. § 2518(1)

[28]18 U.S.C. § 2518(7)

[29]The "Church Committee" was the United States Committee to Study Governmental Operations with Respect to Intelligence Activities.

had engaged in warrantless wiretaps in the name of national security, and that there had been numerous political abuses[30], and in 1978 Congress enacted the FISA.[31]

Title III specifically excluded from its coverage all interceptions of international or foreign communications; and was later amended to state that "the FISA of 1978 shall be the exclusive means by which electronic surveillance of foreign intelligence communications may be conducted."[32]

The government argues that Title III's disclaimer language, at 18 U.S.C. § 2511(2)(f), that nothing therein should be construed to limit the constitutional power of the President (to make international wiretaps). In the *Keith* case, Justice Powell wrote that "Congress simply left Presidential powers where it found them", that the disclaimer was totally neutral, and not a grant of authority. *U.S. v. U.S. District Court*, 407 U.S. at 303.

The FISA defines a "United States person"[33] to include each of Plaintiffs herein and requires a prior warrant for any domestic international interception of their communications. For various exigencies, exceptions are made. That is, the government is granted fifteen days from Congressional Declaration of War within which it may conduct intercepts before application for an order.[34] It is also granted one year, on certification by the Attorney General,[35] and seventy-two hours for other

---

[30]S. REP. NO. 94-755, at 332 (1976)

[31]Pub. L. 95-511, Title I, 92 Stat 1976 (Oct. 25, 1978), codified as amended at 50 U.S.C. §§ 1801 *et seq*.

[32]18 U.S.C. §2511(2)(f)

[33]50 U.S.C. § 1801(h)(4)(i)("United States person) means a citizen of the United States, an alien lawfully admitted for permanent residence, an unincorporated association a substantial number of members of which are citizens of the United States or aliens lawfully admitted for permanent residence, or a corporation which is incorporated in the United States which is not a foreign power.

[34]50 U.S.C. § 1811

[35]50 U.S.C. § 1802

26

defined exigencies.[36]

Those delay provisions clearly reflect the Congressional effort to balance executive needs against the privacy rights of United States persons, as recommended by Justice Powell in the *Keith* case when he stated that:

> Different standards may be compatible with the Fourth Amendment if they are reasonable both in relation to the legitimate need of Government for intelligence information and the protected rights of our citizens.. *U.S. v. U.S. District Court*, 407 U.S. at 322-323.

Also reflective of the balancing process Congress pursued in FISA is the requirement that interceptions may be for no longer than a ninety day duration, minimization is again required[37], and an aggrieved person is again (as in Title III) required to be notified of proposed use and given the opportunity to file a motion to suppress.[38]  Also again, alternatives to a wiretap must be found to have been exhausted or to have been ineffective.[39]

A FISA judicial warrant, moreover, requires a finding of probable cause to believe that the target was either a foreign power or agent thereof,[40] not that a crime had been or would be committed, as Title III's more stringent standard required.  Finally, a special FISA court was required to be appointed, of federal judges designated by the Chief Justice.[41]  They were required to hear, *ex parte*, all applications and make all orders.[42]

---

[36] 50 U.S.C. § 1805(f)

[37] 50 U.S.C. § 1805(e)(1)

[38] 50 U.S.C. § 1806(c)

[39] 50 U.S.C. § 1804(a)(7)(E)(ii), § 1805(a)(5)

[40] 50 U.S.C. § 1805(b)

[41] 50 U.S.C § 1803

[42] 50 U.S.C § 1805

The FISA was essentially enacted to create a secure framework by which the Executive branch may conduct legitimate electronic surveillance for foreign intelligence while meeting our national commitment to the Fourth Amendment.  It is fully described in *United States v. Falvey*, 540 F. Supp. 1306 (E.D.N.Y. 1982), where the court held that FISA did not intrude upon the President's undisputed right to conduct foreign affairs, but protected citizens and resident aliens within this country, as "United States persons."  *Id.* at 1312.

The Act was subsequently found to meet Fourth Amendment requirements constituting a reasonable balance between Governmental needs and the protected rights of our citizens, in *United States v. Cavanagh*, 807 F.2d 787 (9th Cir. 1987), and *United States v. Duggan*, 743, F.2d 59 (2d Cir. 1984).

Against this background the present program of warrantless wiretapping has been authorized by the administration and the present lawsuit filed.

### V.  The Fourth Amendment

The Constitutional Amendment which must first be discussed provides:

> The right the of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. Amend. IV.

This Amendment  ". . . was specifically propounded and ratified with the memory of . . . *Entick v. Carrington*, 95 Eng. Rep. 807 (1765) in mind", stated Circuit Judge Skelly Wright in *Zweibon v. Mitchell*, 516 F.2d 594, 618 n.67 (D.C. Circ. 1975) (en banc) (plurality opinion).  Justice Douglas, in his concurrence in the *Keith* case, also noted the significance of *Entick* in our history,

stating:

> For it was such excesses as the use of general warrants and the writs of assistance that led to the ratification of the Fourth Amendment. In *Entick v. Carrington* (citation omitted), decided in 1765, one finds a striking parallel to the executive warrants utilized here. The Secretary of State had issued general executive warrants to his messengers authorizing them to roam about and to seize libelous material and libellants of the sovereign. Entick, a critic of the Crown, was the victim of one such general search during which his seditious publications were impounded. He brought a successful damage action for trespass against the messengers. The verdict was sustained on appeal. Lord Camden wrote that if such sweeping tactics were validated, then the secret cabinets and bureaus of every subject in this kingdom will be thrown open to the search and inspection of a messenger, whenever the secretary of state shall think fit to charge, or even to suspect, a person to be the author, printer, or publisher of a seditious libel.' (citation omitted) In a related and similar proceeding, *Huckle v. Money* (citation omitted), the same judge who presided over Entick's appeal held for another victim of the same despotic practice, saying '(t)o enter a man's house by virtue of a nameless warrant, in order to procure evidence, is worse than the Spanish Inquisition . . .' See also *Wilkes v. Wood* (citation omitted), . . . [t]he tyrannical invasions described and assailed in *Entick*, *Huckle*, and *Wilkes*, practices which also were endured by the colonists, have been recognized as the primary abuses which ensured the Warrant Clause a prominent place in our Bill of Rights. *U.S. v. U.S. District Court*, 407 U.S. at 328-329 (Douglas, J., concurring).

Justice Powell, in writing for the court in the *Keith* case also wrote that:

> Over two centuries ago, Lord Mansfield held that common-law principles prohibited warrants that ordered the arrest of unnamed individuals who the officer might conclude were guilty of seditious libel. 'It is not fit,' said Mansfield, 'that the receiving or judging of the information should be left to the discretion of the officer. The magistrate ought to judge; and should give certain directions to the officer.' (citation omitted).

> Lord Mansfield's formulation touches the very heart of the Fourth Amendment directive: that, where practical, a governmental search and seizure should represent both the efforts of the officer to gather evidence of wrongful acts and the judgment of the magistrate that the collected evidence is sufficient to justify invasion of a citizen's

29

> private premises or conversation.  Inherent in the concept of a
> warrant is its issuance by a 'neutral and detached magistrate.'
> (citations omitted)  The further requirement of 'probable cause'
> instructs the magistrate that baseless searches shall not proceed.  *U.S.
> v. U.S. District Court*, 407 U.S. at 316.

The Fourth Amendment, accordingly, was adopted to assure that Executive abuses of the

power to search would not continue in our new nation.

Justice White wrote in 1984 in *United States v. Karo*, 468 U.S. 705 (1984), a case involving

installation and monitoring of a beeper which had found its way into a home, that a private residence

is a place in which society recognizes an expectation of privacy; that warrantless searches of such

places are presumptively unreasonable, absent exigencies.  *Id.* at 714-715.  *Karo* is consistent with

*Katz* where Justice Stewart held that:

> 'Over and again this Court has emphasized that the mandate of the
> (Fourth) Amendment requires adherence to judicial processes,'
> (citation omitted) and that searches conducted outside the judicial
> process, without prior approval by judge or magistrate, are per se
> unreasonable under the Fourth Amendment - subject only to a few
> specifically established and well-delineated exceptions.  *Katz,* 389
> U.S. at 357.

Justice Powell's opinion in the *Keith* case also stated that:

> The Fourth Amendment does not contemplate the executive officers
> of Government as neutral and disinterested magistrates.  Their duty
> and responsibility are to enforce the laws, to investigate, and to
> prosecute. (citation omitted)   But those charged with this
> investigative and prosecutorial duty should not be the sole judges of
> when to utilize constitutionally sensitive means in pursuing their
> tasks.   The historical judgment, which the Fourth Amendment
> accepts, is that unreviewed executive discretion may yield too readily
> to pressures to obtain incriminating evidence and overlook potential
> invasions of privacy and protected speech.  *U.S. v. U.S. District
> Court*, 407 U.S. at 317.

Accordingly, the Fourth Amendment, about which much has been written, in its few words requires

30

reasonableness in all searches. It also requires prior warrants for any reasonable search, based upon prior-existing probable cause, as well as particularity as to persons, places, and things, and the interposition of a neutral magistrate between Executive branch enforcement officers and citizens.

In enacting FISA, Congress made numerous concessions to stated executive needs. They include delaying the applications for warrants until after surveillance has begun for several types of exigencies, reducing the probable cause requirement to a less stringent standard, provision of a single court of judicial experts, and extension of the duration of approved wiretaps from thirty days (under Title III) to a ninety day term.

All of the above Congressional concessions to Executive need and to the exigencies of our present situation as a people, however, have been futile. The wiretapping program here in litigation has undisputedly been continued for at least five years, it has undisputedly been implemented without regard to FISA and of course the more stringent standards of Title III, and obviously in violation of the Fourth Amendment.

The President of the United States is himself created by that same Constitution.

### VI. The First Amendment

The First Amendment provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

U.S. CONST. Amend. I.

This Amendment, the very first which the American people required to be made to the new Constitution, was adopted, as was the Fourth, with *Entick v. Carrington*, and the actions of the star chamber in mind. As the Court wrote in *Marcus v. Search Warrants,* 367 U.S. 717 (1961):

31

> Historically the struggle for freedom of speech and press in England
> was bound up with the issue of the scope of the search and seizure.
> . . .
>
> * * * *
>
> This history was, of course, part of the intellectual matrix within
> which our own constitutional fabric was shaped. The Bill of Rights
> was fashioned against the background of knowledge that unrestricted
> power of search and seizure could also be an instrument for stifling
> liberty of expression. *Marcus,* 367 U.S. at 724, 729

As Justice Brennan wrote for the Court in *Dombrowski v. Pfister,* 380 U.S. 479 (1965), the

appellant organizations had been subjected to repeated announcements of their subversiveness which

frightened off potential members and contributors, and had been harmed irreparably, requiring

injunctive relief. The Louisiana law against which they complained, moreover, had a chilling effect

on protected expression because, so long as the statute was available, the threat of prosecution for

protected expression remained real and substantial.

Judge Wright, in *Zweibon,* noted that the tapping of an organization's office phone will

provide the membership roster of that organization, as forbidden by *Bates v. City of Little Rock*, 361

U.S. 516 (1960); thereby causing members to leave that organization, and thereby chilling the

organization's First Amendment rights and causing the loss of membership. *Zweibon*, 516 F.2d at

634.

A governmental action to regulate speech may be justified only upon showing of a

compelling governmental interest; and that the means chosen to further that interest are the least

restrictive of freedom of belief and association that could be chosen. *Clark v. Library of Congress,*

750 F.2d 89, 94 (D.C. Cir. 1984).

It must be noted that FISA explicitly admonishes that ". . . no United States person may be

considered . . . an agent of a foreign power solely upon the basis of activities protected by the First

Amendment to the Constitution of the United States." 50 U.S.C. §1805(a)(3)(A).  See also *United*

*States v. Falvey*, 540 F. Supp. at 1310.

Finally, as Justice Powell wrote for the Court in the *Keith* case*:*

> National security cases, moreover, often reflect a convergence of
> First and Fourth Amendment values not present in cases of 'ordinary'
> crime.  Though the investigative duty of the executive may be
> stronger in such cases, so also is there greater jeopardy to
> constitutionally protected speech.  'Historically the struggle for
> freedom of speech and press in England was bound up with the issue
> of the scope of the search and seizure power,' (citation omitted).
> History abundantly documents the tendency of Government
> –however benevolent and benign its motives – to view with suspicion
> those who most fervently dispute its policies.  Fourth Amendment
> protections become the more necessary when the targets of official
> surveillance may be those suspected of unorthodoxy in their political
> beliefs.  *U.S. v. U.S. District Court*, 407 U.S. at 313-314.

The President of the United States, a creature of the same Constitution which gave us these

Amendments, has undisputedly violated the Fourth in failing to procure judicial orders as required

by FISA, and accordingly has violated the First Amendment Rights of these Plaintiffs as well.

## VII.  The Separation of Powers

The Constitution of the United States provides that "[a]ll legislative Powers herein granted

shall be vested in a Congress of the United States. . . ."[43]  It further provides that "[t]he executive

Power shall be vested in a President of the United States of America."[44]  And that ". . . he shall take

care that the laws be faithfully executed . . . ."[45]

---

[43]U.S. Const. art. I, § 1

[44]U.S. Const. art. II, § 1

[45]U.S. Const. art. II, § 3

Our constitution was drafted by founders and ratified by a people who still held in vivid memory the image of King George III and his General Warrants.  The concept that each form of governmental power should be separated was a well-developed one.  James Madison wrote that:

> The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny.  THE FEDERALIST NO. 47, at 301 (James Madison).

The seminal American case in this area, and one on which the government appears to rely, is that of *Youngstown Sheet & Tube v. Sawyer*, 343 U.S. 579 (1952) in which Justice Black, for the court, held that the Presidential order in question, to seize steel mills, was not within the constitutional powers of the chief executive.  Justice Black wrote that:

> The founders of this Nation entrusted the law-making power to the Congress alone in both good and bad times.  It would do no good to recall the historical events, the fears of power and the hopes for freedom that lay behind their choice.  Such a review would but confirm our holding that this seizure order cannot stand. *Youngstown*, 343 U.S. at 589.

Justice Jackson's concurring opinion in that case has become historic.  He wrote that, although the Constitution had diffused powers the better to secure liberty, the powers of the President are not fixed, but fluctuate, depending upon their junctures with the actions of Congress.  Thus, if the President acted pursuant to an express or implied authorization by Congress, his power was at it maximum, or zenith.  If he acted in absence of Congressional action, he was in a zone of twilight reliant upon only his own independent powers.  *Youngstown*, 343 U.S. at 636-638.  But "when the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for he can rely only upon his own Constitutional powers minus any Constitutional powers of Congress over the matter." *Youngstown*, 343 U.S. at 637 (Jackson, J.,

34

concurring).

In that case, he wrote that it had been conceded that no congressional authorization existed for the Presidential seizure.  Indeed, Congress had several times covered the area with statutory enactments inconsistent with the seizure.  He further wrote of the President's powers that:

> The example of such unlimited executive power that must have most impressed the forefathers was the prerogative exercised by George III, and the description of its evils in the Declaration of Independence leads me to doubt that they were creating their new Executive in his image.  Continental European examples were no more appealing. And if we seek instruction from our own times, we can match it only from the executive powers in those governments we disparagingly describe as totalitarian.  I cannot accept the view that this clause is a grant in bulk of all conceivable executive power but regard it as an allocation to the presidential office of the generic powers thereafter stated. *Id.* at 641.

After analyzing the more recent experiences of Weimar, Germany, the French Republic, and Great Britain, he wrote that:

> This contemporary foreign experience may be inconclusive as to the wisdom of lodging emergency powers somewhere in a modern government.  But it suggests that emergency powers are consistent with free government only when their control is lodged elsewhere than in the Executive who exercises them.  That is the safeguard that would be nullified by our adoption of the 'inherent powers' formula. Nothing in my experience convinces me that such risks are warranted by any real necessity, although such powers would, of course, be an executive convenience.  *Id.* at 652.

Justice Jackson concluded that:

> With all its defects, delays and inconveniences, men have discovered no technique for long preserving free government except that the Executive be under the law, and that the law be made by parliamentary deliberations. *Youngstown*, 343 U.S. at 655 (Jackson, J., concurring).

Accordingly, Jackson concurred, the President had acted unlawfully.

35

In this case, the President has acted, undisputedly, as FISA forbids.  FISA is the expressed statutory policy of our Congress.  The presidential power, therefore, was exercised at its lowest ebb and cannot be sustained.

In *United States v. Moussaoui*, 365 F.3d 292 (4th Cir. 2004) a prosecution in which production of enemy combatant witnesses had been refused by the government and the doctrine of Separation of Powers raised, the court, citing *Mistretta v. United States*, 488 U.S. 361 (1989), noted that it:

> "[C]onsistently has given voice to, and has reaffirmed, the central judgment of the Framers of the Constitution that, within our political scheme, the separation of governmental powers into three coordinate Branches is essential to the preservation of liberty."  *United States v. Moussaoui*, 365 F.3d at 305 citing *Mistretta v. United States*, 488 U.S. 361, 380 (1989)

Finally, in the case of *Clinton v. Jones*, 520 U.S. 681 (1997), the separation of powers doctrine is again discussed and, again,  some overlap of the authorities of two branches is permitted. In that case, although Article III jurisdiction of the federal courts is found intrusive and burdensome to the Chief Executive it did not follow, the court held, that separation of powers principles would be violated by allowing a lawsuit against the Chief Executive to proceed.  *Id.* at 701.  Mere burdensomeness or inconvenience did not rise to the level of superceding the doctrine of separation of powers.  *Id.* at 703.

In this case, if the teachings of *Youngstown* are law, the separation of powers doctrine has been violated.  The President, undisputedly, has violated the provisions of FISA for a five-year period.  Justice Black wrote, in *Youngstown*:

> Nor can the seizure order be sustained because of the several constitutional provisions that grant executive power to the President.

36

> In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker. The Constitution limits his functions in the lawmaking process to the recommending of laws he thinks wise and the vetoing of laws he thinks bad. And the Constitution is neither silent nor equivocal about who make laws which the President is to execute. The first section of the first article says that 'All legislative powers herein granted shall be vested in a Congress of the United States * * *'
>
> The President's order does not direct that a congressional policy be executed in a manner prescribed by Congress – it directs that a presidential policy be executed in a manner prescribed by the President. . . . The Constitution did not subject this law-making power of Congress to presidential or military supervision or control. *Youngstown*, 343 U.S. at 587-588.

These secret authorization orders must, like the executive order in that case, fall. They violate the Separation of Powers ordained by the very Constitution of which this President is a creature.

### VIII.   The Authorization for Use of Military Force

After the terrorist attack on this Country of September 11, 2001, the Congress jointly enacted the Authorization for Use of Military Force (hereinafter "AUMF") which states:

> That the President is authorized to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons.[46]

The Government argues here that it was given authority by that resolution to conduct the TSP in violation of both FISA and the Constitution.

First, this court must note that the AUMF says nothing whatsoever of intelligence or

---

[46]Authorization for Use of Military Force, Pub. L. No. 107-40, § 2(a), 115 Stat. 224 (Sept. 18, 2001) (reported as a note to 50 U.S.C.A. § 1541).

37

surveillance.  The government argues that such authority must be implied.  Next it must be noted that FISA and Title III, are together by their terms denominated by Congress as the exclusive means by which electronic surveillance may be conducted.  Both statutes have made abundantly clear that prior warrants must be obtained from the FISA court for such surveillance, with limited exceptions, none of which are here even raised as applicable.  Indeed, the government here claims that the AUMF has by implication granted its TSP authority for more than five years, although FISA's longest exception, for the Declaration of War by Congress, is only fifteen days from date of such a Declaration.[47]

FISA's history and content, detailed above, are highly specific in their requirements, and the AUMF, if construed to apply at all to intelligence is utterly general.  In *Morales v. TWA, Inc.,* 504 U.S. 374 (1992), the Supreme Court taught us that "it is a commonplace of statutory construction that the specific governs the general."  *Id.* at 384.  The implication argued by Defendants, therefore, cannot be made by this court.

The case of *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) in which the Supreme Court held that a United States citizen may be held as an enemy combatant, but is required by the U.S. Constitution to be given due process of law, must also be examined.  Justice O'Connor wrote for the court that:

> [D]etention of individuals . . . for the duration of the particular conflict in which they are captured is so fundamental and accepted an incident to war as to be an exercise of the "necessary and appropriate force" Congress has authorized the President to use.  *Hamdi*, 542 U.S. at 518.

She wrote that the entire object of capture is to prevent the captured combatant from returning to his same enemy force, and that a prisoner would most certainly return to those forces

---

[47]50 U.S.C. § 1811

if set free.  Congress had, therefore, clearly authorized detention by the Force Resolution.  *Id*. at 518-519.

However, she continued, indefinite detention for purposes of interrogation was certainly not authorized and  it raised the question of what process is constitutionally due to a citizen who disputes the enemy combatant status assigned him.  *Hamdi*, 542 U.S. at 521, 524.

Justice O'Connor concluded that such a citizen must be given Fifth Amendment rights to contest his classification, including notice and the opportunity to be heard by a neutral decisionmaker.  *Hamdi*, 542 U.S. at 533 (citing *Cleveland Board of Education v. Laudermill*, 470 U.S. 532 (1985)).  Accordingly, her holding was that the Bill of Rights of the United States Constitution must be applied despite authority granted by the AUMF.

She stated that:

> It is during our most challenging and uncertain moments that our Nation's commitment to due process is most severely tested; and it is in those times that we must preserve our commitment at home to the principles for which we fight abroad.
>
> * * * *
>
> Any process in which the Executive's factual assertions go wholly unchallenged or are simply presumed correct without any opportunity for the alleged combatant to demonstrate otherwise falls constitutionally short.  *Hamdi*, 542 U.S. at 532, 537.

Under *Hamdi*, accordingly, the Constitution of the United States must be followed.

The AUMF resolution, if indeed it is construed as replacing FISA, gives no support to Defendants here.  Even if that Resolution superceded all other statutory law, Defendants have violated the Constitutional rights of their citizens including the First Amendment, Fourth Amendment, and the Separation of Powers doctrine.

39

### IX.  Inherent Power

Article II of the United States Constitution provides that any citizen of appropriate birth, age and residency may be elected to the Office of President of the United States and be vested with the executive power of this nation.[48]

The duties and powers of the Chief Executive are carefully listed, including the duty to be Commander in Chief of the Army and Navy of the United States,[49] and the Presidential Oath of Office is set forth in the Constitution and requires him to swear or affirm that he "will, to the best of my ability, preserve, protect and defend the Constitution of the United States."[50]

The Government appears to argue here that, pursuant to the penumbra of Constitutional language in Article II, and particularly because the President is designated Commander in Chief of the Army and Navy, he has been granted the inherent power to violate not only the laws of the Congress but the First and Fourth Amendments of the Constitution, itself.

We must first note that the Office of the Chief Executive has itself been created, with its powers, by the Constitution.  There are no hereditary Kings in America and no powers not created by the Constitution.  So all "inherent powers" must derive from that Constitution.

We have seen in *Hamdi* that the Fifth Amendment of the United States Constitution is fully applicable to the Executive branch's actions and therefore it can only follow that the First and Fourth Amendments must be applicable as well.[51]  In the *Youngstown* case the same "inherent powers" argument was raised and the Court noted that the President had been created Commander in Chief

---

[48]U.S. Const. art. II, § 5

[49]U.S. Const. art. II, § 2[1]

[50]U.S. Const. art. II, § 1[8]

[51]See generally *Hamdi*, 542 U.S. 507 (2004)

40

of only the military, and not of all the people, even in time of war.[52]  Indeed, since *Ex Parte Milligan*, we have been taught that the "Constitution of the United States is a law for rulers and people, equally in war and in peace. . . ."  *Ex Parte Milligan*, 71 U.S. (4 Wall.) 2, 120 (1866).  Again, in *Home Building & Loan Ass'n v. Blaisdell*, we were taught that no emergency can create power.[53]

Finally, although the Defendants have suggested the unconstitutionality of FISA, it appears to this court that that question is here irrelevant.  Not only FISA, but the Constitution itself has been violated by the Executive's TSP.  As the court states in *Falvey*, even where statutes are not explicit, the requirements of the Fourth Amendment must still be met.[54]  And of course, the *Zweibon* opinion of Judge Skelly Wright plainly states that although many cases hold that the President's power to obtain foreign intelligence information is vast, none suggest that he is immune from Constitutional requirements.[55]

The argument that inherent powers justify the program here in litigation must fail.

## X.  *Practical Justifications for Exemption*

First, it must be remembered that both Title III and FISA permit delayed applications for warrants, after surveillance has begun.  Also, the case law has long permitted law enforcement action to proceed in cases in which the lives of officers or others are threatened in cases of "hot pursuit", border searches, school locker searches, or where emergency situations exist.  See generally *Warden v. Hayden*, 387 U.S. 294 (1967); *Veronia School District v. Acton*, 515 U.S. 646

---

[52]See generally *Youngstown*, 343 U.S. 579 (1952)

[53]See generally *Home Building & Loan Ass'n v. Blaisdell*, 290 U.S. 398 (1934)

[54]See generally *Falvey*, 540 F. Supp. 1306 (E.D.N.Y. 1982)

[55]See generally *Zweibon*, 516 F.2d 594 (D.C. Circ. 1975)

(1995); and *Michigan Department of State Police v. Sitz*, 496 U.S. 444 (1990).

Indeed, in *Zweibon*, Judge Wright enumerates a number of Defendants' practical arguments here (including judicial competence, danger of security leaks, less likelihood of criminal prosecution, delay, and the burden placed upon both the courts and the Executive branch by compliance) and finds, after long and careful analysis, that none constitutes adequate justification for exemption from the requirements of either FISA or the Fourth Amendment. *Zweibon*, 516 F.2d at 641.  It is noteworthy, in this regard, that Defendants here have sought no Congressional amendments which would remedy practical difficulty.

As long ago as the *Youngstown* case, the Truman administration argued that the cumbersome procedures required to obtain warrants made the process unworkable.[56]  The *Youngstown* court made short shift of that argument and, it appears, the present Defendants' need for speed and agility is equally weightless.  The Supreme Court in the *Keith*[57], as well as the *Hamdi*[58] cases, has attempted to offer helpful solutions to the delay problem, all to no avail.

### XI.  Conclusion

For all of the reasons outlined above, this court is constrained to grant to Plaintiffs the Partial Summary Judgment requested, and holds that the TSP violates the APA; the Separation of Powers doctrine; the First and Fourth Amendments of the United States Constitution; and the statutory law.

Defendants' Motion to Dismiss the final claim of data-mining is granted, because litigation of that claim would require violation of Defendants' state secrets privilege.

---

[56]See generally *Youngstown*, 343 U.S. 579 (1952)

[57]See generally *U.S. v. U.S. District Court*, 407 U.S. 297 (1972)

[58]See generally *Hamdi*, 542 U.S. 507 (2004)

The Permanent Injunction of the TSP requested by Plaintiffs is granted inasmuch as each of the factors required to be met to sustain such an injunction have undisputedly been met.[59]  The irreparable injury necessary to warrant injunctive relief is clear, as the First and Fourth Amendment rights of Plaintiffs are violated by the TSP.  See *Dombrowski v. Pfister*, 380 U.S. 479 (1965).  The irreparable injury conversely sustained by Defendants under this injunction may be rectified by compliance with our Constitution and/or statutory law, as amended if necessary.  Plaintiffs have prevailed, and the public interest is clear, in this matter.  It is the upholding of our Constitution.

As Justice Warren wrote in *U.S. v. Robel*, 389 U.S. 258 (1967):

> Implicit in the term 'national defense' is the notion of defending those values and ideas which set this Nation apart. . . . It would indeed be ironic if, in the name of national defense, we would sanction the subversion of . . . those liberties . . . which makes the defense of the Nation worthwhile.  *Id.* at 264.

IT IS SO ORDERED.

Date: <u>August 17, 2006</u>     s/Anna Diggs Taylor
   Detroit, Michigan      ANNA DIGGS TAYLOR
               UNITED STATES DISTRICT JUDGE

---

[59]It is well-settled that a plaintiff seeking a permanent injunction must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. *eBay Inc. v. MercExchange, L.L.C.* 126 S.Ct. 1837, 1839 (2006).  Further, "[a] party is entitled to a permanent injunction if it can establish that it suffered a constitutional violation and will suffer "continuing irreparable injury" for which there is no adequate remedy at law."  *Women's Medical Professional Corp. v. Baird,* 438 F.3d 595, 602 (6th Cir. 2006).

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing *Memorandum Order* was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail disclosed on the Notice of Electronic Filing on **August 17, 2006**.

s/Johnetta M. Curry-Williams
Case Manager